## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTHER DAKOTA
## WESTERN DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE and their members, OGLALA SIOUX TRIBE and their members, and FOUR DIRECTIONS, INC., | Case No.   20-cv-5058 |
| *Plaintiffs,* | |
| v. | **COMPLAINT** |
| STEVE BARNETT, in his official capacity as Secretary of State for the State of South Dakota and Chairperson of the South Dakota State Board of Elections; LAURIE GILL, in her official capacity as Cabinet Secretary for the South Dakota Department of Social Services; MARCIA HULTMAN, in her official capacity as Cabinet Secretary for the South Dakota Department of Labor and Regulation; and CRAIG PRICE, in his official capacity as Cabinet Secretary for the South Dakota Department of Public Safety, | |
| *Defendants.* | |

///

1

**INTRODUCTION**

1.      Plaintiffs, the Rosebud Sioux Tribe, the Oglala Sioux Tribe, and Four Directions, Inc., an organization engaged in voter registration and civic engagement in South Dakota and throughout Indian Country, bring this lawsuit for declaratory and injunctive relief to rectify Defendants' past and ongoing violations of the "Motor Voter" and agency-based voter registration requirements of the National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq*. ("NVRA").

2.      Because of these violations of the NVRA, South Dakota is depriving thousands of tribal members and other citizens of their federally guaranteed opportunities to register to vote and to change their voter registration addresses when these citizens interact with state agencies.

3.      Congress passed the NVRA in 1993 in part "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." 52 U.S.C. § 20501(b)(1). As one important way of achieving this goal, the NVRA requires certain state agencies to provide voter registration services to the individuals whom they serve. These requirements reflect Congress' findings that "the right of citizens of the United States to vote is a fundamental right" and that "it is the duty of the Federal, State, and local governments to promote the exercise of that right." *Id*. § 20501(a)(1)-(2).

4.      Sections 5 and 7 of the NVRA, 52 U.S.C. § 20504 and 52 U.S.C. § 20506, require that motor vehicle offices and public assistance offices, respectively, must provide voter registration services to citizens who engage in common interactions with the offices.  Specifically, agencies must provide voter registration services whenever an individual applies or, renews, or recertifies public assistance benefits, a driver's license, or a state-issued identification card, as well as when an individual notifies a South Dakota public assistance agency or the Department of Public Safety ("DPS") of a change of address.  (The interactions during which voter registration services must be provided are commonly known as "covered transactions.")

5.      The voter registration obligations for public assistance transactions (Section 7 ) or DPS transactions (Section 5) apply to all covered transactions, whether conducted in person at a public assistance agency, a DPS office, or by remote means, i.e., through the internet, telephone, mail or any other process through which the client receives services from  a South Dakota DPS office or public assistance office.

6.      Plaintiffs notified the Defendants of their violations of Section 5 and Section 7 by letter dated May 20, 2020, consistent with 52 U.S.C. § 20510(b). A copy of this letter is annexed hereto as **EXHIBIT A**. Defendants' sole response was a letter in which they acknowledged the need to comply with the NVRA, but did not propose any specific steps or timelines for bringing South Dakota's practices into compliance

3

with the NVRA. Plaintiffs followed up with a letter dated June 26, 2020, explaining the specifics that would be needed to avoid litigation, but Defendants have not responded to that letter and, upon information and belief, Defendants to date have failed to correct the violations.

7.    To remedy these violations, Plaintiffs respectfully ask this Court to declare that the Defendants are in violation of Section 5 and Section 7 of the NVRA, and to order such injunctive relief as is required to ensure that Defendants promptly and fully correct the past and continuing violations by South Dakota's public assistance and motor vehicle agencies, and for such additional relief as may be appropriate.

## JURISDICTION & VENUE

8.    This case arises under the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. § 20501 *et seq.*

9.    This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. §1362.

10.    This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

11.    This Court has personal jurisdiction over each of the Defendants because each is a resident of the state of South Dakota.

12.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

**A.     Plaintiffs**

13.     Plaintiff **OGLALA SIOUX TRIBE** is a federally recognized Indian tribe whose governing body is recognized by the Secretary of the U.S. Department of the Interior. *See* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462, 5,464 (Jan 30, 2020). Also known as the Oglala Lakota and the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota, the Oglala Sioux Tribe is a branch of the Lakota people and is part of the Oceti Sakowin (Seven Council Fires). The Oceti Sakowin consists of: the Thítȟuŋwaŋ (Teton or Lakota), Bdewákaŋthuŋwaŋ (Mdewakanton), Waȟpéthuŋwaŋ (Wahpeton), Waȟpékhute (Wahpekute), Sisíthuŋwaŋ (Sisseton), Iháŋkthuŋwaŋ (Yankton), and Iháŋkthuŋwaŋna (Yanktonai). The Oglala Sioux Tribe exercises powers of self-governance and jurisdiction over the Pine Ridge Reservation in South Dakota, and is a signatory to the 1851 and 1868 Fort Laramie Treaties, the latter of which established the Great Sioux Reservation.

14.     The Pine Ridge Reservation is located in south-west South Dakota, along the border with Nebraska. The Pine Ridge Reservation was established by

the Act of Mar. 2, 1889, c. 405, 25 Stat 888, which partitioned the Great Sioux Reservation. Today, the Reservation encompasses Oglala Lakota County, Bennett County, and a portion of Jackson County in South Dakota, as well as a section of land in Sheridan County, Nebraska.

15.     The Oglala Sioux Tribe is responsible for protecting the health, safety, and welfare of its tribal members. When Oglala Sioux tribal members are denied registration opportunities, the political power and ability to advocate for Oglala Sioux needs is reduced and the Oglala Sioux Tribe is denied full participation in the federal system through its diminished political power. The Tribe brings this action on behalf of itself and as parens patriae on behalf of its members.

