# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

|  |  |
|---|---|
| ROSEBUD SIOUX TRIBE and their members, OGLALA SIOUX TRIBE and their members, LAKOTA PEOPLE'S LAW PROJECT, Kimberly Dillon, and Hoksila White Mountain,<br><br>    *Plaintiffs,*<br><br>      v.<br><br>STEVE BARNETT, in his official capacity as Secretary of State for the State of South Dakota and Chairperson of the South Dakota State Board of Elections; LAURIE GILL, in her official capacity as Cabinet Secretary for the South Dakota Department of Social Services; MARCIA HULTMAN, in her official capacity as Cabinet Secretary for the South Dakota Department of Labor and Regulation; and CRAIG PRICE, in his official capacity as Cabinet Secretary for the South Dakota Department of Public Safety,<br><br>    *Defendants.* | Case No. 5:20-cv-05058-LLP<br><br><br>**AMENDED<br>COMPLAINT** |

## INTRODUCTION

1.      Plaintiffs, the Rosebud Sioux Tribe, the Oglala Sioux Tribe, the Lakota People's Law Project, an organization working to protect the sovereignty and self-determination of Native peoples, and individuals Kimberly Dillon and Hoksila White Mountain bring this lawsuit for declaratory and injunctive relief to rectify Defendants' past and ongoing violations of the "Motor Voter" and agency-based voter registration requirements of the National Voter Registration Act of 1993, 52 U.S.C. §§ 20501-20511. ("NVRA").

2.      Because of these violations of the NVRA, South Dakota is depriving thousands of tribal members and other citizens of their federally-guaranteed opportunities to register to vote and to change their voter registration addresses when these citizens interact with state agencies.

3.      Congress passed the NVRA in 1993 in part "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office." *Id*. § 20501(b)(1).  As one important way of achieving this goal, the NVRA requires certain state agencies to provide voter registration services to the individuals whom they serve.  These requirements reflect Congress' findings that "the right of citizens of the United States to vote is a fundamental right" and that "it is the duty of the Federal, State, and local governments to promote the exercise of that right." *Id*. §§ 20501(a)(1)-(2).

4.      Sections 5 and 7 of the NVRA, 52 U.S.C. § 20504 and 52 U.S.C. § 20506, require that motor vehicle offices and public assistance offices, respectively, must provide voter registration services to citizens who engage in common interactions with the offices.  Specifically, agencies must provide voter registration services whenever an individual applies for, renews, or recertifies public assistance benefits, a driver's license, or a state-issued identification card, as well as when an individual notifies a South Dakota public assistance agency or the Department of Public Safety ("DPS") of a change of address.  (The interactions during which voter registration services must be provided are commonly known as "covered transactions.")

5.      The voter registration obligations for public assistance transactions (Section 7) or DPS transactions (Section 5) apply to all covered transactions, whether conducted in person at a public assistance agency, a DPS office, or by remote means, i.e., through the internet, telephone, mail or any other process through which the client receives services from a South Dakota DPS office or public assistance office.

6.      Plaintiffs notified the Defendants of their violations of Section 5 and Section 7 by letter dated May 20, 2020, consistent with 52 U.S.C. § 20510(b). A copy of this letter is annexed hereto as **EXHIBIT A**. Defendants' sole response was a letter in which they acknowledged the need to comply with the NVRA, but did not propose any specific steps or timelines for bringing South Dakota's practices into compliance

2

with the NVRA. Plaintiffs followed up with a letter dated June 26, 2020, explaining the specifics that would be needed to avoid litigation, but Defendants did not respond to that letter and, upon information and belief, have failed to correct the violations.

7.      On September 16, 2020, Plaintiffs Rosebud Sioux Tribe and Oglala Sioux Tribe filed a Complaint alleging Section 5 & 7 NVRA violations.   On November 19, 2020 Defendants filed an Answer.  Plaintiffs now file the instant Amended Complaint removing and adding parties and maintaining identical claims.

8.      To remedy these violations, Plaintiffs respectfully ask this Court to declare that the Defendants are in violation of Section 5 and Section 7 of the NVRA, and to order such injunctive relief as is required to ensure that Defendants promptly and fully correct the past and continuing violations by South Dakota's public assistance and motor vehicle agencies, and for such additional relief as may be appropriate.

## JURISDICTION & VENUE

9.      This case arises under the National Voter Registration Act of 1993 (the "NVRA"), 52 U.S.C. §§ 20501-20511.

10.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. §1362.

11.     This Court has jurisdiction to grant both declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202.

12.     This Court has personal jurisdiction over each of the Defendants because each is a resident of the state of South Dakota.

13.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

### A.     Plaintiffs

14.     Plaintiff **OGLALA SIOUX TRIBE** is a federally-recognized Indian tribe whose governing body is recognized by the Secretary of the U.S. Department of the Interior. *See* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 85 Fed. Reg. 5,462, 5,464 (Jan 30, 2020). Also known as the Oglala Lakota and the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota, the Oglala Sioux Tribe is a branch of the Lakota people, and is part of the Oceti Sakowin (Seven Council Fires). The Oceti Sakowin consists of: the Thítȟuŋwaŋ (Teton or Lakota), Bdewákaŋthuŋwaŋ (Mdewakanton), Waȟpéthuŋwaŋ (Wahpeton), Waȟpékhute (Wahpekute), Sisíthuŋwaŋ (Sisseton), Iháŋkthuŋwaŋ (Yankton), and Iháŋkthuŋwaŋna (Yanktonai).  The Oglala Sioux Tribe exercises powers of self-governance, self-determination, and jurisdiction over the Pine Ridge Reservation in South Dakota, and is a signatory to the 1851 and 1868 Fort Laramie Treaties, the latter of which established the Great Sioux Reservation.

15.     The Oglala Sioux Tribe has approximately 46,822 enrolled members.

4

16.     The Pine Ridge Reservation is located in south-west South Dakota, along the border with Nebraska, and covers approximately 3.2 million acres. The Pine Ridge Reservation was established by the Act of Mar. 2, 1889, 25 Stat 888, which partitioned the Great Sioux Reservation. Today, the Reservation encompasses Oglala Lakota County, Bennett County, and a portion of Jackson County in South Dakota, as well as a section of land in Sheridan County, Nebraska.

17.     Poverty is common on the Pine Ridge reservation. Upon information and belief, approximately 90 percent of families live in poverty and the unemployment rate is 85%. The majority of these families receive some type of government assistance such as Supplemental Nutrition Assistant Program ("SNAP"), Medicaid, Children's Health Insurance Program ("CHIP"), and Temporary Assistance for Needy Families ("TANF").

18.     Due to poverty, a tank of gas can be a burden, and travelling long distances is not financially feasible for many members. Many tribal members do not travel long distances often, and usually only out of necessity.

19.     Lack of vehicle access is common, and many people share vehicles. Dependable vehicles that can manage difficult road conditions are rare and a working vehicle is difficult to come by.

20.     There is snow present on the Pine Ridge Reservation about eight to nine months of the year and roads, which can be unpaved and untended, are often unpassable.

21.     Due to an extreme housing shortage, upon information and belief, it is not uncommon for there to be upwards of ten people sharing a home, and moving from home to home is common.

22.     Many homes on the Pine Ridge Reservation are physically unaddressed, meaning there is no address marked on the residence, and the process of getting assigned an address is lengthy and cumbersome.