16.     Plaintiff **ROSEBUD SIOUX TRIBE** is a federally recognized Indian tribe whose governing body is recognized by the Secretary of the U.S. Department of the Interior. *See* 85 Fed. Reg. at 5,465. Also known as the Sicangu Oyate, the Rosebud Sioux Tribe is a branch of the Lakota people and is also part of the Oceti Sakowin (Sioux Nation). The Rosebud Sioux Tribe exercises powers of self-governance and jurisdiction over the Rosebud Indian Reservation in South Dakota. It is also a signatory to the 1851 and 1868 Fort Laramie Treaties, the latter of which established the Great Sioux Reservation.

17.     The Rosebud Indian Reservation is located is south-central South Dakota, along the border with Nebraska. The Rosebud Indian Reservation was

6

established by the Act of Mar. 2, 1889, c. 405, 25 Stat 888, which partitioned the Great Sioux Reservation. Today, the Reservation encompasses all of Todd County, and land in Mellette, Tripp, Gregory, and Brule Counties.

18.    The Rosebud Sioux Tribe is responsible for protecting the health, safety and welfare of its tribal members. When Rosebud Sioux tribal members are denied registration opportunities, the political power and ability to advocate for Rosebud Sioux needs is reduced and the Rosebud Sioux Tribe is denied full participation in the federal system through its diminished political power. The Tribe brings this action on behalf of itself and as parens patriae on behalf of its members.

19.    Plaintiff **FOUR DIRECTIONS, INC.** ("Four Directions") is a 501(c)(4) organization committed to full enfranchisement as a crucial way to navigate a stronger future for Native communities. Four Directions is a nationally renowned voting rights leader for Native communities.

20.    Four Directions' voter registration work began in 2002 when Rosebud Sioux Tribal members Oliver and Barb Semans organized Native voter registration drives on South Dakota's Indian reservations. Four Directions has since leveraged strong relationships with Tribes in Nevada, Arizona, Montana, North Carolina, Minnesota, North Dakota, and South Dakota to organize voter turnout in federal elections and to extend equal access to the ballot box across Indian Country.

21.    Four Directions has four main priorities: Native voting rights, voter empowerment, voter protection, and voter engagement.

22.    Due to the Defendants' ongoing violations of the NVRA, Four Directions has expended additional resources on efforts to assist individuals with registering to vote or updating their voter registration address, when those individuals should have been offered voter registration through South Dakota's public assistance agencies or through DPS. Four Directions expended time, effort, volunteers, and thousands of dollars on additional voter registration drives because of defendant's NRVA noncompliance. Four Directions has also expended additional time, money, effort, and volunteers on assisting voters with updating their addresses, when those voters should have had their voter registration address automatically updated when they changed their driver's license address with DPS. Four Directions also expended additional resources investigating claims of voters who experienced difficulty registering to vote or were not on the rolls on Election Day, some of which would not have been necessary if Defendants had complied with the NVRA.

23.    Had the Defendants complied with their obligations under the NVRA, Four Directions would have deployed these resources toward other activities germane to its purposes, including its voter education and ballot initiative activities. Four Directions could also have used their resources for mission-based

initiatives such as "Get Out The Vote" (GOTV). GOTV initiatives require resources for outreach to ensure equal access to polls as well as substantial transportation expenses. Due to the rural nature of much of South Dakota, transportation and outreach efforts are especially costly. Based on Defendants' ongoing violations, Four Directions reasonably anticipates that this diversion of resources will continue.

**B.     Defendants**

24.    Defendant **STEVE BARNETT** is the Secretary of State of South Dakota and the chief election officer of South Dakota. He is sued in his official capacity. As South Dakota's chief election officer, he is responsible for coordinating the State's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; S.D. CODIFIED LAWS § 12-4-33. This includes ensuring that South Dakota's public assistance agencies and Department of Public Safety satisfy their NVRA obligations.

25.    Defendant **CRAIG PRICE** is Cabinet Secretary for the South Dakota Department of Public Safety ("DPS"), and is sued in his official capacity. As Secretary of DPS, Defendant Price is responsible for ensuring that DPS provides registration opportunities required pursuant to Section 5 of the NVRA and South Dakota law. *See* 52 U.S.C. § 20504; S.D. CODIFIED LAWS § 12-4-2.

9

26.     Defendant **LAURIE GILL** is Cabinet Secretary for the South Dakota Department of Social Services ("DSS"), and is sued in her official capacity. The DSS is a voter registration agency within the meaning of Section 7 of the NVRA, and is so designated by South Dakota law. *See* 52 U.S.C. § 20506(a)(2)(A); S.D. CODIFIED LAWS § 12-4-2.   DSS oversees many public assistance programs, including but not limited to, Temporary Assistance for Needy Families (TANF)[1], Supplemental Nutrition Assistance Program (SNAP),   Medicaid/Children's Health Insurance Program (CHIP), Child Care Service Assistance Program, and Low Income Energy Assistance Program (LIEAP). All of these programs are subject to the requirements of Section 7 of the NVRA. As Secretary of DSS, Defendant Gill is responsible for ensuring that the agency complies with its obligations under the NVRA and South Dakota Law.

27.     Defendant **MARCIA HULTMAN** is Cabinet Secretary for the South Dakota Department of Labor and Regulation ("DLR"), and is sued in her official capacity. DLR is a voter registration agency within the meaning of Section 7 of the NVRA.  *See* 52 U.S.C. § 20506(a)(2)(A) DLR co-administers South Dakota's TANF program with DSS. The TANF program is subject to the requirements of Section 7 of the NVRA. *See* 52 U.S.C. § 20506(a)(2); S.D. CODIFIED LAWS § 12-

---

[1] The Department of Social Services and Department of Labor and Regulation share administration of South Dakota's Temporary Assistance for Needy Families (TANF) program.

4-2. As Secretary of DLR, Defendant Hultman is responsible for ensuring that the agency complies with its obligations under Section 7 of the NVRA.