23.     The majority of homes on the Pine Ridge Reservation do not receive residential mail delivery. Many households share post office boxes, and travel to post offices can be far.

24.     Many households do not have broadband access or cannot afford a device to access the Internet.

25.     Poverty, lack of vehicle access, lack of physical addresses on homes, lack of internet access, inequities in mail delivery service, and limited access to post offices and post office boxes make it difficult for Oglala Sioux tribal members on the Pine Ridge Reservation to register to vote.

26.     On information and belief, the closest in-person registration for many tribal members to register to vote through a public assistance agency or the county

auditor's office is in the city of Hot Springs, an approximately two and a half to three hour drive.

27.     Upon information and belief, once every four years the Fall River County Auditor comes to the reservation to conduct voter registration. Outside of that timeframe, many tribal members have to travel to Hot Springs to register to vote.

28.     Voter registration would be more accessible for Oglala Sioux Tribal members if Defendants' practices were compliant with the NVRA.

29.     The Oglala Sioux Tribe is responsible for protecting the health, safety, and welfare of its tribal members. When Oglala Sioux tribal members are denied registration opportunities, the political power and ability to advocate for Oglala Sioux needs is reduced and the Oglala Sioux Tribe is denied full participation in the federal system through its diminished political power.

30.     The Oglala Sioux Tribe brings this action on behalf of itself, and as parens patriae on behalf of its members.

31.     Plaintiff **ROSEBUD SIOUX TRIBE** is a federally-recognized Indian tribe whose governing body is recognized by the Secretary of the U.S. Department of the Interior. *See* 85 Fed. Reg. at 5,465. Also known as the Sicangu Oyate, the Rosebud Sioux Tribe is a branch of the Lakota people and is also part of the Oceti Sakowin (Sioux Nation). The Rosebud Sioux Tribe exercises powers of self-governance, self-determination, and jurisdiction over the Rosebud Indian

Reservation in South Dakota. It is also a signatory to the 1851 and 1868 Fort Laramie Treaties, the latter of which established the Great Sioux Reservation.

32.     The Rosebud Sioux Tribe has approximately 35,354 enrolled members, about 18,932 of whom are eighteen years of age or older.

33.     The Rosebud Indian Reservation is located in south-central South Dakota, along the border with Nebraska, and covers approximately 1.2 million acres. The Rosebud Indian Reservation was established by the Act of Mar. 2, 1889, 25 Stat 888, which partitioned the Great Sioux Reservation.  Today, the Reservation encompasses all of Todd County, and land in Mellette, Tripp, Gregory, and Lyman Counties.

34.     Poverty is common on the Rosebud Indian Reservation. Upon information and belief, approximately 90 percent of families live in poverty and the median household income is $18,483. The majority of these families receive some type of government assistance such as SNAP, Medicaid, CHIP, and TANF.

35.     Given the extreme poverty, members cannot always afford a tank of gas and instead may choose to spend limited funds on necessities such as food or heating.  Many members do not travel long distances often and usually only out of necessity.

8

36.     Lack of vehicle access is common and many people share vehicles. Dependable vehicles that can manage difficult road conditions are rare and a working vehicle is difficult to come by.

37.     There is snow present on the Rosebud Indian Reservation about eight to nine months of the year and roads, which can be unpaved and untended, are often unpassable.

38.     Due to an extreme housing shortage, upon information and belief, it is not uncommon for there to be upwards of ten people sharing a home, and moving from home to home is common.

39.     Upon information and belief, while 911 has addresses for all homes, homes on the Rosebud Indian Reservation are physically unaddressed meaning they do not have an address on them.

40.     Upon information and belief, the majority of homes on the Rosebud Indian Reservation do not receive residential mail delivery. Many homes share post office boxes and travel to post offices can be far.

41.     Many homes do not have broadband access or cannot afford a device to access the Internet.

42.     Poverty, lack of vehicle access, lack of physical address, lack of internet access, inequities in mail delivery service, and limited access to post offices and post office boxes makes it difficult for Rosebud tribal members to register to vote.

43.     Tribal members have to travel significant distances to register. For example, upon information and belief, tribal members in St. Francis, one of the most populated areas on the reservation, have to travel 86 miles one way to Winner, S.D., the closest place where voter registration is offered through the County Auditor and required by law to be offered at Department of Labor and Regulation ("DLR"), Department of Motor Vehicles ("DMV"), and Department of Social Security ("DSS").

44.     Upon information and belief, tribal members who are residents of Mellete County register to vote at the County Auditor, or at the DMV if available, in White River, S.D., which is about 40 miles from Rosebud.

45.     Todd County is an unorganized county and does not offer many services. Mission, the unofficial county seat of Todd County, is the closest DSS office for many Rosebud tribal members but it provides limited services and, upon information and belief, does not provide voter registration.

46.     Upon information and belief, the next closest DSS office is Winner which is approximately 50 miles from Rosebud, South Dakota, where the majority of Rosebud tribal members live.

47.     Voter registration would be more accessible for Rosebud tribal members if Defendants were compliant with the NVRA.

10

48.     The Rosebud Sioux Tribe has paid third party Get Out The Vote ("GOTV") organizers to assist in registering voters, and has facilitated volunteers to assist in registration of Rosebud tribal members.

49.     The Rosebud Sioux Tribe is responsible for protecting the health, safety and welfare of its tribal members. When Rosebud Sioux tribal members are denied registration opportunities, the political power and ability to advocate for Rosebud Sioux needs is reduced, and the Rosebud Sioux Tribe is denied full participation in the federal system through its diminished political power.

50.     The Rosebud Sioux Tribe brings this action on behalf of itself, and as parens patriae on behalf of its members.

51.     Plaintiff **LAKOTA PEOPLE'S LAW PROJECT** ("Lakota Law") is a project of the Romero Institute, a 501(c)(3) nonprofit interfaith law and policy center.  Lakota Law works to protect the inherent sovereignty and the right to autonomous rule and self-determination of Native peoples, with a particular focus on Lakota communities of North and South Dakota.

52.     Lakota Law has long worked to protect Native voting rights and expand Native voter participation as a core part of its mission to elevate the voices of Native Americans across the country.

53.     Lakota Law focuses much of its work in South Dakota because there is a significant population of Lakota People spread across nine tribal nations and in

11

Rapid City, and because Native people face discrimination and exclusion in South Dakota that can only be rectified through a stronger voice in local and national politics.

54.     Recent examples of Lakota Law's voter engagement work in South Dakota include mobilizing Standing Rock tribal members to register to vote in both 2018 and 2020, and engaging in a robust Native voter turnout initiative in 2020.

55.     Lakota Law plans to substantially expand its voter engagement activities in South Dakota in the coming year because there are significant opportunities for Native voters to make their voices heard in critical 2022 elections.

56.     Due to centuries of discrimination and exclusion from economic opportunity, the vast majority of the Native voters Lakota Law targets for engagement are low-income and, upon information and belief, a large percentage are clients of South Dakota public assistance agencies such as the DSS.   Upon information and belief, some also have drivers' licenses or state identification cards, and so are also clients of DPS.