## FACTUAL ALLEGATIONS

### SOUTH DAKOTA'S DEPARTMENT OF PUBLIC SAFETY AND SECRETARY OF STATE ARE FAILING TO COMPLY WITH SECTION 5 OF THE NVRA

28.     The NVRA's "Motor Voter" provisions are intended to streamline the federal voter registration process, improve accessibility to voter registration, and increase the number of qualified voters who are properly registered. 52 U.S.C. § 20501; *see also, e.g.*, S. Rep. No. 103-6, at 5 (1993) ("[I]ncorporating voter registration into the drivers licensing process provides a secure and convenient method for registering voters; an effective means of reaching groups of individuals generally considered hard-to-reach for voting purposes . . . and a procedure for keeping rolls current through contact with licensees who change addresses").

29.     To accomplish these objectives, Congress enacted Section 5 of the NVRA, 52 U.S.C. § 20504 ("Section 5").

30.     Section 5 requires motor vehicle agencies to provide voter registration services to citizens who engage in certain types of interactions—commonly referred to as "covered transactions."

11

31.    Section 5 also requires motor vehicle agencies to accept voter registration applications from persons who affirm their eligibility on the application form itself, 52 U.S.C. § 20504, and does not exclude persons without Social Security Numbers ("SSNs") or state driver's licenses from the requirement to accept their voter registration applications.

32.    Relevant here, Section 5 requires that, when an individual notifies a motor vehicle agency of a change of address, the voter registration address must be automatically updated unless the individual affirmatively states that the change of address is not for voter registration purposes. 52 U.S.C. § 20504(d). In other words, change of address for voter registration must be "opt out" and not "opt in" when persons register a change of address with DPS. The NVRA defines a "motor vehicle driver's license" as including "any personal identification document issued by a State motor vehicle authority." 52 U.S.C. § 20502(3).

33.    Section 5 also requires that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration," and that, if the individual is already registered, such an application "shall be considered as updating any previous voter registration by the applicant." 52 U.S.C. § 20504(a).

12

34.     Motor vehicle agencies are responsible for transmitting voter registration information received during these covered transactions to the appropriate election officials within ten days of acceptance or, for transactions that occur within five-days of the deadline to register to vote in an election, within five days. *See* 52 U.S.C. § 20504(e).

35.     These requirements must be met regardless of whether a covered transaction takes place in-person at a motor vehicle office, online, by mail, over the phone, or through other remote means.  *See* U.S. Department of Justice, The National Voter Registration Act of 1993 (NVRA): Questions and Answers, Q4, http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php (last visited August 19, 2020).

### *DPS fails to provide sufficient voter registration services to customers who update their addresses using the South Dakota Driver License/I.D. Card Application.*

36.     Under Section 5(d) of the NVRA, a change of address for a customer's driver's license must automatically result in updating the voter's address for voter registration purposes, unless the customer affirmatively opts out of having their address updated for voter registration purposes. 52 US.C. § 20504(d).

37.     Defendants DPS and the Secretary of State are failing to meet their NVRA obligations with respect to change-of-address transactions. Individuals who report a change of address to DPS or who submit a driver's license

application or renewal bearing an address different from the one at which the individual is already registered do not have their voter registration addresses automatically updated. Instead, individuals who wish to update their voting address must take additional affirmative steps to do so, in direct violation of Section 5.

38.    DPS uses the South Dakota Driver License/I.D. Card Application form to process change of address requests by customers who submit this form in person at DPS offices or by mail. This form violates Section 5 because it requires applicants to affirmatively check a box saying "yes" if they wish to update their existing voter registration at the same time they are updating their driver license/I.D. Card address. In contrast, the NVRA requires that the voter registration address update  must occur automatically unless the voter affirmatively states that the change of address is not for voter registration purposes, typically by checking an "opt-out" box on the form. 52 U.S.C. § 20504(d).

39.    The South Dakota Driver License/I.D. Card Application fails to indicate that a change of address for driver's license purposes will automatically update the address for voter registration purposes unless the customer opts out, as required by Section 5.

14

40.    On information and belief, DPS regularly sends every change of address it collects from customers to the Secretary of State, regardless of the customer's response to the voter registration question on the South Dakota Driver License/I.D. Card Application driver's license form. However, in violation of Section 5, the Secretary of State does not consistently use this information to update voter registration records. Only when the customer takes the affirmative step of checking the box to register to vote or the box to update their existing voter registration does the Secretary of State update the individual's voter registration record to reflect the new address information.

### *DPS fails to provide voter registration services to customers without a SSN or driver's license.*

41.    Section 5 of the NVRA requires DPS to accept voter registration applications from persons who affirm their eligibility on the voter registration application form itself.

42.    DPS fails to provide voter registration services to customers who lack either a social security number or a driver's license.

43.    When DPS trains its workers on how to provide voter registration services to customers, it instructs its workers that customers without a SD Driver's License or an SSN can only register to vote in the county auditor's office. *See* DRIVERLICENSINGVOTERREGISTRATION2017, PowerPoint, Slide 6 (S.D. Sec'y of State 2017). A copy of this PowerPoint is annexed hereto as **EXHIBIT B**.

15

44.    DPS' practice of excluding customers without a SD driver's license or SSN from an opportunity to register to vote violates the NVRA because Section 5 does not include those exceptions.

### *DPS fails to provide voter registration services at all DSS offices serving tribal communities and other South Dakotans*

45.    The DPS office in Dupree – a town that is 66% Native American and adjacent to the Cheyenne River Reservation, does not provide any voter registration services.

46.    If a customer requests voter registration at the Dupree DPS office, the office instructs the customer to visit the County Auditor's office.

47.    DPS' failure to provide customers of its Dupree office with any voter registration services violates Section 5(a)(1) of the NVRA, which requires that an application for a driver's license, including a renewal, will serve as an application for voter registration unless the applicant opts out of voter registration.

48.    This practice also violates Section 5(e) of the NVRA, which requires DPS to transmit completed voter applications to the appropriate state election official.

49.    On information and belief, based on the practices discovered at the Dupree DPS office, other DPS offices serving tribal communities are similarly directing customers to the County Auditor's office, in violation of the NVRA.