57.     Due to the Defendants' ongoing violations of the NVRA, Lakota Law has expended additional resources on efforts to assist individuals with registering to vote or updating their voter registration address, when those individuals should have been offered voter registration through South Dakota's public assistance agencies or through DPS. Lakota Law expended time, effort, and thousands of dollars on

additional voter registration drives because of Defendants' NRVA noncompliance. As part of its voter registration efforts, Lakota Law has expended additional time, money, and effort on assisting voters with updating their addresses, when those voters should have had their voter registration address automatically updated when they changed their driver's license address with DPS. Lakota Law also expended additional resources investigating claims of voters who experienced difficulty registering to vote or were not on the rolls on Election Day, some of which would not have been necessary if Defendants had complied with the NVRA.

58.     Had the Defendants complied with their obligations under the NVRA, Lakota Law would have deployed these resources toward other activities germane to its purposes, including its voter education and voter turnout activities. Specifically, Lakota Law could have switched its paid canvassing operation over from voter registration efforts to GOTV earlier in the election cycle, or conserved more resources for this work in the final days before the election. GOTV initiatives require resources for outreach to ensure equal access to polls as well as substantial transportation expenses. Due to the rural nature of much of South Dakota, transportation and outreach efforts are especially costly. Based on Defendants' ongoing violations, and its plans to increase voter engagement activities in South Dakota next year, Lakota Law reasonably anticipates that this diversion of resources will continue.

59.     Plaintiff **KIMBERLY DILLON** is a member of the Rosebud Sioux Tribe who resides in Rapid City, South Dakota.  Defendants' failure to comply with the NVRA has denied Ms. Dillion her rightful opportunity to register to vote and participate in the democratic process.

60.     Ms. Dillion is an eligible, unregistered voter who in 2019 indicated that she wished to register to vote while applying for a state ID card at DPS and also completed a voter registration application at a DSS office. In neither case, however, did the agency fulfill its obligations under the NVRA to ensure that Ms. Dillon's voter registration was accepted, transmitted to the relevant election official, and/or processed. As a result, Ms. Dillon was subsequently turned away from the polls as unregistered in 2020.

61.     Defendants' failure to provide Ms. Dillon with federally-mandated voter registration opportunities cost her the opportunity to vote in 2020, and may yet cost her the chance to vote in 2022.

62.     Plaintiff **HOKSILA WHITE MOUNTAIN** is a member of the Standing Rock Sioux Tribe who resides in McLaughlin, South Dakota.  Mr. White Mountain is a former candidate for mayor and current member of the City Council in McLaughlin who plans to run again for city office.  Defendants' failure to comply with the NVRA has injured his past candidacy for mayor of McLaughlin and threatens to undermine his prospects for successfully running for local office.

14

63.     In 2020, Mr. White Mountain ran for mayor of McLaughlin, a city located on the Standing Rock Reservation with a strong majority of Native residents, but a bare majority of Native registered voters.  This voter registration gap has contributed to mostly White governance of a mostly Native locale.

64.     City officials rejected Mr. White Mountain's initial petition to qualify for the ballot, alleging that 11 of the 28 signatures he submitted were invalid because the signatories, who included DSS clients, were not registered to vote in Corson County.  The city rejected Mr. White Mountain's second round of signatures and informed him that he did not qualify for the ballot.  After vigorous protest, the city eventually added Mr. White Mountain's name to the ballot but never informed him, and he therefore ceased campaigning.  After learning he was on the ballot only approximately two weeks before the election, Mr. White Mountain went on to lose the mayoral election by just 13 votes.

65.     While Mr. White Mountain was at the McLaughlin City Auditorium to vote in South Dakota's municipal elections on June 9, 2020, he personally witnessed at least five Native people being turned away from the polls despite believing they were properly registered - at least two of whom he knows to receive public assistance benefits.  He later talked directly with the person who was in charge of the McLaughlin City Hall polling location on June 9, 2020, and learned that several

people complained about being turned away even though they thought they were properly registered to vote.

66.     Defendants' failure to comply with the NVRA by offering federally-mandated voter registration opportunities to McLaughlin residents injured Mr. White Mountain both by making it more difficult for him to qualify for the ballot as a candidate for mayor and likely affecting the election results.  Given Mr. White Mountain's present intent to run for office again in McLaughlin—either for mayor in 2022, or for re-election to city council in 2023—he reasonably anticipates that this harm will persist.

## B.     Defendants

67.     Defendant **STEVE BARNETT** is the Secretary of State of South Dakota and the chief election officer of South Dakota. He is sued in his official capacity. As South Dakota's chief election officer, he is responsible for coordinating the State's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; S.D. Codified Laws § 12-4-33. This includes ensuring that South Dakota's public assistance agencies and Department of Public Safety satisfy their NVRA obligations.

68.     Defendant **CRAIG PRICE** is Cabinet Secretary for the South Dakota Department of Public Safety ("DPS"), and is sued in his official capacity. As Secretary of DPS, Defendant Price is responsible for ensuring that DPS provides

registration opportunities required pursuant to Section 5 of the NVRA and South Dakota law. *See* 52 U.S.C. § 20504; S.D. Codified Laws § 12-4-2.

69.     Defendant **LAURIE GILL** is Cabinet Secretary for the South Dakota Department of Social Services ("DSS"), and is sued in her official capacity. The DSS is a voter registration agency within the meaning of Section 7 of the NVRA, and is so designated by South Dakota law. *See* 52 U.S.C. § 20506(a)(2)(A); S.D. Codified Laws § 12-4-2.  DSS oversees many public assistance programs, including but not limited to, Temporary Assistance for Needy Families ("TANF"), Supplemental Nutrition Assistance Program ("SNAP"), Medicaid/Children's Health Insurance Program ("CHIP"), Child Care Service Assistance Program, and Low Income Energy Assistance Program ("LIEAP"). All of these programs are subject to the requirements of Section 7 of the NVRA. As Secretary of DSS, Defendant Gill is responsible for ensuring that the agency complies with its obligations under the NVRA and South Dakota Law.

70.     Defendant MARCIA HULTMAN is Cabinet Secretary for the South Dakota Department of Labor and Regulation ("DLR"), and is sued in her official capacity. DLR is a voter registration agency within the meaning of Section 7 of the NVRA. *See* 52 U.S.C. § 20506(a)(2)(A). DLR co-administers South Dakota's TANF program with DSS. The TANF program is subject to the requirements of Section 7 of the NVRA. *See* 52 U.S.C. § 20506(a)(2); S.D. Codified Laws § 12-4-2. As

17

Secretary of DLR, Defendant Hultman is responsible for ensuring that the agency complies with its obligations under Section 7 of the NVRA.

## FACTUAL ALLEGATIONS

### SOUTH DAKOTA'S DEPARTMENT OF PUBLIC SAFETY AND SECRETARY OF STATE ARE FAILING TO COMPLY WITH SECTION 5 OF THE NVRA

71.     The NVRA's "Motor Voter" provisions are intended to streamline the federal voter registration process, improve accessibility to voter registration, and increase the number of qualified voters who are properly registered. 52 U.S.C. § 20501; *see also, e.g.*, S. Rep. No. 103-6, at 5 (1993) ("[I]ncorporating voter registration into the drivers licensing process provides a secure and convenient method for registering voters; an effective means of reaching groups of individuals generally considered hard-to-reach for voting purposes . . . and a procedure for keeping rolls current through contact with licensees who change addresses").