16

## SOUTH DAKOTA'S PUBLIC ASSISTANCE AGENCIES' FAILURE TO COMPLY WITH SECTION 7 OF THE NVRA

50.     South Dakota's failure to fulfill its NVRA Section 7 obligations has a direct, negative impact on the ability of low-income individuals to register to vote and participate in the democratic process. This failure undermines the underlying purpose of Section 7, which is to ensure that voter registration "will be convenient and readily available [for] the poor . . . who do not have driver's licenses and will not come into contact with the other princip[al] place to register under this Act" (namely, motor vehicle departments). H.R. Rep. No. 103-66, at *19 (1993), *reprinted in* 1993 U.S.C.C.A.N. 140, 144 (Conf. Rep.).

51.     The NVRA requires South Dakota to "designate as voter registration agencies . . . all offices in the State that provide public assistance. *See* 52 U.S.C. § 20506(a)(2)(A). "Public assistance" offices include, for example, state offices that administer the Supplemental Nutritional Assistance Program ("SNAP"), Medicaid, Children's Health Insurance Program ("CHIP"), and Temporary Assistance for Needy Families ("TANF"). *See* H.R. Rep. No. 103-66, at *19 (Conf. Rep.); Department of Justice, The National Voter Registration Act of 1993 (NVRA): Questions and Answers, Q13. In South Dakota, these programs are administered by DSS and DLR, making them "voter registration assistance agencies." S.D. CODIFIED LAWS § 12-4-2.

52.     Each Section 7 voter registration agency must provide voter registration services with each covered transaction (*i.e.*, an application, recertification, renewal, or change of address transaction). 52 U.S.C. § 20506(a)(6)(A). The NVRA does not provide an exemption for transactions conducted remotely. Therefore, public assistance agencies must provide these voter registration services during each covered transaction, regardless of whether the transaction takes place in an agency office, over the internet or via email, mail, telephone, fax, or other remote means.

53.     In providing such services, public assistance agencies must, among other things: (i) ask applicants whether they would like to register to vote or change their voter registration address using statutorily prescribed language (the "Voter Preference Question"); (ii) distribute a voter registration application form with each covered transaction, unless the individual applicant declines in writing to register to vote; (iii) inform each applicant that the decision to register or decline to register to vote will not affect the amount of public assistance provided by the agency; and (iv) provide assistance in completing the voter registration forms to the same degree the agency provides assistance in completing its own forms. *See* 52 U.S.C. § 20506(a). Public assistance agencies must also accept completed voter registration application forms for transmittal to the appropriate State election official. *Id.*

18

54.    Only if the voter actively declines in writing to register, typically by checking "no" on a form containing the Voter Preference Question and other required disclosures ("Voter Preference Form") is the agency exempted from the requirement under the NVRA to distribute a voter registration form. *See* 52 U.S.C. § 20506(a)(6)(A).

55.    In short, a client must affirmatively, and in writing, "opt out" of receiving a voter registration application. The provision of the voter registration application is not contingent upon an affirmative request, either written or verbal, from the client, and a lack of response (*i.e.*, leaving the Voter Preference Question blank) may not be treated as a written declination of the registration form.

### *South Dakota has Experienced a Marked Decline in Voter Registration Applications from Public Assistance Agencies*

56.    As reported by South Dakota to the U.S. Election Assistance Commission ("EAC"), the number of voter registration applications originating at public assistance agencies in South Dakota has precipitously declined, from 7,000 in 2004, and, in the most recent presidential election, in 2016, to just 1,100. *See* U.S. Election Assistance Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections For Federal Office 2003-2004*, Table 2 page 23, *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/NVRA%202003-2004%20Report%20Tables%201-4.pdf (last visited on August 20, 2020); U.S.

19

Election Assistance Commission, *The Election Administration and Voting Survey: 2016 Comprehensive Report* (June 2017), EAVS Data Brief, South Dakota, *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/South_Dakota_-_EAVS_2016_Data_Brief_-_508.pdf (last visited on August 20, 2020).

57.    South Dakota's decrease in the number of voter registration applications originating at public assistance agencies cannot be attributed to a decrease in participation in public assistance programs. For example, in 2004, when South Dakota collected 7,000 voter registration applications through public assistance offices, the state's average monthly participation for SNAP (known as "Food Stamps" at that time) was only 53,459. *See* U.S. Department of Agriculture, Food and Nutrition Service, Program Accountability Division (February 2006), *available at* https://fns-prod.azureedge.net/sites/default/files/2004_state_activity.pdf (last visited on August 20, 2020). By comparison, in 2016, when South Dakota collected only 1,100 voter registration applications through public assistance offices, the state's average monthly participation for SNAP was 95,983. *See* Supplemental Nutrition Assistance Program, State Activity Report, FY 2016, *available at* https://fns-prod.azureedge.net/sites/default/files/snap/FY16-State-Activity-Report.pdf (last visited on August 20, 2020).

20

58.    The decrease in South Dakota's reported number of voter registration applications from public assistance agencies in 2016 amounts to an 84% decrease in voter registration applications compared to the 2004 presidential election.

59.    The decrease in voter registration applications does not reflect a lack of need for these services. As of 2016, only 63% of South Dakota citizens earning an annual family income of less than $30,000 reported being registered to vote compared to 77% of those citizens earning $50,000 or more, a 14-percentage point gap. Demos analysis of 2016 Current Population Survey Voting and Registration Supplement, https://www.census.gov/cps/data/ (last visited on August 20, 2020).

60.    A decrease in voter registration applications, in spite of increased public assistance caseloads, indicates that Defendants are systematically failing to comply with the NVRA and, as a result, causing disproportionate harm to voter participation by low-income groups and people of color.

### *DSS Fails To Provide Voter Registration Applications to Clients Who Do Not Affirmatively Decline in Writing*

61.    DSS is violating the NVRA by failing to provide mandated voter registration applications to clients who do not affirmatively decline in writing to register to vote. A client who leaves the Voter Preference Question blank is not provided with a voter registration application, nor assistance for voter registration.