72.     To accomplish these objectives, Congress enacted Section 5 of the NVRA, 52 U.S.C. § 20504.

73.     Section 5 requires motor vehicle agencies to provide voter registration services to citizens who engage in certain types of interactions—commonly referred to as "covered transactions."

74.     Section 5 also requires motor vehicle agencies to accept voter registration applications from persons who affirm their eligibility on the application

18

form itself, 52 U.S.C. § 20504, and does not exclude persons without Social Security Numbers ("SSNs") or state driver's licenses from the requirement to accept their voter registration applications.

75.     Relevant here, Section 5 requires that, when an individual notifies a motor vehicle agency of a change of address, the voter registration address must be automatically updated unless the individual affirmatively states that the change of address is not for voter registration purposes. *Id*. § 20504(d). In other words, change of address for voter registration must be "opt out" and not "opt in" when persons register a change of address with DPS.  The NVRA defines a "motor vehicle driver's license" as including "any personal identification document issued by a State motor vehicle authority." *Id*. § 20502(3).

76.     Section 5 also requires that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration," and that, if the individual is already registered, such an application "shall be considered as updating any previous voter registration by the applicant." *Id*. § 20504(a).

77.     Motor vehicle agencies are responsible for transmitting voter registration information received during these covered transactions to the appropriate election officials within ten days of acceptance or, for transactions that occur within

five-days of the deadline to register to vote in an election, within five days. *See Id*. §

20504(e).

78.     These requirements must be met regardless of whether a covered

transaction takes place in-person at a motor vehicle office, online, by mail, over the

phone, or through other remote means.  *See* U.S. Department of Justice, *The National

Voter   Registration   Act   of   1993   (NVRA):   Questions   and   Answers*,

http://www.justice.gov/crt/about/vot/nvra/nvra_faq.php   (stating   that   the   voter

registration requirements under Section 5 apply to all license transactions with

driver's license offices) (last modified Mar. 11, 2020).

### *DPS Fails to Provide Sufficient Voter Registration Services to Customers Who Update Their Addresses Using the South Dakota Driver License/I.D. Card Application*

79.     Under Section 5 of the NVRA, a change of address for a customer's

driver's license must automatically result in updating the voter's address for voter

registration purposes, unless the customer affirmatively opts out of having their

address updated for voter registration purposes. 52 US.C. § 20504(d).

80.     Defendants DPS and the Secretary of State are failing to meet their

NVRA obligations with respect to change-of-address transactions. Individuals who

report a change of address to DPS or who submit a driver's license application or

renewal bearing an address different from the one at which the individual is already

registered do not have their voter registration addresses automatically updated.

Instead, individuals who wish to update their voting address must take additional affirmative steps to do so, in direct violation of Section 5.

81.     DPS uses the South Dakota Driver License/I.D. Card Application form to process change of address requests by customers who submit this form in person at DPS offices or by mail. This form violates Section 5 because it requires applicants to affirmatively check a box saying "yes" if they wish to update their existing voter registration at the same time they are updating their driver license/I.D. Card address. In contrast, the NVRA requires that the voter registration address update must occur automatically unless the voter affirmatively states that the change of address is not for voter registration purposes, typically by checking an "opt-out" box on the form. *Id*. § 20504(d).

82.     The South Dakota Driver License/I.D. Card Application fails to indicate that a change of address for driver's license purposes will automatically update the address for voter registration purposes unless the customer opts out, as required by Section 5.

83.     On information and belief, DPS regularly sends every change of address it collects from customers to the Secretary of State, regardless of the customer's response to the voter registration question on the South Dakota Driver License/I.D. Card Application driver's license form. However, in violation of Section 5, the Secretary of State does not consistently use this information to update voter

registration records. Only when the customer takes the affirmative step of checking the box to register to vote, or the box to update their existing voter registration, does the Secretary of State update the individual's voter registration record to reflect the new address information.

### *DPS Fails to Provide Voter Registration Services to Customers Without a SSN or Driver's License*

84.     Section 5 of the NVRA requires DPS to accept voter registration applications from persons who affirm their eligibility on the voter registration application form itself through a signature attestation.

85.     DPS fails to provide voter registration services to customers who lack either a social security number or a driver's license.

86.     When DPS trains its workers on how to provide voter registration services to customers, it instructs its workers that customers without a SD Driver's License or an SSN can only register to vote in the county auditor's office. *See* S.D. Sec'y of State, *Voter Registration: You Play A Critical Role In The Voter Registration Process* 6 (2017). A copy of this PowerPoint is annexed hereto as **EXHIBIT B**.

87.     DPS' practice of excluding customers without a SD driver's license or SSN from an opportunity to register to vote violates the NVRA because Section 5 does not include those exceptions.

### *DPS Fails to Provide Voter Registration Services at all DPS Offices Serving Tribal Communities and Other South Dakotans*

88.     The DPS office in Dupree – a town that is 66% Native American and adjacent to the Cheyenne River Reservation, does not provide any voter registration services.

89.     If a customer requests voter registration at the Dupree DPS office, the office instructs the customer to visit the County Auditor's office.

90.     Plaintiff Hoksila White Mountain applied for a driver's license in McIntosh, South Dakota in Corson County, and was not offered an opportunity to register to vote.  When he specifically asked about voter registration he was directed to a separate office.

91.     DPS' failure to provide customers of its Dupree and McIntosh offices with any voter registration services violates Section 5 of the NVRA, which requires that an application for a driver's license, including a renewal, will serve as an application for voter registration unless the applicant opts out of voter registration. 52 U.S.C. § 20504(a)(1).

92.     This practice also violates Section 5 of the NVRA, which requires DPS to transmit completed voter applications to the appropriate state election official. *Id*. § 20504(a)(1).

93.     On information and belief, based on the practices discovered at the Dupree and McIntosh DPS offices, other DPS offices serving tribal communities are

similarly directing customers to the County Auditor's office, in violation of the NVRA.

## SOUTH DAKOTA'S PUBLIC ASSISTANCE AGENCIES' FAILURE TO COMPLY WITH SECTION 7 OF THE NVRA

94.     South Dakota's failure to fulfill its NVRA Section 7 obligations has a direct, negative impact on the ability of low-income individuals to register to vote and participate in the democratic process. This failure undermines the underlying purpose of Section 7, which is to ensure that voter registration "will be convenient and readily available [for] the poor . . . who do not have driver's licenses and will not come into contact with the other princip[al] place to register under this Act" (namely, motor vehicle departments). H.R. Rep. No. 103-66, at 19 (1993), *reprinted in* 1993 U.S.C.C.A.N. 140, 144 (Conf. Rep.) ("H.R. Rep. No. 103-66").

95.     The NVRA requires South Dakota to "designate as voter registration agencies . . . all offices in the State that provide public assistance. *See* 52 U.S.C. § 20506(a)(2)(A). "Public assistance" offices include, for example, state offices that administer the SNAP, Medicaid, CHIP, and TANF. *See* H.R. Rep. No. 103-66, at 19; The National Voter Registration Act of 1993 (NVRA), *supra* (identifying offices that provide public assistance under Section 7). In South Dakota, these programs are administered by DSS and DLR, making them "voter registration assistance agencies." S.D. Codified Laws § 12-4-2.