62.    Pursuant to Section 7 of the NVRA, if the client declines to respond to the Voter Preference Question (i.e., leaves it blank), the agency still must furnish

21

a voter registration application. 52 U.S.C. § 20506(a)(6)(A), (B)(iii). Only if a client affirmatively answers "no" in writing to the Voter Preference Question can the agency withhold a voter registration application. *Id; also see Valdez v. Squier*, 676 F.3d 935, 945-46 (10th Cir. 2012) (The NVRA "must be interpreted as requiring a designated voter registration agency to provide an applicant with a voter registration form unless the applicant declines, in written form, to register to vote. . . . Thus, in sum, [the NVRA] requires an applicant to affirmatively, by way of writing, 'opt out' of receiving a voter registration form."); *Action NC v. Strach*, 216 F. Supp. 3d 597, 640 (M.D.N.C. 2016) (following *Valdez* court's interpretation of opt-out requirement based on plain language statutory construction).

63.    It is the practice of DSS, during at least some covered transactions at DSS offices, to withhold voter registration applications from clients who do not specifically request them by checking "yes" in response to the Voter Preference Question.

64.    The Pierre and Rapid City DSS offices told Plaintiff's field investigators that they do not provide voter registration applications to clients who leave the Voter Preference Question blank on the Economic Assistance Application, which is the application used to apply for TANF, SNAP, and Medicaid benefits in DSS offices.

22

65.    The DSS office in Eagle Butte skipped over the Voter Preference Question while reviewing the Economic Assistance Application with a field investigator, which indicates an office practice that would regularly result in blank responses to the Voter Preference Question.

66.    Additionally, the field investigators encountered at least two examples of public benefits applicants who recalled leaving the Voter Preference Question blank and did not receive a voter registration application during transactions that occurred at the DSS offices in Eagle Butte and Rapid City.

67.    This "opt-in" policy of treating a blank response to the Voter Preference Question as a declination is in violation of Section 7's mandated written declination.

68.    Plaintiffs' investigators interviewed a DSS client who applied for LIEAP at the DSS office in Winner; but did not receive a voter registration application and did not recall any oral or written Voter Preference Question during that transaction.

69.    Plaintiffs' investigators interviewed a DSS client who applied for Medicaid at the DSS office in Rapid City who did not receive voter registration services while completing an application.

70.    A client who completes a covered transaction via telephone is not able to affirmatively decline voter registration in writing, as required by the NVRA.

23

As a result, the NVRA requires that all clients completing a telephone transaction must subsequently be mailed a Voter Preference Form and/or a voter registration application. However, upon information and belief, DSS does not provide a voter registration application form or Voter Preference Form to any client who completes a covered transaction via telephone unless the client affirmatively requests a voter registration application.

### *DSS Fails to Comply with Section 7's Voter Registration Requirements During Change-of-Address, Renewal, and Recertification Transactions*

71.     Some DSS offices recertify public benefits without asking clients the Voter Preference Question.  The DSS offices in Rapid City and Mission use Form DSS-EA-214 to recertify benefits, but Form DSS-EA-214 does not ask the Voter Preference Question. Thus, DSS does not consistently provide the required NVRA voter registration services to its clients during covered transactions to recertify public benefits. On information and belief, the violations concerning recertification transactions that are occurring in the offices identified above are also occurring in other South Dakota DSS offices.

72.     Some DSS offices process change of address requests without asking clients the Voter Preference Question.  None of the DSS offices interviewed by Plaintiffs' investigators offer clients forms to report a change of address that ask the Voter Preference Question. DSS offices in Rapid City and in Mission use the same non-compliant form they use for recertifications, Form DSS-EA-214, which

24

does not ask the Voter Preference Question. The DSS office in Pine Ridge uses a form titled "Note to Benefits Specialist" to process change of address requests, and this form does not ask the Voter Preference Question. The office in Hot Springs has its own change of address form, and it does not ask the Voter Preference Question.

73.    DSS also fails to provide voter registration services when a client reports a change of address by telephone, in violation of Section 7 of the NVRA.

74.    It is not possible for a client to decline the offer of voter registration in writing, as required by Section 7 of the NVRA, during Change of Address transactions conducted over the telephone.

75.    On information and belief, there is also no guidance in the DSS policy manual or elsewhere for furnishing the required NVRA disclosures, which also must be provided in writing to clients conducting a covered transaction over the phone.

76.    DSS's failure to provide these services when clients report a change of address during a remote transaction violates the requirements of the NVRA.

### *Some Covered Voter Registration Agencies Use Forms that Do Not Even Ask the Voter Preference Question*

77.    The application forms for Low Income Energy Assistance (LIEAP), Childcare Service Assistance, and Medicaid/CHIP programs in South Dakota do

not even include the Voter Preference Question required by the NVRA. This directly violates Section 7 of the NVRA.

### ***DSS Fails to Consistently Distribute Voter Registration Forms, Provide Assistance, or Accept Completed Voter Registration Applications During Covered Transactions for Clients who Answer "Yes" to the Voter Preference Question***

78.    For some DSS clients who complete a covered transaction and check "yes" in response to the Voter Preference Question, DSS is failing to (i) effectively distribute voter registration forms, (ii) provide the necessary assistance in registering to vote, and (iii) accept and transmit completed voter application forms.

79.    Plaintiffs' investigators interviewed a DSS client who answered "yes" to the Voter Preference Question while applying for SNAP and TANF benefits at the DSS office in Rapid City, but never received any voter registration form or assistance.

80.    Plaintiffs' investigators interviewed a DSS client who answered "yes" to the Voter Preference Question while applying for SNAP and TANF at the DSS office in Pine Ridge, but never received any voter registration form or assistance.

81.    The practice of failing to provide voter registration applications to public benefits clients who answer "yes" to the Voter Preference Question violates Defendants' duties under Section 7 of the NVRA.

26

82.    Plaintiffs' investigators interviewed a DSS office worker in Pierre who recalled personally answering "yes" to the Voter Preference Question while applying for SNAP benefits and later receiving a voter registration application in the mail instead of during the transaction itself.