96.     Each Section 7 voter registration agency must provide voter registration services with each covered transaction (*i.e.*, an application, recertification, renewal, or change of address transaction). 52 U.S.C. § 20506(a)(6)(A). The NVRA does not provide an exemption for transactions conducted remotely. Therefore, public assistance agencies must provide these voter registration services during each covered transaction, regardless of whether the transaction takes place in an agency office, over the internet, or via email, mail, telephone, fax, or other remote means.

97.     In providing such services, public assistance agencies must, among other things: (i) ask applicants whether they would like to register to vote or change their voter registration address using statutorily prescribed language (the "Voter Preference Question"); (ii) distribute a voter registration application form with each covered transaction, unless the individual applicant declines in writing to register to vote; (iii) inform each applicant that the decision to register or decline to register to vote will not affect the amount of public assistance provided by the agency; and (iv) provide assistance in completing the voter registration forms to the same degree the agency provides assistance in completing its own forms. *See Id*. § 20506(a). Public assistance agencies must also accept completed voter registration application forms for transmittal to the appropriate State election official. *Id*.

98.     Only if the voter actively declines in writing to register, typically by checking "no" on a form containing the Voter Preference Question and other required

disclosures ("Voter Preference Form") is the agency exempted from the requirement under the NVRA to distribute a voter registration form. *See* 52 U.S.C. § 20506(a)(6)(A).

99.     In short, a client must affirmatively, and in writing, "opt out" of receiving a voter registration application. The provision of the voter registration application is not contingent upon an affirmative request, either written or verbal, from the client, and a lack of response (*i.e.*, leaving the Voter Preference Question blank) may not be treated as a written declination of the registration form.

### *South Dakota has Experienced a Marked Decline in Voter Registration Applications from Public Assistance Agencies*

100.     As reported by South Dakota to the U.S. Election Assistance Commission ("EAC"), the number of voter registration applications originating at public assistance agencies in South Dakota has precipitously declined, from 7,000 in the 2004 election cycle to just 1,100 in the 2016 cycle, also a presidential election. *See* U.S. EAC, *The Impact of the National Voter Registration Act, 2003-2004* 23, https://www.eac.gov/sites/default/files/eac_assets/1/6/NVRA%202003-2004%20Report%20Tables%201-4.pdf (last visited on July 7, 2021); U.S. EAC, *2016                        EAVS                        Data                        Brief*,

https://www.eac.gov/sites/default/files/eac_assets/1/6/South_Dakota_-_EAVS_2016_Data_Brief_-_508.pdf (last visited on July 7, 2021).[1]

101.    South Dakota's decrease in the number of voter registration applications originating at public assistance agencies cannot be attributed to a decrease in participation in public assistance programs. For example, in 2004, when South Dakota collected 7,000 voter registration applications through public assistance offices, the state's average monthly participation for SNAP (known as "Food Stamps" at that time) was only 53,459. *See*, Food and Nutrition Service, U.S. Department of Agriculture, *Food Stamp Program State Activity Report, Federal Fiscal Year 2004* (Feb. 2006), https://fns-prod.azureedge.net/sites/default/files/2004_state_activity.pdf. By comparison, in 2016, when South Dakota collected only 1,100 voter registration applications through public assistance offices, the state's average monthly participation for SNAP was 95,983. *See* Food and Nutrition Service, Department of Agriculture, *State Activity Report, Fiscal Year 2016* (Sept. 2017), https://fns-prod.azureedge.net/sites/default/files/snap/FY16-State-Activity-Report.pdf.

---

[1] EAC data show that South Dakota reported 2,921 public assistance agency voter registration applications in the 2018 election cycle. *See* U.S. EAC, *Election Administration and Voting Survey 2018 Comprehensive Report* (June 2019), https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf . The 2016 numbers are useful to compare to a prior presidential year and calibrate against the SNAP numbers listed below.

102.    The decrease in South Dakota's reported number of voter registration applications from public assistance agencies in 2016 amounts to an 84% decrease in voter registration applications compared to the 2004 presidential election, despite an 80% increase in the number of those receiving benefits.  Stated differently, in 2004, up to 13% of those receiving food assistance benefits received voter registration assistance (7,000 applications at all public assistance agencies divided by 53,459 food assistance clients) while in 2016 a maximum of 1.1% of those receiving nutrition benefits successfully submitted a voter registration application (1,100 divided by 95,983), a rate 11.8 times lower in 2016 than in 2004.

103.    The decrease in voter registration applications does not reflect a lack of need for these services. As of 2016, only 63% of South Dakota citizens earning an annual family income of less than $30,000 reported being registered to vote compared to 77% of those citizens earning $50,000 or more, a 14-percentage point gap. Demos analysis of 2016 Current Population Survey Voting and Registration Supplement, https://www.census.gov/cps/data/ (last visited August 20, 2020).

104.    A decrease in voter registration applications, in spite of increased public assistance caseloads and the persistently low voter registration rate among those who use public assistance, indicates that Defendants are systematically failing to comply with the NVRA and, as a result, causing disproportionate harm to voter participation by low-income groups and people of color.

### *DSS Fails To Provide Voter Registration Applications to Clients Who Do Not Affirmatively Decline in Writing*

105.   DSS is violating the NVRA by failing to provide mandated voter registration applications to clients who do not affirmatively decline in writing to register to vote. A client who leaves the Voter Preference Question blank is not provided with a voter registration application.

106.   Pursuant to Section 7 of the NVRA, if the client declines to respond to the Voter Preference Question (i.e., leaves it blank), the agency still must furnish a voter registration application. 52 U.S.C. §§ 20506(a)(6)(A), (B)(iii). Only if a client affirmatively answers "no" in writing to the Voter Preference Question can the agency withhold a voter registration application. *Id*; *also see Valdez v. Squier*, 676 F.3d 935, 945-46 (10th Cir. 2012) (The NVRA "must be interpreted as requiring a designated voter registration agency to provide an applicant with a voter registration form unless the applicant declines, in written form, to register to vote. . . . Thus, in sum, [the NVRA] requires an applicant to affirmatively, by way of writing, 'opt out' of receiving a voter registration form."); *Action NC v. Strach*, 216 F. Supp. 3d 597, 640 (M.D.N.C. 2016) (following *Valdez* court's interpretation of opt-out requirement based on plain language statutory construction).

107.   It is the practice of DSS, during at least some covered transactions at DSS offices, to withhold voter registration applications from clients who do not

specifically request them by checking "yes" in response to the Voter Preference Question.

108.    The Pierre and Rapid City DSS offices told Plaintiffs' field investigators that they do not provide voter registration applications to clients who leave the Voter Preference Question blank on the Economic Assistance Application, which is the application used to apply for TANF, SNAP, and Medicaid benefits in DSS offices.

109.    The DSS office in Eagle Butte skipped over the Voter Preference Question while reviewing the Economic Assistance Application with a field investigator, which indicates an office practice that would regularly result in blank responses to the Voter Preference Question.

110.    Additionally, the field investigators encountered at least two examples of public benefits applicants who recalled leaving the Voter Preference Question blank, and who did not receive a voter registration application during transactions that occurred at the DSS offices in Eagle Butte and Rapid City.

111.    This "opt-in" policy of treating a blank response to the Voter Preference Question as a declination is in violation of Section 7's mandated written declination.

112.    Plaintiffs' investigators interviewed a DSS client who applied for LIEAP at the DSS office in Winner but did not receive a voter registration application and did not recall any oral or written Voter Preference Question during that transaction.