83.    On information and belief, the practice of not consistently providing a voter registration application to persons answering "yes" to the Voter Preference Question while conducting covered transactions extends to other DSS offices beyond those identified in paragraphs 79 to 82, supra.

84.    The practice of failing to provide voter registration applications to individuals who answer "yes" to the Voter Preference Question *during* covered transactions does not comply with the provisions of Section 7.  *See* 52 U.S.C. §§ 20506(a)(4)(A)(i), 20506(A)(6) (stating that "voter registration agenc[ies] … shall—(A) distribute *with* each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—[a voter registration form]") (emphasis added).

### *Defendants Fail to Provide Equal Assistance to Clients with Criminal Records*

85.    DSS fails to consistently provide clients with needed information about their eligibility to register to vote.

86.    Applicants with conviction histories are eligible to vote in South Dakota upon completion of their sentence, including probation, parole, and

27

restitution.   S.D. CODIFIED LAWS § 12-4-18; South Dakota Secretary of State website,   Felony   Convictions,   *available at*   https://sdsos.gov/elections-voting/voting/register-to-vote/felony-convictions.aspx (last visited on August 13, 2020).

87.    In South Dakota, Native Americans make up a disproportionate share of the federal criminal caseload. According to U.S. Sentencing Commission data, in 2013, Natives constituted 57.5% of the caseload in South Dakota but only 8.5% of the total population. U.S. Sentencing Comm'n, Quick Facts Native Americans in   the   Federal   Offender   Population,   2013,   *available at* https://www.ussc.gov/sites/default/   files/pdf/research-and-publications/quick-facts/Quick_Facts_Native_American_Offenders.pdf.

88.    Plaintiffs' investigators interviewed a DSS client who had completed her sentence and was eligible to vote when she applied for SNAP, TANF, and Medicaid at the Martin DSS office.  The DSS case worker who assisted this client with her application skipped the Voter Preference Question when reviewing the benefits application form because this client had once been convicted of a felony, even though she was now eligible to vote under South Dakota law.

89.    Failure to provide accurate assistance regarding voter eligibility violates the equal assistance requirements of Section 7 of the NVRA, 52 U.S.C.S. § 20506(a)(6)(C).

***Defendants Fail to Accept Completed Voter Registration Applications and
Timely Mail Them to County Auditors***

90.    The NVRA requires public assistance staff to mail completed voter registration applications to county auditors within ten days after the date the agency accepts the completed voter registration form, or five days if the agency accepts the completed voter registration form within five days of the last day to register to vote in an election.

91.    DSS offices serving tribal communities do not consistently accept completed voter registration forms to submit to county auditors.

92.    A DSS client told Plaintiffs' field investigators that she received a voter registration application during a covered transaction changing her address at the DSS office in Pine Ridge, but the DSS worker then instructed this client to mail it in herself. On information and belief, this practice is likely occurring in other DSS offices.

93.    DSS's practice of failing to accept all "completed voter registration forms for transmittal to the appropriate State election official" violates the provisions of Section 7 of the NVRA. 52 U.S.C.A. § 20506(a)(4)(A)(iii).

94.    Even though South Dakota law requires that voter registration applications "completed at any local, state, or federal agency during any given week commencing on Tuesday through the following Monday shall be sent to the appropriate county auditors no later than the following Wednesday," S.D.

29

CODIFIED LAWS § 12-4-5, DSS has insufficient policies to ensure that DSS workers uniformly comply with NVRA and state law requirements on timely submission of voter registration applications to county auditors.

95.    The DSS Policy Manual only requires employees to send voter registration applications to the county auditors "before election time" and does not mention the submission deadlines required by the NVRA or South Dakota law.

96.    DSS's vague instruction to employees to send voter registration applications to the county auditors "before election time" is wholly insufficient to comply with the NVRA's specific requirements on timely submission.

97.    On information and belief, DSS does not have a process to collect completed voter registration forms that it mails or faxes to public benefits clients.

98.    DSS' failure to require timely submissions to county auditors violates Section 7 of the NVRA.

### *DSS and DLR offices fail to offer an opportunity to register to vote to all public benefits applicants*

99.    The DSS office in Rapid City does not offer voter registration forms when processing renewals or recertifications for public benefits.

100.    The practice of failing to provide voter registration services during all covered transactions, including during transactions to renew or recertify public benefits, violates Section 7 of the NVRA.

101.  The DSS Hot Springs office does not offer any voter registration assistance in-house, and instead directs clients who answer "yes" to the Voter Preference Question to visit the county auditor's office to apply for voter registration there.

102.  DSS' practice of directing some clients who answer "yes" to the voter preference question to the county auditor's office to apply for voter registration violates Section 7 by preventing people from registering to vote while applying for benefits, rather than having to visit a separate office.

103.  The DLR website states that "The Department of Labor and Regulation administers [TANF] together with the Department of Social Services."

104.  DLR typically receives applications for TANF assistance in-person, but DLR employment service specialists who receive TANF applications via fax, telephone, and mail may accommodate those clients.

105.  Given that DSS and DLR accept applications for benefits in all these ways, they also must provide an opportunity to apply for voter registration in these transactions.

106.  DLR does not provide voter registration applications to TANF clients, nor does it accept and transmit voter registration applications from such clients.

31

107.    When DLR receives an Economic Assistance Application form from a TANF client indicating that the applicant would like to register to vote, it does not provide that applicant with a voter registration form.

108.    According to DLR, it "does not receive voter registration applications" and specifically "does not receive voter registration forms from TANF applicants."

109.    DLR staff do not provide voter registration services regardless of the way an applicant fills out the voter preference question on the Economic Assistance Application.

110.    DLR's failure to provide clients with an opportunity to register to vote while applying for TANF directly violates Section 7 of the NVRA, which requires DLR to provide all TANF applicants with a voter registration form unless the client declines in writing to register to vote.