113.     Plaintiffs' investigators interviewed a DSS client who applied for Medicaid at the DSS office in Rapid City who did not receive voter registration services while completing an application.

114.     A client who completes a covered transaction via telephone is not able to affirmatively decline voter registration in writing, as required by the NVRA. As a result, the NVRA requires that all clients completing a telephone transaction subsequently be mailed a Voter Preference Form and/or a voter registration application. However, upon information and belief, DSS does not provide a voter registration application form or Voter Preference Form to any client who completes a covered transaction via telephone unless the client affirmatively requests a voter registration application.

### _DSS Fails to Comply with Section 7's Voter Registration Requirements During Change-of-Address, Renewal, and Recertification Transactions_

115.     Some DSS offices recertify public benefits without asking clients the Voter Preference Question.  The DSS offices in Rapid City and Mission use Form DSS-EA-214 to recertify benefits, but Form DSS-EA-214 does not ask the Voter Preference Question. Thus, DSS does not consistently provide the required NVRA voter registration services to its clients during covered transactions to recertify public benefits. On information and belief, the violations concerning recertification transactions that are occurring in the offices identified above are also occurring in other South Dakota DSS offices.

31

116.     Some DSS offices process change of address requests without asking clients the Voter Preference Question.  None of the DSS offices interviewed by Plaintiffs' investigators offer clients forms to report a change of address that ask the Voter Preference Question. DSS offices in Rapid City and in Mission use the same non-compliant form they use for recertifications, Form DSS-EA-214, which does not ask the Voter Preference Question. The DSS office in Pine Ridge uses a form titled "Note to Benefits Specialist" to process change of address requests, and this form does not ask the Voter Preference Question. The office in Hot Springs has its own change of address form, and it does not ask the Voter Preference Question.

117.     DSS also fails to provide voter registration services when a client reports a change of address by telephone, in violation of Section 7 of the NVRA.

118.     It is not possible for a client to decline the offer of voter registration in writing, as required by Section 7 of the NVRA, during Change of Address transactions conducted over the telephone.

119.     On information and belief, there is also no guidance in the DSS policy manual or elsewhere for furnishing the required NVRA disclosures, which also must be provided in writing to clients conducting a covered transaction over the phone.

120.     DSS's failure to provide these services when clients report a change of address during a remote transaction violates the requirements of the NVRA.

32

### *Some Covered Voter Registration Agencies Use Forms that Do Not Even Ask the Voter Preference Question*

121.    The application forms for LIEAP, Childcare Service Assistance, and Medicaid/CHIP programs in South Dakota do not even include the Voter Preference Question required by the NVRA. This directly violates Section 7 of the NVRA.

### *DSS Fails to Consistently Distribute Voter Registration Forms, Provide Assistance, or Accept Completed Voter Registration Applications During Covered Transactions for  Clients who Answer "Yes" to the Voter Preference Question*

122.    For some DSS clients who complete a covered transaction and check "yes" in response to the Voter Preference Question, DSS is failing to (i) effectively distribute voter registration forms, (ii) provide the necessary assistance in registering to vote, and (iii) accept and transmit completed voter application forms.

123.    Plaintiffs' investigators interviewed a DSS client who answered "yes" to the Voter Preference Question while applying for SNAP and TANF benefits at the DSS office in Rapid City, but never received any voter registration form or assistance.

124.    Plaintiffs' investigators interviewed a DSS client who answered "yes" to the Voter Preference Question while applying for SNAP and TANF at the DSS office in Pine Ridge, but never received any voter registration form or assistance.

125.    The practice of failing to provide voter registration applications to public benefits clients who answer "yes" to the Voter Preference Question violates Defendants' duties under Section 7 of the NVRA.

126.     Plaintiffs' investigators interviewed a DSS office worker in Pierre who recalled personally answering "yes" to the Voter Preference Question while applying for SNAP benefits, and later receiving a voter registration application in the mail instead of during the transaction itself.

127.     On information and belief, the practice of not consistently providing a voter registration application to persons answering "yes" to the Voter Preference Question while conducting covered transactions extends to other DSS offices beyond those identified in paragraphs 123 to 126, *supra*.

128.     The practice of failing to provide voter registration applications to individuals who answer "yes" to the Voter Preference Question ***during*** covered transactions does not comply with the provisions of Section 7.  *See* 52 U.S.C. § 20506(a)(4)(A)(i); *id.* 20506(a)(6)(A) (stating that "voter registration agenc[ies] … shall . . . distribute ***with*** each application for such service or assistance, and with each recertification, renewal, or change of address form relating to such service or assistance—[a voter registration form]") (emphasis added).

129.     Plaintiff Kimberly Dillon and her partner Kesean Stinson both filled out voter registration applications at the DSS office in Todd County in December of 2019 and yet both were turned away from the polls at their Todd County precinct in 2020 and told they were not on the list of registered voters.

130.     Plaintiff Hoksila White Mountain is a DSS client who has applied for SNAP benefits and conducted change of address transactions in DSS offices in Hughes County and Corson County and has either not been offered the chance to register to vote or has filled out voter registration applications only to later discover that he was not added to the voter rolls.

131.     The failure to properly transmit completed voter registration applications to local elections officials does not comply with the provisions of Section 7 of the NVRA.  *See* 52 U.S.C. §§ 20506(a)(4)(A)(iii).

## Defendants Fail to Provide Equal Assistance to Clients with Criminal Records

132.     DSS fails to consistently provide clients with needed information about their eligibility to register to vote.

133.     Applicants with conviction histories are eligible to vote in South Dakota upon completion of their sentence, including probation, parole, and restitution.  S.D. Codified Laws § 12-4-18; S.D. Sec'y of State, *Felony Convictions*, https://sdsos.gov/elections-voting/voting/register-to-vote/felony-convictions.aspx (last visited on July 7, 2021).

134.     In South Dakota, Native Americans make up a disproportionate share of the federal criminal caseload. Natives constituted 51.5% of the 2019 federal caseload in South Dakota, U.S. Sentencing Comm'n, *Quick Facts Native American Offenders*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-

35

facts/Native_American_Offenders_FY19.pdf (last visited July 7, 2021), but are just 9% of the State's population. U.S. Census Bureau, *Quick Facts: South Dakota*, https://www.census.gov/quickfacts/fact/table/SD# (last visited July 7, 2021).

135.     Plaintiffs' investigators interviewed a DSS client who had completed her sentence and was eligible to vote when she applied for SNAP, TANF, and Medicaid at the Martin DSS office. The DSS case worker who assisted this client with her application skipped the Voter Preference Question when reviewing the benefits application form because this client had once been convicted of a felony, even though she was now eligible to vote under South Dakota law.

136.     Failure to provide accurate assistance regarding voter eligibility violates the equal assistance requirements of Section 7 of the NVRA, 52 U.S.C.S. § 20506(a)(6)(C).

### *Defendants Fail to Accept Completed Voter Registration Applications and Timely Transmit Them to County Auditors*

137.     The NVRA requires public assistance staff to transmit completed voter registration applications to county auditors within ten days after the date the agency accepts the completed voter registration form, or five days if the agency accepts the completed voter registration form within five days of the last day to register to vote in an election.

138.     DSS offices serving tribal communities do not consistently accept completed voter registration forms to submit to county auditors.