111.    DLR's and DSS's processes for providing voter registration services to TANF applicants also violate Section 7 to the extent that these agencies fail to distribute voter registration forms with each TANF application and fail to provide the same degree of assistance with voter registration as with the TANF application process. 52 USCA §§ 20506(a)(6)(A), 20506(a)(6)(C).

112.    To the extent that DSS mails voter registration forms to TANF applicants who mark that they want to register to vote, regardless of whether DSS

received the Economic Assistance Application from DLR or directly from the TANF applicant, that practice violates Section 7.

113.   The NVRA requires agencies to "distribute [voter registration forms] with each [TANF] application." 52 USCA § 20506(a)(6)(A).  The term "with" means that the South Dakota Voter Registration Form should be provided in the same transaction as a TANF applicant's in-person meeting with a DLR local office.

114.   DSS' subsequent mailing of the voter registration form to the TANF applicant would be a later transaction that does not satisfy Section 7 of the NVRA.

115.   DSS's practice of mailing voter registration forms to clients who applied for TANF in-person at a DLR office also violates Section 7's requirement that agencies provide the same degree of assistance with voter registration as they do for the TANF application process.  52 USCA § 20506(a)(6)(C).

116.   If a person receives in-person assistance at a DLR office in completing their TANF application, then receiving a voter registration form in the mail, without the opportunity for assistance with completing it, is an inferior level of assistance that violates the equal assistance requirements of Section 7.

///

///

### *DSS offices fail to consistently process and submit completed voter registration applications*

117.   Federal law requires public benefits agencies to accept completed voter registration applications and mail them to county auditors, regardless of whether the client who completed the form lists a non-9-1-1 address, or no address at all.

118.   The instructions on the Election Assistance Commission's National Voter Registration Form specifically provide a system to document the home address of applicants who live in rural areas: "Note: If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C (at the bottom of the form)." *See* EAC National Voter Registration Form, *available at* https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf (last visited on August 20, 2020).

119.   DSS offices serving tribal communities fail to consistently process and submit all completed voter registration applications to county auditors.

120.   On November 11, 2019, Plaintiffs' field investigators encountered a person who had walked about 30 miles from Porcupine, SD to the Pine Ridge DSS field office in 12-degree Fahrenheit weather to submit a change of address request for his SNAP benefits.

121.   In violation of Section 7 of the NVRA, this DSS client was not offered a voter registration application during his change-of-address transaction.

34

122.   Following this transaction, the field investigators provided this DSS client with a voter registration application, assisted his completion of the application, and delivered his completed application to the Pine Ridge DSS field office.

123.   A staff person at the DSS office threw the completed voter registration form in the trash and told the field investigator that she refused to accept the voter registration application because she was following orders from a DSS memorandum instructing DSS workers to refuse voter registration applications lacking a "9-1-1 address."   The field investigator asked the Pine Ridge DSS worker to remove the voter registration form from the trash, showed the worker that the address in that application was sufficient for voter registration purposes, and asked the worker to mail in the completed application to the county auditor.

124.   The Pine Ridge field office did not respond to inquiries asking whether it had mailed in the voter registration application. On information and belief, this DSS client is still is not registered as of the date of this complaint.

## SOUTH DAKOTA HAS FAILED TO CORRECT ITS ONGOING NVRA VIOLATIONS

125.   To ensure state compliance, the NVRA provides that "[a] person who is aggrieved by a violation [of the NVRA] may provide written notice of the violation to the chief election official of the State involved."   52 U.S.C. § 20510(b)(1).  If the violation is not corrected within a set period of time (ordinarily

90 days, but only 20 days at this time due to the proximity to an election), "the

aggrieved person may bring a civil action . . . for declaratory or injunctive relief .

. . ." 52 U.S.C. § 20510(b)(2).

126.   On May 20, 2020, counsel for Plaintiffs sent a notice letter to

Defendants notifying them of numerous NVRA violations. The letter indicated

that Plaintiffs' counsel was prepared to meet with Defendants to help them

develop a comprehensive compliance plan. *See* **EXHIBIT A**.

127.   But, upon information and belief, the NVRA violations identified in

Plaintiffs' notice letter have not been cured. The Defendants sent a response to the

Notice Letter in June 2020 which acknowledged the need to comply with the

NVRA; but provided no specifics on how or when this compliance would be

achieved. Defendants have entirely failed to respond to a subsequent letter asking

for specifics on how and when compliance would be achieved.

128.   As a result of Defendants' continuing failure to ensure compliance with

Sections 5 and 7 of the NVRA, persons applying for and renewing driver's

licenses or state identification cards, or updating their addresses, and persons

applying for and renewing public assistance, or updating their addresses, are still

not being consistently offered the opportunity to register to vote as required by

the NVRA.

## FIRST CAUSE OF ACTION

### Violation of Section 5 of the National Voter Registration Act of 1993

129.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

130.   Defendants Barnett and Price have failed and continue to fail to provide voter information and registration opportunities and assistance as required by Section 5 of the National Voter Registration Act of 1993, 52 U.S.C. § 20504.

## SECOND CAUSE OF ACTION

### Violation of Section 7 of the National Voter Registration Act of 1993

131.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 128 as if fully set forth herein.

132.   Defendants Barnett, Gill and Hultman have failed, and continue to fail, to provide voter information and registration opportunities and assistance to clients of public assistance agencies as required by Section 7 of the National Voter Registration Act of 1993, 52 U.S.C. § 20506.

### Basis For Injunctive Relief

133.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 132 as if fully set forth herein.

37

134.   Defendants have violated Sections 5 and 7 of the NVRA by depriving South Dakota voters of opportunities to register to vote or to receive assistance with voter registration in accordance with these statutory provisions.

135.   Missed voter registration opportunities impose unnecessary and legally-prohibited burdens on voters who must seek out voter registration materials and opportunities that should have been provided to them by Defendants and may result in complete disenfranchisement when voters do not or cannot create such opportunities for themselves prior to South Dakota's voter registration deadline. Because monetary relief cannot compensate for these lost opportunities to participate in the democratic process, Plaintiffs have no adequate remedy at law for Defendants' violation of their rights and will suffer irreparable harm without injunctive relief.