139.    A DSS client told Plaintiffs' field investigators that she received a voter registration application during a covered transaction changing her address at the DSS office in Pine Ridge, but the DSS worker then instructed this client to mail it in herself. On information and belief, this practice is likely occurring in other DSS offices.

140.    DSS's practice of failing to accept all "completed voter registration forms for transmittal to the appropriate State election official" violates the provisions of Section 7 of the NVRA. 52 U.S.C.A. § 20506(a)(4)(A)(iii).

141.    Even though South Dakota law requires that voter registration applications "completed at any local, state, or federal agency during any week commencing on Tuesday through the following Monday shall be sent to the appropriate county auditor by the agency receiving the registration card no later than the following Wednesday," S.D. Codified Laws § 12-4-5, DSS has insufficient policies to ensure that DSS workers uniformly comply with NVRA and state law requirements on timely submission of voter registration applications to county auditors.

142.    The DSS Policy Manual only requires employees to send voter registration applications to the county auditors "before election time" and does not mention the submission deadlines required by the NVRA or South Dakota law.

143.     DSS's vague instruction to employees to send voter registration applications to the county auditors "before election time" is wholly insufficient to comply with the NVRA's specific requirements on timely submission.

144.     On information and belief, DSS does not have a process to collect completed voter registration forms that it mails or faxes to public benefits clients.

145.     DSS' failure to require timely submissions to county auditors violates Section 7 of the NVRA.

### *DSS and DLR Offices Fail to Offer an Opportunity to Register to Vote to All Public Benefits Applicants*

146.     The DSS office in Rapid City does not offer voter registration forms when processing renewals or recertifications for public benefits.

147.     The practice of failing to provide voter registration services during all covered transactions, including during transactions to renew or recertify public benefits, violates Section 7 of the NVRA.

148.     The DSS Hot Springs office does not offer any voter registration assistance in-house, and instead directs clients who answer "yes" to the Voter Preference Question to visit the county auditor's office to apply for voter registration there.

149.     DSS' practice of directing some clients who answer "yes" to the voter preference question to the county auditor's office to apply for voter registration

violates Section 7 by preventing people from registering to vote while applying for benefits, rather than having to visit a separate office.

150.    The DLR website states that "The Department of Labor and Regulation administers [TANF] together with the Department of Social Services." S.D. DLR, *Temporary       Assistance       for       Needy       Families       (TANF)*, https://dlr.sd.gov/localoffices/job_search_tools/tanf.aspx (last visited July 7, 2021).

151.    DLR typically receives applications for TANF assistance in-person, but DLR employment service specialists who receive TANF applications via fax, telephone, and mail may accommodate those clients.

152.    Given that DSS and DLR accept applications for benefits in all these ways, they also must provide an opportunity to apply for voter registration in these transactions.

153.    DLR does not provide voter registration applications to TANF clients, nor does it accept and transmit voter registration applications from such clients.

154.    When DLR receives an Economic Assistance Application form from a TANF client indicating that the applicant would like to register to vote, it does not provide that applicant with a voter registration form.

155.    According to DLR, it "does not receive voter registration applications" and specifically "does not receive voter registration forms from TANF applicants."

156.     DLR staff do not provide voter registration services regardless of the way an applicant fills out the voter preference question on the Economic Assistance Application.

157.     DLR's failure to provide clients with an opportunity to register to vote while applying for TANF directly violates Section 7 of the NVRA, which requires DLR to provide all TANF applicants with a voter registration form unless the client declines in writing to register to vote.

158.     DLR's and DSS's processes for providing voter registration services to TANF applicants also violate Section 7 to the extent that these agencies fail to distribute voter registration forms with each TANF application and fail to provide the same degree of assistance with voter registration as with the TANF application process.  52 USCA §§ 20506(a)(6)(A), 20506(a)(6)(C).

159.     To the extent that DSS mails voter registration forms to TANF applicants who mark that they want to register to vote, regardless of whether DSS received the Economic Assistance Application from DLR or directly from the TANF applicant, that practice violates Section 7.

160.     The NVRA requires agencies to "distribute [voter registration forms] with each [TANF] application." *Id*.  § 20506(a)(6)(A).  The term "with" means that the South Dakota Voter Registration Form should be provided in the same transaction as a TANF applicant's in-person meeting with a DLR local office.

40

161.     DSS' subsequent mailing of the voter registration form to the TANF applicant would be a later transaction that does not satisfy Section 7 of the NVRA.

162.     DSS's practice of mailing voter registration forms to clients who applied for TANF in-person at a DLR office also violates Section 7's requirement that agencies provide the same degree of assistance with voter registration as they do for the TANF application process. *Id.* § 20506(a)(6)(C).

163.     If a person receives in-person assistance at a DLR office in completing their TANF application, then receiving a voter registration form in the mail, without the opportunity for assistance with completing it, is an inferior level of assistance that violates the equal assistance requirements of Section 7.

### *DSS Offices Fail to Consistently Process and Submit Completed Voter Registration Applications*

164.     Federal law requires public benefits agencies to accept completed voter registration applications and mail them to county auditors, regardless of whether the client who completed the form lists a non-9-1-1 address, or no address at all.

165.     The instructions on the EAC's National Voter Registration Form specifically provide a system to document the home address of applicants who live in rural areas: "Note: If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C (at the bottom of the form)." *Se*e EAC, *Register To Vote In Your State By Using This Postcard           Form           and           Guide*,

41

https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf (last visited on July 7, 2021).

166.     As noted in paragraphs 22 and 39 above, many residences on tribal reservations do not have a physical address.

167.     DSS offices serving tribal communities fail to consistently process and submit all completed voter registration applications to county auditors.

168.     On October 11, 2019, Plaintiffs' field investigators encountered a person who had walked about 30 miles from Porcupine, SD to the Pine Ridge DSS field office in 12-degree Fahrenheit weather to submit a change of address request for his SNAP benefits.

169.     In violation of Section 7 of the NVRA, this DSS client was not offered a voter registration application during his change-of-address transaction.

170.     Following this transaction, the field investigators provided this DSS client with a voter registration application, assisted his completion of the application, and delivered his completed application to the Pine Ridge DSS field office.

171.     A staff person at the DSS office threw the completed voter registration form in the trash and told the field investigator that she refused to accept the voter registration application because she was following orders from a DSS memorandum instructing DSS workers to refuse voter registration applications lacking a "9-1-1 address."  The field investigator asked the Pine Ridge DSS worker to remove the

voter registration form from the trash, showed the worker that the address in that application was sufficient for voter registration purposes, and asked the worker to mail in the completed application to the county auditor.

172.     The Pine Ridge field office did not respond to inquiries asking whether it had mailed in the voter registration application. On information and belief, this DSS client is still is not registered as of the date of this amended complaint.

## SOUTH DAKOTA HAS FAILED TO CORRECT ITS ONGOING NVRA VIOLATIONS

173.     To ensure state compliance, the NVRA provides that "[a] person who is aggrieved by a violation of [the NVRA] may provide written notice of the violation to the chief election official of the State involved."  52 U.S.C. § 20510(b)(1).  If the violation is not corrected within a period of time set by statute (ordinarily 90 days, but 20 days if violations occur within 120 days of a federal election), "the aggrieved person may bring a civil action . . . for declaratory or injunctive relief . . . ."*Id*. § 20510(b)(2).