136.   Defendants will suffer no undue harm if compelled to comply with their statutory obligations, while voters may be wholly deprived of their right to vote if Defendant's violations of the law continue, and therefore, the balance of hardships favors a mandatory permanent injunction against Defendants.

137.   Issuing an injunction against Defendants promotes the public interest by ensuring voter rolls are accurate and current and by increasing the number of eligible individuals in tribal communities who are able to vote and have their voices heard.

138.   Injunctive relief is required to remedy Defendants' current and past violations of these laws and to secure ongoing compliance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants on the claims for relief as alleged in this Complaint and enter an Order:

(i)    declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated Section 5 of the National Voter Registration Act of 1993, 52 U.S.C. § 20504, by failing to provide required voter registration services during driver's license and identification application and renewal processes and change of address transactions;

(ii)    declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated Section 7 of the National Voter Registration Act of 1993, 52 U.S.C. § 20506, by failing to provide required voter registration services through agencies that provide public assistance, including the South Dakota Department of Social Services and South Dakota Department of Labor Relations;

(iii)    temporarily and permanently enjoining Defendants, their agents and successors in office, and all persons working in concert with them, from implementing practices and procedures that violate, or fail to ensure compliance with, Sections 5 and 7 of the NVRA, 52 U.S.C. § 20506;

(iv)    directing Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all appropriate measures necessary to remedy the harm caused by their non-compliance with Sections 5 and 7 of the NVRA, including, without limitation, ensuring that individuals affected by Defendants' non-compliance are provided remedial opportunities for voter registration;

(v)    directing Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all steps necessary to ensure ongoing compliance with the requirements of Sections 5 and 7 of the NVRA, 52 U.S.C § 20506, including, without limitation, procedures for distribution of voter registration applications and voter preference forms, and training and monitoring personnel to ensure that designated agencies are distributing voter registration forms to each person who applies for a driver's license, identification, or public assistance benefits, and each person who recertifies, renews, and changes address for a driver's license, identification, or benefits, inquiring of all such persons, in writing, whether they would like to register to vote or change their voter registration address and providing to them the NVRA-required information concerning the voter registration process, assisting such persons in completing voter registration applications to the same degree that assistance is provided with other public assistance forms, accepting completed voter registration forms, and

40

timely transmitting completed registration forms to the appropriate election

authority;

(vi)    awarding Plaintiffs reasonable attorney fees, including litigation

expenses, and costs pursuant to 52 U.S.C. § 20510(c);

(vii)   retaining jurisdiction over this action to ensure that Defendants are

complying with their obligations under the NVRA; and

(viii)  awarding such other and further equitable relief as the Court deems

just and proper.

Respectfully submitted,

Dated: September 16, 2020

*/s/ Terry Pechota*

NATALIE LANDRETH\*
NATIVE AMERICAN RIGHTS FUND
745 W. 4th Avenue, Suite 502
Anchorage, AK 99501-1736
(907) 276-0680
landreth@narf.org

JACQUELINE DE LEÓN\*
KIM GOTTSCHALK\*
NATIVE AMERICAN RIGHTS FUND
1506 Broadway
Boulder, CO 80302-6296
(303) 447-8760
jdeleon@narf.org
jeronimo@narf.org

TERRY PECHOTA
SD SBN 2002
PECHOTA LAW OFFICE
1617 Sheridan Lake Road
Rapid City, SD 57702
(605) 341-4400
tpechota@1868treaty.com

CHIRAAG BAINS\*
DĒMOS
740 6th Street NW, 2nd Floor
Washington, DC 20001
(202) 864-2746
cbains@demos.org

BRENDA WRIGHT\*
MIRANDO GALINDO\*
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004

41

(646) 948-1621
(212) 633-1405
bwright@demos.org
mgalindo@demos.org

*Attorneys for Plaintiffs*

*\*Application for admission pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2020, I electronically transmitted the attached document to the Clerk's Office using CM/ECF System for filing and mailed a copy to:

Steve Barnett
Secretary of State
Capitol Building
500 East Capitol Avenue, suite 204
Pierre, SD 57501-5070

Laurie Gill
Cabinet Secretary
700 Governors Drive
Pierre, SD 57501

Marcia Hultman
Cabinet Secretary
Department of Labor and Regulation
123 W. Missouri Avenue
Pierre, SD 57501-0405

Craig Price
Cabinet Secretary
Department of Public Safety
118 W Capitol Avenue
Pierre, SD 57501

*/s/ Terry Pechota*

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Rosebud Sioux Tribe and their members, Oglala Sioux Tribe and their members, and Four Directions, Inc.

**DEFENDANTS**

Steve Barnett Secretary of State, Laurie Gill Cabinet Secretary SD Dept. of Social Services, Marcia Hultman Cabinet Secretary SD Dept. of Labor, Craig Price Cabinet Secretary SD Dept. of Public Safety

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Hughes County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Terry Pechota
Pechota Law Office
1617 Sheridan Lake Road. Rapid City, SD 57702. (605) 341-4400

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1   U.S. Government Plaintiff
- ❏ 2   U.S. Government Defendant
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ❏ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ Pharmaceutical | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | **SOCIAL SECURITY** | ❏ 480 Consumer Credit (15 USC 1681 or 1692) |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| | | | ❏ 791 Employee Retirement Income Security Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ☒ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ❏ 2 Removed from State Court
- ❏ 3 Remanded from Appellate Court
- ❏ 4 Reinstated or Reopened
- ❏ 5 Transferred from Another District *(specify)*
- ❏ 6 Multidistrict Litigation - Transfer
- ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
52 U.S.C. § 20501, 52 U.S.C. § 20504, 52 U.S.C. § 20506, 52 U.S.C. § 20510
Brief description of cause:
violation of Sections 5 and 7 of the National Voter Registration Act.

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ❏ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____    DOCKET NUMBER _____

DATE
09/16/2020

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____