174.     On May 20, 2020, counsel for Plaintiffs sent a notice letter to Defendants notifying them of numerous NVRA violations. The letter indicated that Plaintiffs' counsel was prepared to meet with Defendants to help them develop a comprehensive compliance plan. *See* **EXHIBIT A**.

175.     But, upon information and belief, the NVRA violations identified in Plaintiffs' notice letter have not been cured. The Defendants sent a response to the

43

Notice Letter in June 2020 which acknowledged the need to comply with the NVRA; but provided no specifics on how or when this compliance would be achieved. Defendants entirely failed to respond to a subsequent letter asking for specifics on how and when compliance would be achieved.

176.     As a result of Defendants' continuing failure to ensure compliance with Sections 5 and 7 of the NVRA, persons applying for and renewing driver's licenses or state identification cards, or updating their addresses, and persons applying for and renewing public assistance, or updating their addresses, are still not being consistently offered the opportunity to register to vote as required by the NVRA.

## FIRST CAUSE OF ACTION

### Violation of Section 5 of the National Voter Registration Act of 1993

177.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 93 and 173 through 176 as if fully set forth herein.

178.     Defendants Barnett and Price have failed, and continue to fail, to provide voter information and registration opportunities and assistance as required by Section 5 of the National Voter Registration Act of 1993, 52 U.S.C. § 20504.

## SECOND CAUSE OF ACTION

### Violation of Section 7 of the National Voter Registration Act of 1993

179.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 70 and 94 through 176 as if fully set forth herein.

180.     Defendants Barnett, Gill and Hultman have failed, and continue to fail, to provide voter information and registration opportunities and assistance to clients of public assistance agencies as required by Section 7 of the National Voter Registration Act of 1993, 52 U.S.C. § 20506.

**Basis For Injunctive Relief**

181.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 178 as if fully set forth herein.

182.     Defendants have violated Sections 5 and 7 of the NVRA by depriving South Dakota voters of opportunities to register to vote or to receive assistance with voter registration in accordance with these statutory provisions.

183.     Missed voter registration opportunities impose unnecessary and legally-prohibited burdens on voters who must seek out voter registration materials and opportunities that should have been provided to them by Defendants and may result in complete disenfranchisement when voters do not, or cannot, create such opportunities for themselves prior to South Dakota's voter registration deadline. Because monetary relief cannot compensate for these lost opportunities to participate in the democratic process, Plaintiffs have no adequate remedy at law for Defendants' violation of their rights, and will suffer irreparable harm without injunctive relief.

184.     Defendants will suffer no undue harm if compelled to comply with their statutory obligations, while voters may be wholly deprived of their right to vote if

Defendant's violations of the law continue, and therefore, the balance of hardships favors a mandatory permanent injunction against Defendants.

185.     Issuing an injunction against Defendants promotes the public interest by ensuring voter rolls are accurate and current, and by increasing the number of eligible individuals in tribal communities who are able to vote and have their voices heard.

186.     Injunctive relief is required to remedy Defendants' current and past violations of these laws and to secure ongoing compliance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants on the claims for relief as alleged in this Complaint and enter an Order:

(i)     declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated Section 5 of the National Voter Registration Act of 1993, 52 U.S.C. § 20504, by failing to provide required voter registration services during driver's license and identification application and renewal processes and change of address transactions;

(ii)     declaring, pursuant to 28 U.S.C. § 2201 and 52 U.S.C. § 20510(b)(2), that Defendants have violated Section 7 of the National Voter Registration Act of 1993, 52 U.S.C. § 20506, by failing to provide required voter registration services

through agencies that provide public assistance, including the South Dakota Department of Social Services and South Dakota Department of Labor Relations;

(iii)    pursuant to 28 U.S.C. § 2202, temporarily and permanently enjoining Defendants, their agents and successors in office, and all persons working in concert with them, from implementing practices and procedures that violate, or fail to ensure compliance with, Sections 5 and 7 of the NVRA, 52 U.S.C. § 20506;

(iv)    pursuant to 28 U.S.C. § 2202, directing Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all appropriate measures necessary to remedy the harm caused by their non-compliance with Sections 5 and 7 of the NVRA, including, without limitation, ensuring that individuals affected by Defendants' non-compliance are provided remedial opportunities for voter registration;

(v)    pursuant to 28 U.S.C. § 2202, directing Defendants, under a court-approved plan with appropriate reporting and monitoring requirements, to take all steps necessary to ensure ongoing compliance with the requirements of Sections 5 and 7 of the NVRA, 52 U.S.C § 20506, including, without limitation, procedures for distribution of voter registration applications and voter preference forms, and training and monitoring personnel to ensure that designated agencies are providing voter registration services to each person who applies for a driver's license, identification, or public assistance benefits, and each person who recertifies, renews,

or changes address for a driver's license, identification, or benefits, inquiring of all

such persons, in writing, whether they would like to register to vote or change their

voter registration address and providing to them the NVRA-required information

concerning the voter registration process, assisting such persons in completing voter

registration applications to the same degree that assistance is provided with other

public assistance forms, accepting completed voter registration forms, and timely

transmitting completed registration forms to the appropriate election authority;

(vi)    awarding Plaintiffs reasonable attorney fees, including litigation

expenses, and costs pursuant to 52 U.S.C. § 20510(c);

(vii)   retaining jurisdiction over this action to ensure that Defendants are

complying with their obligations under the NVRA; and

(viii)  awarding such other and further equitable relief as the Court deems just

and proper.


Dated: August 10, 2021                          Respectfully submitted,


                                                */s/ Terry Pechota*
                                                _____
JACQUELINE DE LEÓN*                             TERRY PECHOTA
KIM GOTTSCHALK*                                 SD SBN 2002
NATIVE AMERICAN RIGHTS FUND                     PECHOTA LAW OFFICE
1506 Broadway                                   1617 Sheridan Lake Road
Boulder, CO 80302-6296                          Rapid City, SD 57702
(303) 447-8760                                  (605) 341-4400
jdeleon@narf.org                                tpechota@1868treaty.com
jeronimo@narf.org

SAMANTHA B. KELTY*
NATIVE AMERICAN RIGHTS FUND
1514 P St. NW Ste. D
Washington, DC 20005
(928) 814-8922
kelty@narf.org

ADAM LIOZ*
DĒMOS
740 6th Street NW, 2nd Floor
Washington, DC 20001
(202) 864-2746
alioz@demos.org

BRENDA WRIGHT*
DĒMOS
80 Broad Street, 4th Floor
New York, NY 10004
(646) 948-1621
(212) 633-1405
bwright@demos.org

*Attorneys for Plaintiffs*
*Admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2021, I electronically transmitted the

attached document to the Clerk's Office using CM/ECF System for filing and

mailed a copy to:

> Steve Barnett
> Secretary of State
> Capitol Building
> 500 East Capitol Avenue, suite 204
> Pierre, SD 57501-5070

> Laurie Gill
> Cabinet Secretary
> 700 Governors Drive
> Pierre, SD 57501

> Marcia Hultman
> Cabinet Secretary
> Department of Labor and Regulation
> 123 W. Missouri Avenue
> Pierre, SD 57501-0405

> Craig Price
> Cabinet Secretary
> Department of Public Safety
> 118 W Capitol Avenue
> Pierre, SD 57501

/s/ Terry Pechota