UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| ROSEBUD SIOUX TRIBE and their members, OGALALA SIOUX TRIBE and their members, and LAKOTA PEOPLE'S LAW PROJECT, Kimberly Dillion, and Hoksila White Mountain, | ) ) ) ) ) ) | 5:20-cv-05058-LLP |
| Plaintiffs, | ) ) ) | DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS |
| v. | ) ) | |
| STEVE BARNETT, in his official capacity as Secretary of State for the State of South Dakota and Chairperson of the South Dakota State Board of Elections; LAURIE GILL, in her official capacity as Cabinet Secretary for the South Dakota Department of Social Services; MARCIA HULTMAN, in her official capacity as Cabinet Secretary for the South Dakota Department of Labor and Regulation; and CRAIG PRICE, in his official capacity as Cabinet Secretary for the South Dakota Department of Public Safety, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Defendants object to Plaintiffs' Statement of Undisputed Material Facts

("Statement"), filed in support of its Motion for Summary Judgment (ECF 78),

for failure to identify "facts" that are "material" to its motion. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that a fact is

"material" only if it "might affect the outcome of the suit under the governing law"). Rather than providing only material facts, Plaintiffs offer, instead, factual assertions, including general background information and matters otherwise immaterial to this case.

Subject to this objection, pursuant to Rule 56.1B of the Civil Local Rules of Practice of the United States District Court District of South Dakota, Defendants, by the undersigned counsel, respectfully submit the following response to Plaintiffs' Statement. This response is designed solely to respond to the Plaintiffs' Statement by identifying which of the factual grounds for Plaintiffs' motion are disputed. These disputes relate only to facts Plaintiffs proffer and have no bearing on Defendants' Motion to Dismiss or the factual support for that Motion.

## <u>RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.      The National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501– 20511, is a federal law that took effect on January 1, 1995, Pub. L. 103–31, §13, May 20, 1993, 107 Stat. 89.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

2.      When it passed the NVRA, Congress found that: (1) the right of citizens of the United States to vote is a fundamental right; (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities. 52 U.S.C. § 20501(a).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

2

3.      In passing the NVRA, Congress intended, inter alia, "(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;[and] (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. § 20501(b).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

4. Section 5 of the NVRA, 52 U.S.C. § 20504 ("Section 5"), also known as the NVRA's "Motor Voter" provision, was intended to further Congress' objective of increasing the number of eligible citizens who register to vote by incorporating voter registration into the driver's licensing process.  See S. Rep. No. 103-6, at 5 (1993).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

5.      Section 7 of the NVRA, 52 U.S.C. § 20506 ("Section 7"), was intended by Congress to ensure that voter registration "will be convenient and readily available [for] the poor. . . who do not have driver's licenses and will not come into contact with the other princip[al] place to register under this Act" by making voter registration available at public benefits offices and other locations. H.R. Rep. No. 103-66, at 19 (1993), reprinted in 1993 U.S.C.C.A.N. 140,144 (Conf. Rep.).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

6.      A "covered agency" is any state office or agency required to provide voter registration services under Sections 5 or 7 of the NVRA, including any "voter registration agency" as defined by the NVRA.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

**Further, the NVRA does not contain the phrase "covered agency" and it is not defined in the NVRA.**

7.      A "covered transaction" is any interaction at a covered agency during which voter registration services must be provided under the NVRA, whether conducted in person or remotely. Under Section 5, covered transactions include a driver's license application (including any renewal application" and a change of address. 52 U.S.C. §§ 20504(a)(1), (d). Under

Section 7, covered transactions include public assistance benefits applications, renewals, recertifications, and changes of address. 52 U.S.C. § 20506(a)(6).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

**Further, the NVRA does not contain the phrase "covered transaction" and it is not defined in the NVRA.**

**Further, Defendants object to Plaintiffs' statement that voter registrations services must be provided under the NVRA if done "remotely" because "remotely" is not contained in the NVRA and it is not defined.**

8. "Voter registration application" means any application, form, or card, or any portion thereof, through which an individual can register to vote or update their voter registration, including the "mail voter registration form" described in 52 U.S.C. § 20508(b) or an equivalent form.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

**Further disputed, the NVRA does not contain the phrase "voter registration application" and it is not defined in the NVRA.**

9.     Section 5 requires state motor vehicle agencies and driver's license offices provide voter registration services in connection with driver's license applications, renewals, and change of address transactions. 52 U.S.C. § 20504.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

10.     Section 5 requires that "[e]ach State motor vehicle driver's license application (including any renewal application) submitted to the appropriate State motor vehicle authority under State law shall serve as an application for voter registration with respect to elections for Federal office unless the applicant fails to sign the voter registration application" and that "[a]n application for voter registration submitted under paragraph (1) shall be considered as updating any previous voter registration by the applicant." 52 U.S.C. § 20504(a).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

11.     Under Section 5, "[e]ach State shall include a voter registration application form for elections for Federal office as part of an application for a State motor vehicle driver's license." 52 U.S.C. § 20504(c)(1).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

12.    With respect to change of address transactions, Section 5 requires that "[a]ny change of address form submitted in accordance with State law for purposes of a State motor vehicle driver's license shall serve as notification of change of address for voter registration with respect to elections for Federal office for the registrant involved unless the registrant states on the form that the change of address is not for voter registration purposes." 52 U.S.C. § 20504(d).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

13.    Under Section 7, a "voter registration agency" is any agency designated by a state "for the registration of voters in elections for Federal office," which must include "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities." 52 U.S.C. §§ 20502(5), 20506(a)(1)-(2).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

14.    Under Section 7, a voter registration agency that provides public assistance benefits or services must provide voter registration services in connection with each application, recertification, renewal, or change of address in connection with a public assistance benefit or service provided by the agency. 52 U.S.C. § 20506(a)(6)(A).

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

**Further disputed.  As read, Plaintiffs' statement would include "public benefits" and "public services" and Defendants' dispute those characterizations.  The phrases "public benefits" and "public services" are not used anywhere in 52 U.S.C. § 20506.  Section 52 U.S.C. § 20506(a)(6)(A) speaks for itself.**

15.    Section 7 further requires that, for each covered transaction, a voter registration agency provide a form containing the question, "If you are not registered to vote where you live now, would you like to apply to register to vote here today?" (the "voter preference question") and the other required language contained in 42 U.S.C. § 20506(a)(6)(B). The required form is referred to as a "voter preference form" and is sometimes referred to by South Dakota agencies

as a "declination form."

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

**Further disputed, Defendants object to the use of the phrase "covered transaction" as that phrase is not contained in the NVRA.**

16.    The NVRA requires that "[e]ach State shall designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

17.    South Dakota has designated as voter registration agencies those offices and locations identified by S.D. Codified Laws § 12-4-2, which states:

> Voter registration shall be conducted by each county auditor and municipal finance officer. Voter registration shall be available at the secretary of state's office and at those locations which provide driver licenses; food stamps; temporary assistance for needy families; women, infants, and children nutrition program; Medicaid; military recruitment; and assistance to the disabled as provided by the Department of Human Services.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

18.    In South Dakota, the Department of Public Safety ("DPS") is the State's driver's licensing authority. See S.D. Codified Laws §§ 32-12-2, 32-12-3.2, 32-12-4, 32-12-11, 32-12-17.

**RESPONSE:  Disputed.  This statement contains legal conclusions, not material assertions of fact.**

19.    In South Dakota, "locations which provide driver licenses" include DPS offices and "issue sites" operated by local or county government offices, or by other entities, under agreements with DPS. Ex. 13 (Ex. 4 to Schrank Dep.).

**RESPONSE:  Undisputed.**

20.    In South Dakota, the Department of Social Services ("DSS") is the agency responsible for determining eligibility for and administering "food stamps" (now known as Supplemental Nutrition Assistance Program, or SNAP, benefits) and Temporary Assistance for Needy Families ("TANF") benefits, among other public assistance programs. S.D. Codified

Laws § 28-1-1.

**RESPONSE:  Undisputed.**

21.    The South Dakota Department of Labor and Regulations ("DLR") administers the employment and job training components of the TANF and SNAP programs, as well as a range of public assistance programs under the federal Workforce Innovation and Opportunity Act ("WIOA"). Ex. 3 (McEntaffer Dep. 33:20-34:11, 62:1-3, 78:9-19, 79:1-6, 82:3-83:7, 85:1-86:22, 87:1-21, 97:1-98:12, 101:11-21, 105:15-22, 106:1-107:22, 108:1-20, 142:12-22, 172:13-173:20, 177:1-9, 178:10-179:22); Ex. 4 (McEntaffer Dep. Exs. 11, 12, Vol. 2 Exs. 1, 2); Ex. 8A (DLR, S.D. Website, https://dlr.sd.gov/localoffices/job_search_tools/default.aspx).

**RESPONSE:  Disputed.  Defendants' dispute that DLR provides public assistance and administers the employment and job training components of the TANF and SNAP programs as DLR gets funding from DSS to provide employment and training activities and their role is to provide DLR services when working with TANF or SNAP clients and DLR provides services regardless of TANF eligibility.  Pls. Ex. 3 (McEntaffer Dep. 33:22-34:11); Pls. Ex. 10 (Miller Dep 159:18-160:2-7, 160:21-161:1, 161:6-162:1, 163:6-14).**

**DLR disputes the references to the WIOA program and to any inferences that DLR needs to provide voter registration services under the WIOA program.  This factual allegation was never raised in the Plaintiffs' Complaint or Amended complaint.  (Complaint ECF 1 and Amended Complaint ECF 44).**

**WIOA is the federal job training program and if an individual is on "public assistance" they would be considered low income and those individuals may qualify for certain DLR services under WIOA.  Pls. Ex. 3 (McEntaffer Dep. 82:3-19).**

22.    DLR does not consider itself a public assistance agency and believes that it has no responsibilities under the NVRA. Ex. 4 (McEntaffer Dep. 30:9-15, 58:10-59:1, 148:20-22, 149:1-22, 150:1-7).

**RESPONSE:  Undisputed.**

23.    In South Dakota, the Women, Infants and Children ("WIC") nutrition program isadministered by the South Dakota Department of Health. Ex. 10 (Miller Dep. 208:19-209:10, 214:21-215:4); see also South Dakota WIC, https://sdwic.org/.

**RESPONSE: Disputed. This factual allegation was never raised in the Plaintiffs' Complaint or Amended Complaint.**

**Subject to objection, undisputed.**

24.    The Rosebud Sioux Tribe is a federally recognized Indian tribe that exercises powers of self-governance, self-determination, and jurisdiction over the Rosebud Indian Reservation in South Dakota. Ex. 27 (Decl. of Scott Herman ¶ 3 ("Herman Decl.")).

**RESPONSE: Undisputed.**

25.    The Rosebud Sioux Tribe is responsible for protecting the health, safety, and welfare of its approximate 35,354 enrolled members. Ex. 27 (Herman Decl. ¶ 3).

**RESPONSE: Disputed to the extent the statement does not indicate how many enrolled members of the Rosebud Sioux Tribe live in South Dakota. The United States Census Bureau five-year estimate from 2015-2019 indicates there were 11,404 individuals (+/- 174) living on the Rosebud Reservation and off reservation trust land. Ex. 1. https://www.census.gov/tribal/?st=46&aianihh=3235**

**Of the 11,404, there were 10,107 (+/-6) American Indian and Alaska Native. The population for those 18 years and over were estimated to be at 6,699 (+/- 102). Ex. 1. https://www.census.gov/tribal/?st=46&aianihh=3235**

26.    During the 2020 election, the Tribe provided Todd County an office space for early voting and registration, and the Tribe provides volunteers to assist with voter registration. Ex. 27 (Herman Decl. ¶¶ 15, 16).

**RESPONSE: Undisputed.**

27.    55 percent of Rosebud Reservation residents live below the poverty line and the median household income is $24,331, and a similar percentage receive public assistance through State agencies including DSS. Ex. 27 (Herman Decl. ¶ 27).

**RESPONSE: Undisputed.**

28.    The Oglala Sioux Tribe is a federally recognized Indian tribe that exercises powers of self-governance, self-determination, and jurisdiction over the Pine Ridge Reservation in South Dakota. Ex. 26 (Decl. of Kevin Killer ¶ 3 ("Killer Decl.")).

**RESPONSE: Undisputed.**

29.    The Oglala Sioux Tribe is responsible for protecting the health, safety, and welfare of its 46,822 enrolled members. (Killer Decl. ¶ 3).

**RESPONSE:  Disputed to the extent it is unknown how many enrolled members of the Oglala Sioux Tribe live in South Dakota.  The United States Census Bureau five-year estimate from 2015-2019 indicates there were 19,950 individuals (+/- 165) living on the Pine Ridge Reservation and off reservation trust land.  Ex. 2. https://www.census.gov/tribal/index.html?st=46&aianihh=2810**

30.    Approximately 90 percent of Oglala Lakota Tribe members receive public assistance benefits from DSS. (Killer Decl. ¶ 21).

**RESPONSE:  Undisputed.**

31.    Plaintiff Lakota People's Law Project ("Lakota Law") is a project of the Romero Institute, a 501(c)(3) nonprofit interfaith law and policy center that works to protect the inherent sovereignty and the right to autonomous rule and self-determination of Native peoples, with a particular focus on Lakota communities of North Dakota and South Dakota. Ex. 30 (Decl. of Chase Iron Eyes ¶ 3 ("Iron Eyes Decl.")).

**RESPONSE:  Disputed to the extent that Lakota People's Law Project does not have standing as a Plaintiff in this matter as they did not provide notice and they have no members.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Subject to objection undisputed, but immaterial.**

32.    As a core part of our mission of elevating the voices of Native peoples, Lakota Law has long worked to protect voting rights and expand voter participation of Native peoples in South Dakota. Ex. 30 (Iron Eyes Decl. ¶ 4).

**RESPONSE:  Disputed to the extent that Lakota People's Law Project does not have standing as a Plaintiff in this matter as they did not provide notice and they have no members. Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Subject to objection undisputed, but immaterial.**

33.    Lakota Law has five staff based in South Dakota. Of these, four work on voting rights and voter registration issues. Ex. 30 (Iron Eyes Decl. ¶ 5).

**RESPONSE:  Disputed to the extent that Lakota People's Law Project does not have standing as a Plaintiff in this matter as they did not provide notice and they have no members.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Subject to objection undisputed, but immaterial.**

34.   Lakota Law has operated on nearly every tribal nation in South Dakota and spoken with thousands of tribal citizens in the state. Ex. 30 (Iron Eyes Decl. ¶ 7).

**RESPONSE:  Disputed to the extent that Lakota People's Law Project does not have standing as a Plaintiff in this matter as they did not provide notice and they have no members.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Subject to objection undisputed, but immaterial.**

35.   Lakota Law diverted resources from its 2020 phone banking operations to focus on registering voters and updating addresses for tribal members in South Dakota. Ex. 30 (Iron Eyes Decl. ¶¶ 13-14).

**RESPONSE:  Disputed to the extent that Lakota People's Law Project does not have standing as a Plaintiff in this matter as they did not provide notice and they have no members.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Further disputed as this statement was not raised in Plaintiffs' Amended Complaint.  (Amended Compl. ECF 44).**

**Further disputed that resources were "diverted from its 2020 phone banking operation" because of any conduct of Defendants and that the cited document at Ex. 30 (Iron Eyes Decl. ¶-14) is based on speculation.**

36.   To counteract Defendants' failure to provide voter registration services under the NVRA to tribal citizens, Lakota Law has diverted and expended staff time and resources to engage in voter registration targeted at tribal citizens, assisting voters with updating their addresses, and investigating claims by individuals receiving public assistance who believed they were registered to vote but were turned away from the polls in recent elections, and plan to continue these activities through the 2022 election if Defendants' violations are not cured. Ex. 30 (Iron Eyes Decl. ¶¶ 9-11, 16-17).

**RESPONSE:  Disputed.  Defendants dispute Lakota People's Law Projects standing as a Plaintiff in this matter.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Defendants' dispute on the grounds that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted. Pls. Ex. 30 (Iron Eyes Decl. ¶¶ 9-10)**

**Defendants further dispute Lakota Law had to counteract Defendants conduct to the extent Plaintiffs' characterization contradicts the allegations in Plaintiffs' Amended Complaint wherein they indicated they have long worked to expand Native voter participation, and the cited exhibit does not support that the State has failed to offer voter registration services to Plaintiffs Rosebud Sioux Tribe and Oglala Sioux Tribe as neither Plaintiff is mentioned in the cited Exhibit.  (Amended Compl. ECF 44).  Pls. Ex. 30 (Iron Eyes Decl.).**

**There is no ¶¶ 16-17 in the declaration.  The declaration ends at ¶ 15.  Pls. Ex. 30 (Iron Eyes Decl.).**

37.   The time and resources Lakota Law spent on these activities was diverted from the organization's other mission-critical voter engagement work in South Dakota and other states, including reducing the time and resources the organization can spend on its get-out-the vote efforts in South Dakota and other states. Ex. 30 (Iron Eyes Decl. ¶¶ 12-16).

**RESPONSE:  Disputed.   Defendants dispute Lakota People's Law Projects standing as a Plaintiff in this matter.  Ex. 3 (May 20, 2020 Demos Ltr.).  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Defendants dispute Lakota Law had to counteract Defendants conduct to the extent Plaintiffs' characterization contradicts the allegations in Plaintiffs' Amended Complaint wherein they indicated they have long worked to expand Native voter participation, and the cited exhibit does not support that the State has failed to offer voter registration services to Plaintiffs Rosebud Sioux Tribe and Oglala Sioux Tribe as neither Plaintiff is mentioned in the cited Exhibit.  (Amended Compl. ECF 44).  Pls. Ex. 30 (Iron Eyes Decl.).**

**The declaration at ¶ 12 is disputed on the grounds that it is based on or constitutes hearsay inadmissible for the truth of the matter asserted.  Further, Defendants were in compliance with the NVRA and object to ¶ 12's inference that Defendants were not in compliance with the NVRA.  Pls. Ex. 30 (Iron Eyes Decl. ¶ 12).**

**Defendants were in compliance with NVRA and object to ¶ 13 and the inference that more tribal citizens would have been registered to vote had it not been for Defendants' conduct with regards to Plaintiffs Rosebud Sioux Tribe and Oglala Sioux Tribe as neither Plaintiff is mentioned in the cited Exhibit.   Pls. Ex. 30 (Iron Eyes Decl. ¶ 13).**

**Defendants were in compliance with the NVRA and object to the entirety of ¶ 14 and objects to the allegation that DPS did not properly**

11

**offer voter registration services in compliance with NVRA and that there would have been an increase in the number of Native Americans registered to vote as the paragraph relies on speculation and neither Plaintiff Rosebud Sioux Tribe or Oglala Sioux Tribe is mentioned in the cited Exhibit.  Pls. Ex. 30 (Iron Eyes Decl. ¶ 14).**

**Defendants were in compliance with the NVRA and object to ¶ 15 that Defendants violated the NVRA and that Lakota Law had to expend time and resources on activities because of Defendant's conduct as neither Plaintiff Rosebud Sioux Tribe or Oglala Sioux Tribe is mentioned in the cited Exhibit.  Pls. Ex. 30 (Iron Eyes Decl. ¶ 15).**

**There is no ¶ 16 in the declaration.  Pls. Ex. 30 (Iron Eyes Decl.).**

38.    Kimberly Dillon is a member of the Rosebud Sioux Tribe. Ex. 29 (Decl. of Kimberly Dillon ¶ 2 ("Dillon Decl.")).

**RESPONSE:  Disputed.  Defendants dispute Kimberly Dillon has standing as a Plaintiff in this matter.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**The declaration was not signed under penalty of perjury as required by 28 U.S.C § 1747.  Pls. Ex. 29 (Decl. of Kimberly Dillon ¶ 2 ("Dillon Decl.")).**

**Subject to objections, undisputed**

39.    Ms. Dillon currently resides in Rapid City, South Dakota. Ex. 31 (Supp. Decl. of Kimberly Dillon ¶ 1) ("Dillon Supp. Decl.").

**RESPONSE:  Disputed.  Defendants dispute Kimberly Dillon has standing as a Plaintiff in this matter.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Subject to objections, undisputed.**

40.    Ms. Dillon was turned away from the polls in Todd County as unregistered in 2020 due to a failure of the DSS office in Mission, South Dakota to update her address. Ex. 29 (Dillon Decl. ¶¶ 8-10, 12, 15); Ex. 31 (Dillon Supp. Decl. ¶¶ 6-9).

**RESPONSE:  Disputed.  Disputed.  Defendants dispute Kimberly Dillon has standing as a Plaintiff in this matter.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**EXHIBIT 29**

**Disputed.  Defendants' object to the Ex. 29 Declaration as it was not signed under penalty of perjury as required by 28 U.S.C § 1747.  Pls. Ex. 29 (Dillon Decl. ¶ ¶ 8-10, 12, 15).**

**Further Defendants' object to ¶ 10 of the Ex. 29 Declaration in that she "believed" that she was registered to vote at her Mission address.  Stating that she "believed" does not satisfy the requirement that a witness have personal knowledge of the fact.  Pls. Ex. 29 (Dillon Decl. ¶ 10.**

**Further Defendants' object to ¶ 12 of the Ex. 29 Declaration as the declaration is based on or constitutes hearsay inadmissible for the truth of the matter asserted.**

**Further Defendants' object to ¶ 15 of the Ex. 29 Declaration as the declaration is based on or constitutes hearsay inadmissible for the truth of the matter asserted.**

## EXHIBIT 31

**Disputed.  Defendants' object to ¶ 8 of the Ex. 31 Declaration in that she "believed" that she was registered to vote at her Mission address.  Stating that she "believed" does not satisfy the requirement that a witness have personal knowledge of the fact.**

41.     She fears that, given a recent move, when she has to change her address that it will not be correctly processed again. Ex. 29 (Dillon Decl. ¶ 10); Ex. 31 (Dillon Supp. Decl. ¶ 11).

**RESPONSE:  Disputed.  Defendants dispute Kimberly Dillon has standing as a Plaintiff in this matter.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Disputed.  Defendants' object to the Ex. 29 Declaration as it was not signed under penalty of perjury as required by 28 U.S.C § 1747.**

**Defendants' dispute ¶ 11 of Ex. 31 as she never stated a factual assertion that there was a problem at the Mission office and her assertion is speculative.  Pls. Ex. 31 (Dillon Supp. Decl. ¶ 11).**

42.     Plaintiff Hoksila White Mountain is a member of the Standing Rock Sioux Tribe. Ex. 28 (Decl. of Hoksila White Mountain ¶ 1 ("White Mountain Decl.")).

**RESPONSE:  Disputed to the extent that Hoksila White Mountain does not have standing as a Plaintiff in this matter as they did not provide notice.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

13

**Subject to objection, undisputed.**

43.     Mr. White Mountain resides in McLaughlin, South Dakota. Ex. 28 (White Mountain Decl. ¶ 1).

**RESPONSE:  Disputed to the extent that Hoksila White Mountain does not have standing as a Plaintiff in this matter as they did not provide notice.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510; 52 U.S.C. § 20510.**

**Subject to objection, undisputed**

44.     Mr. White Mountain is a former candidate for mayor and current member of the City Council in McLaughlin. Ex. 28 (White Mountain Decl ¶¶. 2-3).

**RESPONSE:  Disputed to the extent that Hoksila White Mountain does not have standing as a Plaintiff in this matter as they did not provide notice.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Subject to objection, undisputed**

45.     Mr. White Mountain received SNAP benefits for 2 to 3 years. He conducted recertifications in the Mobridge DSS office. Mobridge is near McLaughlin in neighboring Walworth County. He was never offered an opportunity to register to vote during those transactions. Ex. 28 (White Mountain Decl. ¶ 6). He also was not offered an opportunity to register vote when he applied for a driver's license in McIntosh on September 12, 2017; instead, when he asked to register to vote, they sent him down the hall to a separate office where he registered. Ex. 28 (White Mountain Decl. ¶ 6).

**RESPONSE:  Disputed to the extent that Hoksila White Mountain does not have standing as a Plaintiff in this matter as he did not provide notice.  Ex. 3 (May 20, 2020 Demos Ltr.); 52 U.S.C. § 20510.**

**Disputed as to the last sentence that he was not offered an opportunity to register to vote when he applied for a driver's license in McIntosh on September 12, 2017.  When you apply for a driver's license the voter registration is on the driver's license application itself and so Mr. White Mountain was offered the opportunity to register to vote.  See Pls. Ex. 13 (Schrank Dep. Ex. 2 DPS_000342-DPS_000343).**

**Subject to objection, undisputed as to the first two sentences.**

46.     After finally becoming registered to vote, in 2020, Mr. White Mountain ran for mayor of McLaughlin. In February 2020, city officials rejected his initial petition to qualify for the ballot, alleging that 11 of the 28 signatures

he submitted were invalid because the signatories, who included DSS clients, were not registered to vote in Corson County. Ex. 28 (White

Mountain Decl. ¶ 3).

**RESPONSE:  Disputed.  The second sentence of ¶ 3 of Ex. 28 of the declaration is based on, or constitutes hearsay, inadmissible for the truth of the matter asserted.**

47.    Steve Barnett is the Secretary of State of the State of South Dakota ("Secretary of State" or "SOS").  Answer to Am. Compl. ¶ 68, ECF No. 47.

**RESPONSE:  Undisputed**

48.    As Secretary of State, Secretary Barnett is the Chairperson of the South Dakota State Board of Elections. S.D. Codified Laws § 12-1-5; Answer to Am. Complaint ¶ 68, ECF No. 47.

**RESPONSE: Undisputed**

49.    In South Dakota, the Secretary of State serves as the State's chief state election official. Ex. 1 (Warne Dep. 22:1-4, 120:19-5); 52 U.S.C. § 20509; S.D. Codified Laws § 12-4- 33).

**RESPONSE:  Undisputed**

50.    As the State's chief state election official, Secretary Barnett has the duty to coordinate and enforce compliance with the NVRA by the State and its agencies. Ex. 1 (Warne Dep. 22:1-4, 120:19-5); 52 U.S.C. § 20509; S.D. Codified Laws § 12-4-33.

**RESPONSE:  Disputed.  Defendants object to the Plaintiffs statement that Secretary Barnett has the duty to enforce compliance with the NVRA as neither 52 U.S.C. § 20509 or S.D. Codified Laws § 12-4-33 state the Secretary of State has the duty to enforce compliance with the NVRA.  Under 52 U.S.C. § 20509 the person designated by the state is responsible for coordination of the State responsibilities.  Under S.D. Codified Laws § 12-4-33 the Secretary of State is the state election official pursuant to section 10 of the NVRA.**

51.    Secretary Barnett acknowledges public assistance agencies in South Dakota serve populations that are less likely to have a driver's license than average South Dakota residents and thus less likely to visit driver's license offices or use those offices' services. Ex. 1 (Warne Dep. 127:20-128:7).

**RESPONSE:  Undisputed, but immaterial.**

52.     Laurie Gill is the Cabinet Secretary of the South Dakota Department of Social Services ("DSS"). Answer to Am. Compl. ¶ 70, ECF No. 47.

**RESPONSE:  Undisputed**

53.     DSS administers the Supplemental Nutrition Assistance Program (SNAP); Temporary Assistance for Needy Families (TANF); Medical Assistance Programs, which include Medicaid, long-term care programs, and the Children's Health Insurance Program (CHIP); Child Care Assistance Programs; and the Low-Income Energy Assistance Program (LIEAP). Ex. 10 (Miller Dep 20:4-21:1, 21:16-22); Ex. 19B (Gill Resp. to Interrog. No. 1).

**RESPONSE:  Undisputed**

54.     As a public assistance agency, DSS is a voter registration agency covered by Section 7 of the NVRA and is so designated by South Dakota law. 52 U.S.C. § 20506(a)(2)(A); S.D. Codified Laws § 12-4-2; Answer to Am. Compl. ¶ 70, ECF No. 47.

**RESPONSE:  Disputed to the extent that all Divisions within DSS are not required to provide voter registration, such as the Division of Child Support.**

55. Marcia Hultman is the Cabinet Secretary of the South Dakota Department of Labor and Regulation ("DLR"). Answer to Am. Compl. ¶ 71, ECF No. 47; Ex. 4 (McEntaffer Dep. Ex. 4 ¶ 24).

**RESPONSE:  Undisputed**

56.     DLR administers public assistance benefits and services under TANF, SNAP, and WIOA. Ex. 3 (McEntaffer Dep. 30:9-15, 33:20-34:11, 58:10-59:1, 62:1-3, 78:9-19, 79:1-6, 82:3- 83:7, 85:1-86:22, 87:1-21, 97:2-98:12, 101:11-21, 105:15-22, 106:1-107:22, 108:1-20, 109:5-20, 110:1-3); Ex. 4 (McEntaffer Dep. vol. 2 Ex. 3); Ex. 3 (McEntaffer Dep. 143:6-14, 142:12-22, 148:20-22, 149:1-22, 150:1-7, 172:13-173:20, 177:1-9, 178:10-179:22); Ex. 4 (McEntaffer Dep. vol. 1 Exs. 11, 12, vol. 2 Exs. 1, 2); Ex. 8A ((DLR, S.D. Website, https://dlr.sd.gov/localoffices/job_search_tools/default.aspx).

**RESPONSE:  Disputed.  DLR does not provide public assistance benefits under TANF, SNAP, and WIOA.  DLR gets funding from DSS to provide employment and training activities and their role is to provide DLR services when working with TANF or SNAP clients.  Pls. Ex. 3 (McEntaffer Dep. 33:22-34:11).  DLR provides services regardless of TANF eligibility.  Pls. Ex. 3 (McEntaffer Dep. 33:22-34:11); Pls. Ex. 10 (Miller Dep 159:18-160:2-7, 160:21-161:1, 161:6-162:1, 163:6-14)**

**DLR disputes any inferences that DLR needs to provide voter registration services under the WIOA program.   This factual allegation was never raised in the Plaintiff's Complaint or Amended Complaint. (Complaint ECF 1 and Amended Complaint ECF 44).**

**WIOA is a federal job training program designed to help job seekers access employment, education, training and support services to succeed in the labor market.  Individuals on "public assistance" would be considered low income and may also qualify for certain financial services, such as tuition assistance, under WIOA.  Pls. Ex. 3 (McEntaffer Dep. 82:3-83:4).  Others who may receive services, including financial services, under WIOA include veterans, individuals with disabilities, and out-of-school and at-risk youth.  Pls. Ex. 3 (McEntaffer Dep. 82:3-19).**

57.     Craig Price is the Cabinet Secretary of the South Dakota Department of Public Safety ("DPS"). Ex. 12 (Schrank Dep. 29:14-15); Answer to Am. Compl. ¶ 69, ECF No. 47.

**RESPONSE:  Undisputed**

58.     As Secretary of DPS, Defendant Price is responsible for ensuring that DPS provides registration opportunities required pursuant to Section 5 of the NVRA and South Dakota law. See 52 U.S.C. § 20504; S.D. Codified Laws § 12-4-2.

**RESPONSE:  Undisputed**

59.     As South Dakota's driver's licensing authority, DPS is covered by Section 5 of the NVRA. NVRA, 52 U.S.C. § 20504; Answer to Am. Compl. ¶ 69, ECF No. 47.

**RESPONSE:  Undisputed**

60.     Plaintiffs' counsel investigated South Dakota's compliance with Sections 5 and 7 of the NVRA by examining data submitted by South Dakota to the U.S. Election Assistance Commission; examining public assistance agencies' forms, policies, and practices; requesting and reviewing public records related to South Dakota's Section 7 policies and practices; and conducting a field investigation by visiting DSS offices and speaking with public assistance clients in and around tribal reservations. Am. Compl. Ex. A, ECF 44-1.

**RESPONSE:  Disputed on the ground that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.**

**Further disputed in that Plaintiffs' characterization of the cited document does not state that Plaintiffs investigated South Dakota's compliance with Section 5 by examining data submitted by South Dakota to the U.S. Election Assistance Commission.  Pls. Am. Compl. Ex. A, ECF 44-1.**

61.    Plaintiffs notified Defendants of their violations of Section 5 and Section 7 of the NVRA by letter dated May 20, 2020. Am. Compl. Ex. A, ECF 44-1.

**RESPONSE:  Disputed.  The only Plaintiffs who were included in the letter were Rosebud Sioux Tribe, Oglala Sioux Tribe and Four Directions. Plaintiffs subsequently filed an Amended Complaint and removed Four Directions and added Lakota Peoples Law Project, Kimberly Dillon, and Hoksila White Mountain none of whom provided notice as required by 52 U.S.C. § 20510; Pls. Am. Compl. Ex. A, ECF 44-1; Compl. Ex. 4, ECF 1.**

62.    DSS responded to Plaintiffs' May 20, 2020, notice letter on June 5, 2020. Ex. 11 (Miller Dep. Ex. 18 (DSS_04014-016)). SOS, DPS, and DLR did not respond separately to Plaintiffs' Notice Letter prior to the filing of the Complaint in this action.

**RESPONSE:  Disputed.  All Plaintiffs did not provide a notice letter as required by 52 U.S.C. § 20510.  Ex. 3**

**Further disputed in that DSS responded on behalf of SOS, DPS, and DLR.  Ex.  8.**

**Defendants further object in that SOS responded separately by letter on June 15, 2020, prior to the complaint being filed.  Ex. 4.**

**Subject to the objections, undisputed.**

63.    Plaintiffs replied to DSS's June 5, 2020, Resp. letter on June 26, 2020. In that letter, Plaintiffs took note of DSS's June 5, 2020 Resp., and explained the respects in which it was insufficient to remedy the violations identified in the May 20, 2020 notice letter. Plaintiffs' June 26, 2020 letter further explained the specifics that would be needed to avoid litigation. Ex. 9 (Pls.' June 26, 2020 Letter).

**RESPONSE:  Disputed.  Defendants Object to the Plaintiffs characterization of their letter.  Plaintiffs acknowledged that Defendants made changes to how agencies handle their voter registrations as requested by Plaintiffs, however, Plaintiffs, as a condition on avoiding litigation, wanted a memorandum of understanding and wanted to have**

input on how state government agencies handle voter registration services.  **Pls. Ex. 9 (Pls.' June 26, 2020 Letter)**

64.    DSS did not respond to Plaintiffs' June 26, 2020, reply letter. Ex. 10 (Miller Dep. 255:19-256:3).

**RESPONSE:  Undisputed**

65.    DSS leadership was not involved in any discussions about the requests Plaintiffs made in their June 26, 2020, reply letter on how Defendants could achieve compliance with the NVRA. Ex. 10 (Miller Dep. 258:8-258:17).

**RESPONSE:  Disputed to the extent of Plaintiffs' characterization of the testimony.  The Plaintiffs asked from the Departments perspective were there any specific objections about the requests.  The witness testified she could not answer that question as she was not involved in any discussions regarding the requests.  Ex. 10 (Miller Dep. 258:8-258:17).**

**Defendants further object as the letter was addressed to Secretary Barnett and Laura Ringling.  Pls. Ex. 9 (Pls.' June 26, 2020 Letter)**

66.    DSS leadership is unaware of any specific objections to the requests made by Plaintiffs in their June 26, 2020, reply letter. Ex. 10 (Miller Dep. 258:8-258:17).

**RESPONSE:  Disputed.  Disputed to the extent of Plaintiffs' characterization of the testimony.  Plaintiffs asked from the Departments perspective were there any specific objections about the requests.  The witness testified she could not answer that question as she was not involved in any discussions regarding the requests.**

**Defendant further objects as the letter was addressed to Secretary Barnett and Laura Ringling.  Pls. Ex. 9 (Pls.' June 26, 2020 Letter)**

67.    Other than DSS, the other Defendants did not respond on their own to Plaintiffs' May 20, 2020, notice letter or June 26, 2020, reply letter at any point. Answer to Am. Compl. ¶ 7, ECF No. 47.

**RESPONSE:  Disputed.  Defendants object in that DSS responded on behalf of SOS, DPS, and DLR to the May 20, 2020 letter.  Ex.  8.**

**Defendants further object in that SOS responded to the May 20, 2020 letter separately by letter on June 15, 2020, prior to the complaint being filed.  Ex. 4**

**Subject to the objections undisputed.**

68.     Corson County is a rural county located entirely within the boundaries of the Standing Rock Indian Reservation, where the Standing Rock Sioux Tribe is located. Ex. 14 (Bertolotto Dep. 24:9-21).

**RESPONSE:  Undisputed, but immaterial as Standing Rock Sioux Tribe is not a Plaintiff.**

69.     The majority of Corson County's residents are Native American. Ex. 14 (Bertolotto Dep. 25:9-15); see also U.S. Census Bureau, Corson County, South Dakota (Race and Ethnicity section), https://data.census.gov/cedsci/profile?g=0500000US46031.

**RESPONSE:  Undisputed, but immaterial as Standing Rock Sioux Tribe is not a Plaintiff.**

70.     The current Corson County auditor, Tammy Bertolotto, was appointed to that position in 2013 and reelected several times since. Ex. 14 (Bertolotto Dep. 17:13-19:7).

**RESPONSE:  Undisputed, but immaterial.**

71.     The current staff in the Corson County auditor's office are Ms. Bertolotto and her deputy auditor. Ex. 14 (Bertolotto Dep. 21:22-22:8).

**RESPONSE:  Undisputed, but immaterial.**

72.     Neither Ms. Bertolotto nor her deputy are Native American. Ex. 14 (Bertolotto Dep. 23:3-5). B. Hughes County

**RESPONSE:  Undisputed, but immaterial.**

73.     Hughes County is located in central South Dakota and is the home of the state's capital, Pierre. Ex. 15 (Naylor Dep. 19:1-7).

**RESPONSE:       Undisputed, but immaterial**

74.     Hughes County's Native American population is 12.1 percent. See U.S. Census Bureau, Quick Facts: Hughes County, South Dakota (2021),

https://www.census.gov/quickfacts/fact/table/hughescountysouthdakota/PST045221 (Race and Hispanic Origin section).

**RESPONSE:  Undisputed, but immaterial.**

75.     The Hughes County auditor's office includes the finance officer/auditor and two deputy auditors. Ex. 15 (Naylor Dep. 16:21-17:1, 17:16-19).

**RESPONSE:  Undisputed, but immaterial.**

76.     None of the Hughes County auditor's office employees is Native American. Ex. 15 (Naylor Dep. 18:16-18).

**RESPONSE:  Undisputed, but immaterial.**

77.     Oglala Lakota County is a county in southwestern South Dakota. The county is located entirely within the Pine Ridge Indian Reservation. Many of the county's residents are members of the Oglala Lakota tribe. Ex. 8B. (Oglala Lakota Cnty., S.D. Website, https://oglalalakota.sdcounties.org/).

**RESPONSE:  Undisputed.**

78.     Pine Ridge is a city in Oglala Lakota County. Pine Ridge is on the Pine Ridge Reservation. Ex. 26 (Killer Decl. ¶¶ 5, 8).

**RESPONSE:  Undisputed.**

79.     Oglala Lakota County's population is 92.4% Native American. See U.S. Census Bureau, Quick Facts: Oglala Lakota County, South Dakota (2021), https://www.census.gov/quickfacts/oglalalakotacountysouthdakota.

**RESPONSE:  Undisputed.**

80.     Oglala Lakota County does not have its own county seat. Ex. 8B (Oglala Lakota Cnty., S.D. Website, https://oglalalakota.sdcounties.org/).

**RESPONSE:  Undisputed, but immaterial.**

81.     Because Oglala Lakota County does not have its own county seat, its administrative center is in Hot Springs in neighboring Fall River County. Ex. 8B (Oglala Lakota Cnty., S.D. Website, https://oglalalakota.sdcounties.org/).

**RESPONSE:  Undisputed.**

82.     The Fall River County auditor serves as the county auditor for Oglala Lakota County. Ex. 8B (Oglala Lakota Cnty., S.D., Auditors & Welfare Office, https://oglalalakota.sdcounties.org/auditors-welfare-office/; Fall River Cnty., S.D., Auditors & Welfare Office, https://fallriver.sdcounties.org/auditors-welfare-office/).

**RESPONSE:  Undisputed.**

83.     Fall River County's population is 6.8 percent Native American. U.S. Census Bureau, Quick Facts: Fall River Cnty., S.D. (2021), https://www.census.gov/quickfacts/fact/table/fallrivercountysouthdakota/HSD410219.

**RESPONSE:  Undisputed, but immaterial.**

84.     Todd County is located in southern South Dakota, entirely within the Rosebud Indian Reservation. Ex. 27 (Herman Decl. ¶ 3).

**RESPONSE:  Undisputed.**

85.     Todd County's population is 86.8 percent Native American. U.S. Census Bureau, Quick Facts: Todd County, S.D. (2021), https://www.census.gov/quickfacts/fact/table/toddcountysouthdakota/PST045221.

**RESPONSE:  Undisputed.**

86.     Todd County is unincorporated and does not have its own county seat. Ex. 27 (Herman Decl. ¶¶ 3, 7); see also Statistical Atlas, Overview of Todd County, South Dakota, https://statisticalatlas.com/county/South-Dakota/Todd-County/Overview.

**RESPONSE:  Undisputed.**

87.     Because Todd County does not have its own county seat, Winner, South Dakota, in neighboring Tripp County, serves as the administrative center for Todd County. Ex. 27 (Herman Decl. ¶ 6).

**RESPONSE:  Undisputed.**

88.     Residents of Todd County rely on Tripp County for various services, including county auditor services, under a contract with Tripp County. Ex. 11 (Warne Dep. Ex. 4) (Contract for the Provision of Governmental Services to Todd County, December 6, 2017, ¶ 3)).

**RESPONSE:  Disputed.  Defendants Object in that the referenced Exhibit does not exist.**

**Subject to the objection, undisputed.**

89.     Barbara DeSersa is the Tripp and Todd County Auditor and has held that position since 2014. Ex. 16 (DeSersa Dep. 13:16-19).

**RESPONSE:  Undisputed.**

90.     The two offices have three employees: Ms. DeSersa and two Deputy Auditors. Ex. 16 (DeSersa Dep. 16:13-19). One deputy handles Tripp County and one deputy handles Todd County. Ex. 16 (DeSersa Dep. 26:15-27:2).

**RESPONSE:  Undisputed.**

91.     One staff member of the Tripp/Todd County auditor's office is Native American. Ex. 16 (DeSersa Dep. 17:4-6).

**RESPONSE:  Undisputed.**

92.    Ziebach County is a rural county located in northwestern South Dakota. Ex. 17 (Longbrake Dep. 19:20-20:4).

**RESPONSE:  Undisputed, but immaterial.**

93.    Ziebach County is located entirely within the borders of the Cheyenne River Sioux Reservation. Ex. 17 (Longbrake Dep. 20:5-13).

**RESPONSE:  Undisputed, but immaterial.**

94.    Ziebach County has approximately 2,400 residents. U.S. Census Bureau, Quick Facts: Ziebach Cnty., S.D. (People section) (2021), https://www.census.gov/quickfacts/fact/table/ziebachcountysouthdakota/PST045221.

**RESPONSE:  Undisputed, but immaterial.**

95.    71.1 percent of Ziebach County's residents are Native American. U.S. Census Bureau, Quick Facts: Ziebach Cnty., S.D. (Race and Hispanic Origin section) (2021), https://www.census.gov/quickfacts/fact/table/ziebachcountysouthdakota/PST045221.

**RESPONSE:  Undisputed, but immaterial.**

96.    The only major town or city in Ziebach County is Dupree, the county seat. Ex. 17 (Longbrake Dep. 21:12-17).

**RESPONSE:  Undisputed, but immaterial.**

97.    The current Ziebach County auditor, Cindy Longbrake, has served as county auditor since 1990. She joined the office in 1985 as deputy auditor. Ex. 17 (Longbrake Dep. 14:3-13).

**RESPONSE:  Undisputed, but immaterial.**

98. There is only one DSS office in Ziebach County. The office is located in the courthouse in Dupree and is only open one day per week. Ex. 17 (Longbrake Dep. 25:10-12, 29:19-30:2).

**RESPONSE:  Disputed.  The testimony indicates that DSS is only in Dupree courthouse one day a week.  The testimony indicates they have another office.  There is no testimony regarding how many other DSS offices there are within Dupree or Ziebach County.  Pls. Ex. 17 (Longbrake Dep. 25:10-12, 29:19-30:2).**

99.   Ms. Longbrake is not Native American. Ex. 17 (Longbrake Dep. 18:15-18).

**RESPONSE:  Undisputed, but immaterial.**

100.   In South Dakota, county auditors are county officials whose responsibilities include administering elections and processing voter registration applications, including those transmitted by covered agencies. S.D. Codified Laws § 12-4-2; Ex. 14 (Bertolotto Dep. 17:4-11); Ex. 15 (Naylor Dep. 16:1-8); Ex. 17 (Longbrake Dep. 13:9-14:2, 15:7-18); Ex. 16 (DeSersa Dep. 14:21:15:22); Ex. 1 (Warne Dep. 61:18-22; 70:9-15; 81:5-12).

**RESPONSE:  Disputed as to the reference of "covered agencies" as county auditors process voter registration applications, including those transmitted by "voter registration agencies."  52 U.S.C. § 20502(5).**

**Subject to objection, undisputed.**

101.   County auditor offices enter all voter registration applications, including those transmitted by covered agencies, into TotalVote, the state's electronic voter registration system. Ex. 17 (Longbrake Dep. 12:13-16, 15:7-13, 15:19-16:4); Ex. 1 (Warne Dep. 70:9-15; 78:14- 80:2).

**RESPONSE: Disputed as to the reference of "covered agencies" as county auditors process voter registration applications, including those transmitted by "voter registration agencies."  52 U.S.C. § 20502(5).**

**Further dispute as county auditor offices do not enter "all" voter registration applications as DPS has access to and enters voter information directly into TotalVote.  Pls. Ex. 1 (Warne Dep. 78:14- 80:2).**

102.   County auditor offices have no way to confirm whether a state agency transmitted voter registration applications to that office, if there were problems with a voter registration application being transmitted from a state agency, or if an agency failed to enter or transmit a voter registration application correctly. Ex. 14 (Bertolotto Dep. 61:11-16, 63:14-17); Ex. 17 (Longbrake Dep. 76:9-13).

**RESPONSE: Disputed.  Defendants' Object.  County auditor can generate an audit log from TotalVote. Pls. Ex. 14 (Bertolotto Dept 61:22-15)**

103.   SOS describes its enforcement duties under the NVRA as: (a) "provid[ing] the information for the agencies to be able to fulfill the requirements of NVRA," (b) "provid[ing] training for DPS examiners at their

annual training," (c) "updat[ing] declination forms," (d) "work[ing] with DPS to update the driver's license form." Ex. 1 (Warne Dep. 21:17-22:15).

**RESPONSE: Disputed. If agencies are not complying with the NVRA SOS would have a responsibility to correct that. Through SOS, the State Board of elections promulgates rules related to NVRA compliance. The SOS also monitors the voter list maintenance as required by the NVRA. Pls. Ex. 1 (Warne Dep. 21:17-24:9), SDCL 12-4-35, SDCL: 12-4-37, SDC: 12-4-39.**

104.   SOS concedes that if various agencies are not complying with their responsibilities under the NVRA, the Secretary "probably" has a responsibility to take corrective action under the NVRA. Ex. 1 (Warne Dep. 22:16-20).

**RESPONSE: Disputed. If agencies are not complying with the NVRA SOS would have a responsibility to correct that. Through SOS, the State Board of elections promulgates rules related to NVRA compliance. The SOS also monitors the voter list maintenance as required by the NVRA. Pls. Ex. 1 (Warne Dep. 21:17-24:9), SDCL 12-4-35, SDCL: 12-4-37, SDC: 12-4-39.**

105.   SOS is aware of recurring problems with DPS offices processing voter registration applications since at least 2018, including entering the wrong city or county on an application, sending applications to the wrong county auditor's office, entering an incorrect or old address for the voter, and not submitting the voter registration application at all, resulting in some individuals not being registered despite their effort to do so through a DPS office. Ex. 1 (Warne Dep. 324:2-327:3); Ex. 2 (Warne Dep. Ex. 43).

**RESPONSE: Disputed. While the testimony indicated some issues during 2018, there have not been recurring issues since 2018, and during the 2020 election SOS did not see the issues that arose during the 2018 election. Ex. 1 (Warne Dep. 327:9-15).**

106.   SOS is aware that county auditors routinely see errors in the voter registration applications submitted by DPS. Ex. 1 (Warne Dep. 82:18-83:3).

**RESPONSE: Disputed. SOS, in response, answered there could be an error or two in applications coming from DPS and that the errors also occur on written applications that people send. Ex. 1 (Warne Dep. 82:18-83:3). There is no indication whether the errors are from DPS entering the information or whether the errors were the result of the driver's responses provided by the license applicant. Ex. 1 (Warne Dep. 82:18-83:3).**

107.   If a voter believes they registered to vote at a driver's license office but do not appear on the voter rolls, county auditors may contact SOS to pull the individual's driver's license application or renewal form to determine whether the individual actually registered. SOS has no formal system for logging how many times it has received requests for assistance in pulling applications or curing errors on voter registration applications submitted through DPS Ex. 1 (Warne Dep. 84:15-18, 87:15-19).

**RESPONSE:  Disputed.  SOS has a file of driver's license applications that it has pulled, and SOS's records indicate how many searches were done.  Ex. 1 (Warne Dep. 84:15-18, 86:5-22).**

108.   Although DPS sends voter registration files containing errors to county auditors on a regular basis, SOS has no knowledge of how often counties are curing those errors using SOS's recommended procedure of contacting SOS to pull original applications. Ex. 1 (Warne Dep. 87:7-14).

**RESPONSE:  Disputed as a mischaracterization of the testimony. Namely – SOS indicated they did not know if DPS was using SOS's "suggested procedure" to correct errors.  Pls. Ex. 1 (Warne Dep. 87:7-14). SOS <u>did not</u> indicate they had no knowledge of "how often counties were curing those errors.  *Id*.   But SOS affirmatively responded that the counties "are updating the information.  Pls. Ex. 1 (Warne Dep. 87:7-14).**

109.   SOS believes that DPS transmits voter registration applications to the wrong county "a few times every couple of weeks," but SOS does not formally track how frequently this occurs. Ex. 1 (Warne Dep. 94:12-95:2, 96:9-22, 97:5-8); Ex. 19A (Barnett Resp. to Interrog. No. 1).

**RESPONSE:  Disputed.  Defendants' object.  SOS has a file of driver's license applications that it has pulled.  Pls. Ex. 1 (Warne Dep. 84:15-18).**

110.   SOS does not know how often DPS transmits voter applications to the wrong county. Ex. 1 (Warne Dep. 94:12-95:2, 96:9-22, 97:8); Ex. 19A (Barnett Resp. to Interrog. No. 1).

**RESPONSE:  Disputed.  This statement mischaracterizes the testimony provided.  SOS estimated that applications are provided to the wrong county "Maybe a few time – I mean a few times every couple of weeks."  Pls. Ex. 1 (Warne Dep. 94:12-95:2).**

111.   SOS does not know how often, or if, wrongly transmitted DPS applications are corrected. Ex. 1 (Warne Dep. 94:12-95:2, 96:9-22, 97:5-8); Ex. 19A (Barnett Resp. to Interrog. No. 1).

**RESPONSE:  Undisputed.**

112.   In June 2018, around the time of the 2018 primary election, SOS learned of eight voters whose applications through DPS were not appearing in the TotalVote system, at least six of whom had not been entered in TotalVote by the DPS examiners that processed the applications. Ex. 1 (Warne Dep. 305:10-308:14); Ex. 2 (Warne Dep. Ex. 40). SOS is currently unaware of whether those individuals were successfully registered to vote or permitted to cast a ballot in the June 2018 primary. Ex. 1 (Warne Dep. 307:22-308:19). SOS does not recall following up with, taking any corrective action against, or monitoring or auditing DPS to address these specific issues or to assess whether these problems indicated a systemic issue. Ex. 1 (Warne Dep. 311:12-312:6).

**RESPONSE:  Disputed.  Defendants' object to the second sentence in that Ms. Warne indicated she could not recall if the individuals were able to vote, however, the typical process would be to allow the voter to vote a provisional ballot.   Pls. Ex. 1 (Warne Dep. 309:9 -311:1).   Defendants object to third sentence in that Ms. Warne indicated if issues occurred with DPS again they would work with DPS and SOS's vendor to see what is going on.  Pls. Ex. 1 (Warne Dep. 309:9 -312:14).**

113.   In 2019, SOS identified a problem with bPro, the electronic system in which DPS examiners enter voter registration data. The system was automatically populating the date field with the current date, not the date the voter completed the voter registration form. A DPS examiner needed to manually change the date for it to be correct, but SOS notified DPS that its examiners were not always making this change. Ex. 1 (Warne Dep. 330:7-332:3, 333:9-19); Ex. 2 (Warne Dep. Ex. 44).

**RESPONSE:  Disputed.  Defendants' object as this issue must have been corrected in 2020 because SOS did not have any problems.  Pls. Ex. 1 (Warne Dep. 330:7 -332:18).**

**Subject to the objection undisputed.**

114.   SOS is unaware of whether such a change was ever implemented. Ex. 1 (Warne Dep. 333:20-335:4).

**RESPONSE:  Disputed.  Defendants object as this must have been corrected in 2020 because SOS did not have any problems.  Pls. Ex. 1 (Warne Dep. 330:7 -332:18).**

115.   SOS was aware that DPS's issues with incorrect date field entry persisted until at least Spring 2020. Ex. 1 (Warne Dep. 335:10-339:10).

**RESPONSE:  Disputed on the ground that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.  The deposition transcript refers to Exhibit 45 on page 335:10 of**

the transcript which is an email from another individual and the testimony of Ms. Warne relates to Exhibit 45.  Pls. Ex. 1 (Warne Dep. 335:10-339:10).

116.   SOS has not followed up with DPS on this issue or monitored or audited whether the issue has been addressed, and has deferred entirely to DPS to correct the issue. Ex. 1 (Warne Dep. 339:11-340:9).

**RESPONSE:  Disputed.  Disputed on the ground that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.  The deposition transcript refers to Exhibit 45 on page 335:10 of the transcript which is an email from another individual and the testimony of Ms. Warne relates to Exhibit 45.  Pls. Ex. 1 (Warne Dep. 335:10-340:9).**

117.   SOS is unaware of any systematic changes made by DPS to improve its processing of voter registration applications after a significant number of problems in 2018. Ex. 1 (Warne Dep. 327:22-329:1).

**RESPONSE:  Disputed as vague as to the meaning of "significant." Further the characterization of a significant number of problems is not supported by the exhibit Plaintiffs refer to at** Pls. **Ex. 1 (Warne Dep. 327:22-329:1).**

**Subject to objection undisputed.**

118.   DPS is not aware of any system the Secretary of State uses to evaluate compliance at DPS. Ex. 12 (Schrank Dep. 164:4-9). Other than training, assistance with application verbiage, and reviewing registrations, the Secretary of State plays no role in DPS's NVRA compliance. Ex. 12 (Schrank Dep. 167:2-19).

**RESPONSE:  Disputed.  If agencies are not complying with the NVRA SOS would have a responsibility to correct that.  Through SOS, the State Board of Elections promulgates rules related to NVRA compliance.  SOS monitors the voter list maintenance as required by the NVRA, and SOS works with their vendor Bpro to try and address any problems.   Pls. Ex. 1 (Warne Dep. 21:17-24:9, 334:6-13), SDCL 12-4-35, SDC: 12-4-37, SDCL: 12-4-39.**

119.   A voter without a United States Postal Service ("USPS") mailing address may register to vote by providing either a physical address or description of where the individual is residing on the individual's voter registration application. Ex. 19A (Barnett Resp. to Interrog. No. 3); Ex. 1 (Warne Dep. 104:5-105:7).

**RESPONSE:  Undisputed**

120.   The instructions on the EAC's National Voter Registration Form specifically provide a system to document the home address of applicants who live in rural areas: "Note: If you live in a rural area but do not have a street address, or if you have no address, please show where you live using the map in Box C (at the bottom of the form)." See U.S. Election Assistance Comm'n, Register To Vote In Your State By Using This Postcard Form and Guide, https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.

**RESPONSE:  Undisputed**

121.   SOS has not provided training or guidance to county election officials on registering voters who do not have a USPS mailing address and need to provide a physical description of their location of residence. The manual for SOS's TotalVote system does not include any instructions on how to handle this situation. Ex. 1 (Warne Dep. 102:2-21, 104:21-105:11).

**RESPONSE:  Disputed.  The references to the transcript do not reflect that training has not been provided and Ms. Warne testified that when confronted with a physical description address from a voter the county auditors would assign them to a precinct.  Pls. Ex. 1 (Warne Dep. 102:2-21, 104:21-105:11).**

122.   In training provided by SOS to DPS examiners, SOS instructs examiners that if an individual leaves the address field blank because they do not have a USPS address, the examiner should still send the application to the county auditor to process as an incomplete application. Ex. 1 (Warne Dep. 107:10-20); Ex. 19A (Barnett Resp. to Req. for Admission No. 1).

**RESPONSE:  Disputed.  SOS trains DPS that, if the applicant has no physical address, they need to provide a description and instructs DPS to let the applicant know they cannot list a P.O. Box address as their physical address.  SOS instructs DPS to ensure accuracy as a voter's address is linked to a specific jurisdiction and to always error on the side of the voter and pass on the registration if any information is entered in the voter registration section of the application.  Pls. Ex. 1 (Warne Dep. Ex. 31 pgs. 29-30, 35, 41-42).**

**Furthermore, the Barnett Req. for Admission No. 1 only refers to applications that do not contain a driver's license number, non-driver ID number, or a social security number and nothing is mentioned in Plaintiffs Req. for Admission No. 1 about a voter address.   Pls. Ex. 19A (Barnett Resp. to Req. for Admission No. 1).**

123.   SOS has not instructed DPS examiners to inform an individual that they may put in a description of their location of residence on their voter registration form if they do not have a USPS address. Ex. 1 (Warne Dep. 107:21-108:3).

**RESPONSE:   Disputed.   SOS trains DPS that if the applicant has no physical address, they need to provide a description and instructs DPS to let the applicant know they cannot list a P.O. Box address as their physical address and instructs DPS to ensure accuracy as a voter's address is linked to a specific jurisdiction Pls. Ex. 2 (Warne Dep. Ex. 31, pgs. SOS_001788-SOS_001789, SOS_00179435).**

124.   Pursuant to a South Dakota regulation, ARSD 5:02:02:21, it is SOS's policy that if a prospective voter does not have a driver's license, non-driver ID, or Social Security number, they must complete an affidavit in the county auditor's office before being permitted to register to vote. Ex. 1 (Warne Dep. 100:15-101:7).

**RESPONSE:  Defendants dispute that ARSD 5:02:02:21, requires a prospective voter to provide a driver's license, non-driver ID, or Social Security number.   ARSD 5:02:02:21.**

**Further disputed, in that many States require a prospective voter to provide a driver's license, non-driver ID, or Social Security number to register to vote.  Ex. 6 Register To Vote In Your State By Using This Postcard Form and Guide at pg. 2 Box 6 and pgs. 3-2. https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf**

125.   SOS does not know the number of ARSD 5:02:02:21 forms (for a registrant without a driver's license, non-driver ID, or Social Security number) that were completed in each South Dakota county in any of the past five years or, of those, the number of prospective pregistrants who were subsequently added to the voter registration rolls. Ex. 19A (Barnett Resp. to Interrog. No. 5).

**RESPONSE:  Defendants' dispute ARSD 5:02:02:21 requires a prospective voter to provide a driver's license, non-driver ID, or Social Security number.  ARSD 5:02:02:21.**

**Subject to the objection it is undisputed that SOS does not know the number of ARSD 5:02:02:21 that were completed.  Pls. Ex. 19A (Barnett Resp. to Req. for Admission No. 5).**

126.   SOS does not track the use of ARSD 5:02:02:21 forms (for a registrant without a driver's license, non-driver ID, or social security number). Ex. 19A (Barnett Resp. to Interrog. No. 5).

**RESPONSE: Defendants' dispute that ARSD 5:02:02:21 requires a prospective voter to provide a driver's license, non-driver ID, or Social Security number.**

**Subject to the objection it is undisputed that SOS does not know the number of ARSD 5:02:02:21 that were completed.  Pls. Ex. 19A (Barnett Resp. to Req. for Admission No. 5).**

127.   SOS cannot currently track the number of voters who used an affidavit using the TotalVote system, since those forms cannot be uploaded into that system. To determine how many individuals used affidavits, SOS must request that information from county auditor offices or manually search its own records of communications from county auditors about those requests. Other than inquiring about that information in Resp. to a discovery request in this lawsuit, SOS does not track that information. Ex. 1 (Warne Dep. 206:16-208:10).

**RESPONSE: Disputed.  Ms. Warne testified at her deposition on November 15, 2021, that they were working with their vendor on a way to track the number of voters who used an affidavit and that they could probably count on one hand the number of individuals who used an affidavit as it is very rare.   Pls. Ex. 1 (Warne Dep. 205:9-206:20).**

128.   If an agency transmits a voter registration application without a driver's license or Social Security number, county auditors send a notice to the voter that their voter registration application was incomplete. Ex. 1 (Warne Dep. 101:8-102:1); Ex. 16 (DeSersa Dep. 27:21-28:3); Ex. 15 (Naylor Dep. 41:10-13). SOS has never sought or provided guidance to county election officials about whether this practice conflicts with the NVRA. Ex. 1 (Warne Dep. 101:8-102:1).

**RESPONSE:  Disputed.  Defendants' object to the reference at Plaintiffs Ex. 16 (DeSersa Dep. 27:21-28:3) as that refers to if the voter's social security number does not match with the driver's license number, non-drivers' identification number, or their Social Security number and does not refer to an application that did not contain a driver's license or Social Security number.  Pls. Ex. 16 (DeSersa Dep. 27:21-28:3).**

**Further disputed to the cited reference at Plaintiffs Ex 15 (Naylor Dep. 41:10-13) as her testimony has nothing to do with voter registration applications that don't have a driver's license or Social Security number. Pls. Ex. 15 (Naylor Dep. 41:10-13).**

**Further disputed in that that State law allows for a voter registration application to use a nondriver identification number to register to vote and Ms. Warne is mistaken because a voter registration**

**form that did not contain driver's license or Social Security number would not result in the county auditor sending an incomplete notice if it contained a nondriver identification number.  SDCL 12-4-5.4.**

129.   Before this lawsuit was filed, SOS did not provide any training to county auditors on the use of affidavits for individuals seeking to register to vote without a driver's license, nondriver ID, or Social Security number. Ex. 1 (Warne Dep. 208:15-210:7).

**RESPONSE:  Undisputed, but immaterial.**

130.   Currently, there is no way for individuals without a driver's license, non-driver ID, or Social Security number to know that they have the option to submit an affidavit if they are otherwise eligible to vote, unless an agency employee or voter registration official affirmatively provides them that information, which SOS does not require them to do. Ex. 1 (Warne Dep. 210:8-211:1); Ex. 2 (Warne Dep. Ex. 28); Ex. 22 (Off. of Bennett Cnty. Auditor, Invalid or Incomplete Voter Registration Acknowledgment Notices).

**RESPONSE:  Disputed.  When a voter registration is sent to the county auditor and it does not contain a driver's license, non-driver ID, or Social Security number the county auditor would send an incomplete notice to that individual who can then contact the county auditor to find out what needs to done to complete the registration.  Plaintiffs Ex. 1 (Warne Dep. 101:8-14).**

**Further disputed as to Plaintiffs Ex. 2 (Warne Dep. Ex. 28) as it does not support Plaintiffs' statement.  Pls. Ex. 2 (Warne Dep. Ex. 28)**

**Further disputed as this requirement is found in state statute. SDCL 12-4-5.4**

**Subject objection undisputed, but immaterial.**

131.   SOS has no knowledge of, and does not actively monitor, DSS's processes and procedures for handling voter registration applications, including whether DSS offices correctly or timely transmit voter registration applications to county auditors as required by the NVRA Ex. 1 (Warne Dep. 63:20-64:2, 62:18-63:7); whether or how DSS handles change of address requests Ex. 1 (Warne Dep. 56:8-57:5); or whether or how DSS provides voter registration services during covered transactions made online or by telephone, Ex. 1 (Warne Dep. 57:16-58:11).

**RESPONSE:  Undisputed**

132.   SOS is not aware of when a voter registration agency is required under the NVRA to present a client with the voter preference form. Ex. 1 (Warne Dep. 33:2-5, 33:14-34:13, 35:20-

36:22).

**RESPONSE:  Disputed.  It was never asked of Ms. Warne when a voter registration agency is required under the "NVRA" to present a client with the voter preference form and the question is ambiguous and can be interpreted to be asking at what stage during an application interview, recertification interview, renewal interview, or change of address is the voter registration form to be provided not if they need to be provided with an application interview, recertification interview, renewal interview, or change of address.  Pls. Ex. 91(Warne Dep. 33:2-5, 33:14-34:13, 35:20-36:22).**

133.   SOS is unaware of DSS's process, if any, for providing voter registration application forms with voter preference forms to individual clients. Ex. 1 (Warne Dep. 47:14- 48:16).

**RESPONSE:  Undisputed**

134.   SOS has provided no guidance to DSS on when or how to ask the voter preference question to clients. Ex. 1 (Warne Dep. 37:1-5).

**RESPONSE:  Disputed.  There was no question asked about when a voter preference question needs to be provided.  Pls. Ex. 1 (Warne Dep. 37:1-5).**

135.   SOS does not record the number of incidents in which a voter who asserts that hey registered to vote at DSS but did not appear on the voter registration rolls when they attempted to vote. Ex. 1 (Warne Dep. 28:11-29:19, 31:4-19).

**RESPONSE:  Disputed.  Warne testified that since 2015 there has been just a few, or only about 5, people who have called her about registering at DSS but not appearing on the voter registration rolls when they attempted to vote.  Pls. Ex. 1 (Warne Dep. 28:11-29:19, 31:4-19).**

**Subject to the objection undisputed.**

136.   Because SOS does not monitor DSS's compliance with its voter registration application transmittal obligations, the only way that SOS would become aware of problems with a local DSS office's transmittal of voter registration applications to county auditors would be if a member of the public complained on Election Day that they were not registered to vote as they had

33

expected after submitting a registration form through DSS. Ex. 1 (Warne Dep. 64:3-64:20).

**RESPONSE:  Undisputed.**

137.   The U.S. Election Assistance Commission, using data reported by the South Dakota Secretary of State, identified an 84 percent decrease in voter registration applications generated from public assistance agencies in South Dakota between 2002 and 2018. See Ex. 24 (U.S. Election Assistance Comm'n, The Impact of the National Voter Registration Act of 1993 n the Administration of Elections For Federal Office 2003-2004, at 23 (Table 2) (2005)); Ex. 22 (U.S. Election Assistance Comm'n, EAVS Data Brief, South Dakota (2016)); Ex. 23 (U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2018 Comprehensive Report: A Report to Congress, at 65, 70 (2019)).

**RESPONSE:  Disputed.   Plaintiffs exhibit 24 does not support their statement.  Pls. Ex. 24 is from the 2004 election.  Plaintiffs Ex. 22 is the 2016 election.  Pls. Ex. 23 is for duplicate registrations and confirmation notices.**

**Further disputed as the date Plaintiffs cited references can be misleading as there is no comparison as to how much registrations have increased at DPS or through mail in voter registration forms and Plaintiffs in posing a question to Ms. Warne stated there was a decline of 68% of voter registrations between 2002 and 2018 not 84 percent.  Pls. Ex. 1 (Warne Dep. 125:16-126:20).**

138.   SOS acknowledges that this 84 percent decrease in voter registration applications generated from public assistance agencies from 2002 to 2018 represents a substantial decline. Ex. 1 (Warne Dep. 125:16-126:20); Ex. 2 (Warne Dep. Ex. 16).

**RESPONSE:  Disputed.  Ms. Warne did not acknowledge an 84 percent decrease was a substantial decline in voter registration from public assistance agencies and stated that part of is that more people are registering to vote when they get their driver's license.  Ex. 9 (Warne Dep. 125:16-126:6).  Of those individuals that registered to vote in 2020 46 percent were from DPS, 24.8 percent were received by mail, email, or fax, and 23.2 percent were in person voter registrations accounting for 94 percent of all those who registered to vote in 2020. Ex. 7 2020 EAVS Data Brief: South Dakota. (https://www.eac.gov/sites/default/files/EAVS%202020/State%20Data%20Briefs/2020_EAVS_Data_Brief_SD_508c.pdf).**

**Defendants further dispute Plaintiffs' Ex. 2 (Warne Dep. Ex. 16) as it is a graph made by plaintiffs and there is no foundation or verification of this data.**

139.   SOS has never analyzed data it has reported to EAC. Ex. 1 (Warne Dep. 125:16-126:20); Ex. 2 (Warne Dep. Ex. 16).

**RESPONSE:  Disputed.  Defendants' object, Warne did not state she has never analyzed data it has reported to EAC; she stated she did not pull any data from EAC with regards to public assistance agencies.  Ex. 9 (Warne Dep. 125:16- 126:20).**

**Defendants further object to Plaintiffs Ex. 2 (Warne Dep. Ex. 16) as it is a graph made by plaintiffs and there is no foundation or verification of this data from supporting documentation.**

140.   In 2020, SOS was informed that two voter registration applications from local DSS offices in Oglala Lakota County were not transmitted to the county auditor for approximately one month after being completed. In the first, the voter signed and dated the form on April 15, 2020. The application was date-stamped as received by the local DSS office a week later on April 22, 2020, but did not arrive at the county auditor's office until nearly a month later on May 18, 2020. In the second, the voter signed and dated the form on April 17, 2020. The form was stamped received by the Pine Ridge DSS office on April 20, 2020; but the county auditor did not receive the application until May 18, 2020. Ex. 1 (Warne Dep. 273:19-278:6); Ex. 2 (Warne Dep. Ex. 36). After learning about this information from the Oglala Lakota County auditor's office, SOS did not take any action with respect to the county auditor or the local DSS offices, and has not undertaken any monitoring or auditing of those offices since then. Ex. 1 (Warne Dep. 278:13-279:17, 282:7-18). SOS does not know what caused these transmission delays. Ex. 1 (Warne Dep. 279:18-280:6).

**RESPONSE:  Disputed.  Ms. Warne testified this was the beginning of COVID and Many offices were closed to the public and everything was being done by mail and we do not know if the voter registrations were delayed or lost for a while because the U.S. Mail system.   Pls. Ex. 1 (Warne Dep. 280:7-281:12).**

141.   In another incident in which a voter missed a registration deadline because a satellite DSS office failed to comply with an NVRA requirement, SOS spoke with DSS about the issue but has not done any monitoring or follow-up on that office's compliance. Ex. 1 (Warne Dep. 284:13-285:22).

**RESPONSE:  Disputed that DSS failed to comply with the NVRA as the voter came back to the DSS office and wanted to take her voter registration form with her.  Pls. Ex. 1 (Warne Dep. 284:13-285:22).**

142.   In another example, after SOS notified DSS in October 2020 of a recurring issue with a local DSS office in Oglala Lakota County not properly date-stamping voter registration applications on the date received, SOS has not done any follow-up with DSS to determine whether the issue has been resolved. Ex. 1 (Warne Dep. 293:7-294:8, 298:12-15); Ex. 2 (Warne Dep. 38).

**RESPONSE:  Disputed as vague as to the meaning of "recurring."**

**Further disputed in that SOS indicated date-stamping was not a big problem and that SOS informed DSS about date stamping.  Pls. Ex. 1 (Warne Dep. 298:7-15); Pls. Ex. 2 (Warne Dep. Ex. 38).**

143.   The Lyman County auditor's office does not keep copies of incomplete voter registration applications from public assistance agencies, log how many incomplete applications it receives from those agencies, or note which DSS or other public assistance office transmitted an incomplete application. Ex. 21 (Lyman County Resps. to Subpoena).

**RESPONSE:  Disputed the response is referring to voter registration applications from DSS not all public assistance agencies.  Pls. Ex. 21 (Lyman County Resps. to Subpoena).**

144.   The Ziebach County auditor's office does not log receipt of hard copy voter registration applications transmitted by public assistance agencies. Ex. 17 (Longbrake Dep. 50:7- 11).

**RESPONSE:  Undisputed, but immaterial.**

145.   Beyond providing ad hoc guidance, SOS has not provided DSS other guidance on NVRA compliance. Ex. 10 (Miller Dep. 158:20-159:1, 215:22-4).

**RESPONSE:  Disputed.  Defendants object in that Julie Miller testified she was not aware of any, which could mean SOS did provide other guidance that Julie Miller was not aware of.  Pls. Ex. 10 (Miller Dep. 158:20-159:1, 215:22-216:4).**

146.   SOS has not provided training to DSS leadership or staff on how voter registration services should be provided in compliance with the NVRA. Ex. 10 (Miller Dep. 159:2-8).

**RESPONSE:  Disputed to the extent Plaintiffs characterization conflicts with the actual content of the cited documents.  Julie Miller indicated that she was not aware of training in recent memory, but she did not state that no training had been provided and could not say that**

training had not been provided in the past.  Pls. Ex. 10 (Miller Dep. 159:2-8).

147.   DSS does not report any data or other information regarding its voter registration services to SOS. Ex. 10 (Miller Dep. 159:9-17).

**RESPONSE:  Undisputed, but immaterial.**

148.   SOS does not consider two agencies that provide public assistance—DLR and DOH—to be covered by the NVRA. Ex. 1 (Warne Dep. 229:4-14, 230:15-233:14).

**RESPONSE:  Disputed.  Defendants' object in that it is a misstatement of the law as DLR does not provide public assistance.**

**Further disputed in that DOH is covered by the NVRA and SOS indicated as much.  Pls. Ex. 1 (Warne Dep. 54:17-22); SDCL 12-4-2; ARSD 05:02:03:12; ARSD 05:02:03:18.**

**Further disputed as to allegations were raised in Plaintiffs' Complaint or Amended Complaint regarding the Department of Health.**

149.   SOS does not consider DLR to provide public assistance within the definition of the NVRA. Ex. 1 (Warne Dep. 229:4-14).

**RESPONSE:  Undisputed.**

150.   Even though WIC is a public assistance program covered by Section 7 and state law, DOH has not been designated under South Dakota law as a voter registration agency subject to Section 7. Ex. 1 (Warne Dep. 229:4-11, 231:4-7).

**RESPONSE:  Disputed.  The statement is a misstatement of the law as voter registration shall be available at those locations that provide women, infants, and children nutrition program (WIC) and SOS indicated offices that provide WIC are public assistance agencies.  Pls. Ex. 1 (Warne Dep. 54:17-22); SDCL 12-4-2; ARSD 05:02:03:12; ARSD 05:02:03:18.**

**Further disputed as no allegations were raised in Plaintiffs' Complaint or Amended Complaint regarding the Department of Health.**

151.   SOS believes that DOH is not obligated to provide voter registration services but may do so if it wishes. Ex. 1 (Warne Dep. 229:4-11, 230:15-233:14). DOH is not designated a voter registration agency. Ex. 1 (Warne Dep. 229:4-11, 231:4-7).

**RESPONSE:  Disputed.  Defendants' object the statement is a misstatement of the law.  Voter registration shall be available at those**

locations that provide women, infants, and children nutrition program (WIC) and SOS indicated offices that provide WIC are public assistance agencies.  Pls. Ex. 1 (Warne Dep. 54:17-22); SDCL 12-4-2; ARSD 05:02:03:12; ARSD 05:02:03:18.

Further disputed as no allegations were raised in Plaintiffs' Complaint or Amended Complaint regarding the Department of Health.

152.   With respect to Section 7 of the NVRA, SOS has issued no guidance, created no manuals or other materials, and offered no training whatsoever to DSS and other public assistance agencies in the five years prior to September 2, 2021. Ex. 1 (Warne Dep. 120:19- 121:5).

RESPONSE:  Disputed.  SOS provided the voter registration application and voter preference forms to DSS that DSS must use.  SOS contacts DSS regarding specific areas or specific forms, and guidance is provided in that format by SOS when SOS sees a problem.  Pls. Ex. 10 (Miller Dep. 157:20-158:16).

153.   SOS has not provided any training to DSS staff on voter registration or NVRA compliance for at least the last five years. It is SOS's understanding that DSS does its own trainings. Ex. 1 (Warne Dep. 119:20-120:5).

RESPONSE:  Undisputed, but immaterial.

154.   SOS has not reviewed or provided advice on the content of DSS's training of its staff on voter registration or NVRA compliance. Ex. 1 (Warne Dep. 120:6-10).

RESPONSE:  Undisputed, but immaterial.

155.   SOS has not provided guidance to DSS on the agency's equal assistance obligations under the NVRA. Ex. 1 (Warne Dep. 60:15-61:8).

RESPONSE:  Disputed.  Warne indicated that she might have sent them over a statute that talks about DSS's assistance obligation.  Pls. Ex. 1 (Warne Dep. 60:15-21).

Further disputed in that the question posed asked whether DSS has provided any guidance on obligations with respect to providing assistance under the NVRA, the question did not ask about equal assistance obligations. Pls. Ex. 1 (Warne Dep. 60:15-21).

156.   SOS has not provided guidance to DSS on its obligation to transmit voter registration applications in a timely manner as required by the NVRA. Ex. 1 (Warne Dep. 63:8-13).

**RESPONSE:  Disputed.  Warne indicated that SOS sent the updated forms to DSS and could not recall other guidance without going through her emails.  Pls. Ex. 1 (Warne Dep. 63:8-19).**

157.   SOS staff generally do not answer inquiries from agency or county auditor staff on how to implement NVRA requirements, because the SOS considers such inquiries to be requests for legal advice. Instead of answering such inquiries from agency or county auditor staff, SOS staff refer such inquiries to each agency or office's staff attorney or state's attorney. Ex. 1 (Warne Dep. 263:7-265:19, 267:5-9, 268:20-269:9); Ex. 2 (Warne Dep. Ex. 34).

**RESPONSE:  Disputed.  Ex. 2 (Warne Dep. Ex. 34) is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.**

**Subject to objection, undisputed.**

158.   The Secretary of State provides all agencies with pre-coded voter preference and voter registration forms, with codes corresponding to the programs and agencies listed in S.D. Admin. R. 5:02:03:18(7). Ex. 1 (Warne Dep. 42:14-18, 47:6-7; 54:7-55:2). The agencies print the pre-coded forms provided by SOS. Ex. 1 (Warne Dep. 52:13-21).

**RESPONSE:  Undisputed.**

159.   SOS amended the voter preference forms for voter registration agencies and voter registration forms in July 2020, after receiving Plaintiffs' notice letter. Ex. 1 (Warne Dep. 24:7- 26:4).

**RESPONSE:  Disputed.  The word "amended" is not accurate.  SOS updated the voter preference forms by reviewing Section 7 of the NVRA and added additional language to make the forms easier for the applicant and for the agency employee to understand.  Pls. Ex. 1 (Warne Dep. 24:7-26:9).**

160.   Other than the July 2020 revisions, SOS has not otherwise amended the voter preference and voter registration forms in recent years. Ex. 1 (Warne Dep. 55:7-56:7).

**RESPONSE:  Disputed.  The word "amended" in Plaintiff's statement of fact is not accurate.   SOS updated the voter preference forms by reviewing Section 7 of the NVRA and added additional language to make it easier for the applicant and for the agency employee.  Pls. Ex. 1 (Warne Dep. 24:7-26:9).**

**Subject to objection, undisputed.**

161.   Before July 2020, State agencies were using forms coded for different agencies or not coded at all. Ex. 1 (Warne Dep. 47:6-7, 54:21-55:6, 240:20-241:9). There is only one agency code for all public assistance agencies. Ex. 1 (Warne Dep. 239:16-19, 240:20-21, 241:14-17).

**RESPONSE:  Disputed.  As to the first sentence, nothing in any of the cited references in Plaintiffs' Statement indicates State agencies were using forms that were not coded.  Pls. Ex. 1 (Warne Dep. 47:6-7, 54:21-55:6, 240:20-241:9).   Further disputed that "agencies" were using forms coded for different agencies as there is nothing in any of the cited references that more than one agency has ever used an incorrect code. Pls. Ex. 1 (Warne Dep. 47:6-7, 54:21-55:6, 240:20-241:9).**

**The second sentence is undisputed, but immaterial.**

162.   In response to Plaintiffs' notice letter, SOS worked with DSS to add language to the revised voter preference form in July 2020 to state, "If you do not check either box, you will be provided a voter registration form that you may complete at your convenience." Ex. 1 (Warne Dep. 45:6-46:11; 271:13-273:12).

**RESPONSE:  Undisputed.**

163.   The voter preference forms amended by SOS and provided to public assistance agencies in July 2020 contain the following language: "If you would like help filling out the voter registration form, we will help you. The decision to seek or accept help is yours. You may fill out the voter registration form in private." Ex. 2 (Warne Dep. Ex. 2; Ex. 1 (Warne Dep. 246:8-13; Ex. 18, Bennett County South Dakota Voter Registration Form). SOS admits that this language means that an individual registering to vote must affirmatively ask for assistance to receive help completing the voter registration form. Ex. 1 (Warne Dep. 245:1-17). SOS admits that this language is inconsistent with the NVRA requirement that public assistance offices provide assistance to all individuals wishing to register to vote, with or without a request for help from the voter. Ex. 1 (Warne Dep. 245:18-246:7). (Q. "Is that consistent with your understanding of what the NVRA requires? A. No. They're supposed to provide the assistance to the person wanting to register to vote.")

**RESPONSE:  Dispute.  The language of the voter preference form speaks for itself.  The language stating "You may fill out the application form in private" qualifies the previous sentence.  If the voter would like to fill out the form in private the voter does not need to seek or accept help. Pls. Ex. 1 (Warne Dep. Ex. 2).**

**Further dispute that this language is inconsistent with the NVRA as almost identical language appears in Section 7.  Section 7 states that the**

**required form include "(iv)" the statement, 'If you would like help in filling out the voter registration applications form, we will help you.  The decision whether to seek or accept help is yours.  You may fill out the application form in private...'"**  *See* **52 U.S.C. 20506(a)6(B)(iv).**

164.   The agency voter preference forms have not been updated or amended since July 2020. Ex. 1 (Warne Dep. 246:14-17).

**RESPONSE:  Undisputed.**

165.   SOS expects all public assistance agencies to use the updated voter preference forms provided by SOS to the agencies in July 2020. Ex. 1 (Warne Dep. 246:18-247:6, 269:10- 270:8). However, SOS admits that if an agency is using a different form, SOS would not know that unless the agency requested SOS's review of that form, which is not required. Ex. 1 (Warne Dep. 270:4-15).

**RESPONSE:  Undisputed.**

166.   SOS does not monitor whether voter registration agencies are using the voter preference form provided by SOS or whether they are using the correct version. Ex. 1 (Warne Dep. 46:11-18).

**RESPONSE:  Disputed.  The testimony reflects that the question only pertained to the voter preference form being used by DSS and not all agencies and that she did not know if SOS followed up with DSS on whether they are using the form provided by DSS.  Ex. 9 (Warne Dep. 44:4-47:3).**

167.   SOS conducts workshops for county auditors at the biennial two-day county auditor conference, which cover a variety of election-related topics. Ex. 1 (Warne Dep. 111:20- 112:15).

**RESPONSE:  Undisputed.**

168.   Prior to 2021, SOS did not provide any training on NVRA compliance at the biennial county auditor conferences. Ex. 1 (Warne Dep. 112:16-20-113:6); Ex. 2 (Warne Dep. Ex. 12).

**RESPONSE:  Disputed.  Testimony indicates Ms. Warne would have to go back and look at all the agendas to see if SOS included voter registration training at the biennial workshop to county auditors as the training on voter registration under the NVRA to county auditors is conducted separately from the county auditor biennial training.   Pls. Ex. 1 (Warne Dep. 112:2-113:3).**

169.   The most recent county auditor conference was held in October 2021, approximately a year after this lawsuit was filed. At the October 2021 conference, which was attended by 140 individuals including county auditors, their staff, SOS, Deputy Secretary of State, and SOS's full election team, SOS conducted a workshop on the NVRA. Although the allotted time for this workshop on the conference agenda was 30 minutes, the workshop actually lasted only four minutes and 41 seconds. Ex. 20 (Agenda for 2021 Auditor Election Workshop); Ex. 5 (Training Video Tr. 2:2-7). The workshop presenter, Kea Warne (Director of SOS's Division of Elections), informed attendees that the session was added because of this lawsuit. Id. There were no questions from attendees following Ms. Warne's brief presentation. Id. No other session covered the NVRA. Ex. 1 (Warne Dep. 214:9-216:22, 224:20-225:19); Ex. 2 (Warne Dep. Ex. 30); Ex. 20 (Agenda for 2021 Auditor Election Workshop).

**RESPONSE:  Disputed. There is no reference to the training lasting four minutes and 41 seconds.  Pls. Ex. 30 (Agenda for 2021 Auditor Election Workshop); Pls. Ex. 31 (Training Video Tr. 2:2-7).**

**Subject to objection, undisputed.**

170.   SOS's October 2021 NVRA workshop at the county auditor conference did not address the topic of when an agency is required to assist a voter in completing a voter registration application, or what kind of assistance should be provided. Ex. 1 (Warne Dep. 227:12-17, 228:5-10).

**RESPONSE:  Undisputed but immaterial.  County Auditors are not required to know, and have no reason to know, when a state agency is required to assist a voter in completing a voter registration application, or what kind of assistance should be provided by an agency.  County Auditors only accept voter registrations and input the data.**

171.   The Corson County auditor does not know what the NVRA requires in terms of voter registration, is not familiar with the term "covered transactions" as used in the NVRA, is not sure whether there are specific types of transactions that an individual may have with a government agency where voter registration must be provided under the NVRA, and is unaware of whether there are any South Dakota state laws or regulations relating to NVRA compliance. Ex. 14 (Bertolotto Dep. 28:13-20, 29:3-8, 29:9-12).

**RESPONSE:  Disputed.  The term "covered transactions" is not contained in and is not defined in the NVRA, and Plaintiffs did not explain what they meant by a "covered transaction".   Pls. Ex. 7 (Bertolotto Dep. 28:13-20, 29:3-8, 29:9-12).**

**Subject to the objection the statement is immaterial.  County Auditors are notrequired to know what the NVRA requires with regard to state agencies.**

172.   The recently retired Hughes County auditor, who was deposed as a representative of that office, did not know what a "covered transaction" is under the NVRA or whether specific state laws govern compliance with the NVRA. Ex. 15 (Naylor Dep. 22:16-23:8).

**RESPONSE:  Disputed.  Objection - as to the term "covered transaction" is not contained in and is not defined in the NVRA and Plaintiffs did not explain what they meant by a "covered transaction". Pls. Ex. 15 (Naylor Dep. 22:16-23:8).**

**Subject to the exemption the statement is immaterial.  County Auditors are not required to know what the NVRA requires with regard to state agencies.**

173.   The Todd/Tripp County has attended the Auditor Election Workshop SOS provides every two years and various other webinars provided by SOS since she was elected to her position in 2014. Ex. 16 (DeSersa Dep. 13:18-19).

**RESPONSE:  Disputed.  Nothing in the cited reference refers to Auditor Election Workshops or training in which DeSersa participated. Pls. Ex. 16 (DeSersa Dep. 13:18-19).**

174.   The Todd/Tripp County Auditor is not familiar with the NVRA, has never been trained on the NVRA, has no understanding of it, does not know any state or federal laws that govern compliance with the NVRA, and does not know who is responsible for the State's compliance with the NVRA. Ex. 16 (DeSersa Dep. 21:8-22:4; 31:22-32:16, 35:3-5).

**RESPONSE:  Undisputed, but immaterial.**

175.   The Todd/Tripp County auditor was not aware of, and to her knowledge had never been trained by SOS that, state regulation ARSD 5:02:02:21 requires a person without a driver license, nondriver identification number or social security number to fill out a separate statement in order to complete a voter registration application. Ex. 16 (DeSersa Dep. 87:12- 89:19; 96:2-12); Ex. 16 (DeSersa Dep. Ex. 2).

**RESPONSE:  Disputed.  There is no ARSD 5:02:02:21 and therefore ARSD 5:02:02:21 does not require a person without a driver license, nondriver identification number, or social security number to fill out a separate statement in order to complete a voter registration.**

176.   The Ziebach County auditor is not aware of any state laws or regulations governing compliance with the NVRA. Ex. 17 (Longbrake Dep. 24:12-15).

**RESPONSE:  Undisputed, but immaterial.**

177.   None of the county auditor offices deposed by Plaintiffs track their compliance with NVRA requirements. Ex. 14 (Bertolotto Dep. 113-21-114:1); Ex. 15 (Naylor Dep. 62:4-10); Ex. 17 (Longbrake Dep. 75:18-21).

**RESPONSE:  Disputed.  Plaintiffs deposed four county auditors and their cited references only refer to three.**

**Subject to objection, undisputed.**

178.   If a Corson County resident signs and dates a voter registration application before a voter registration deadline, but the transmittal from the state agency is postmarked after that deadline, the Corson County auditor's office will not process the application for the upcoming election but will only register the voter for future elections. Ex. 14 (Bertolotto Dep. 103:21-104:18, 108:6-109:11).

**RESPONSE:  Undisputed.**

179.   If the Hughes County auditor's office receives a voter registration application from a state agency after a voter registration deadline, the office will consider the date stamped on the application by the agency, if any, to be the application date, regardless of the date the voter signed the form. Ex. 15 (Naylor Dep. 54:21-55:10).

**RESPONSE:  Undisputed**

180.   If a voter registration application transmitted by a state agency was not date stamped by the agency, the Hughes County auditor's office would use the date of the postmark (if any) or, if the transmittal was not postmarked, the date received by the auditor's office as the date of the application. Ex. 15 (Naylor Dep. 55:14-17, 57:21-58:7).

**RESPONSE:  Undisputed.**

181.   The Todd/Tripp County Auditor does not process voter registration applications from DSS according to SDCL 12-4-6.1, which says that if it "is received by the auditor within five days following any voter registration deadline and is dated by the deadline, the card shall be considered to be effective on the date which it was signed at the agency." Instead, the odd/Tripp County Auditor processes DSS voter registration applications only if they are

postmarked by the registration deadline. Ex. 16 (DeSersa Dep. 99:20-100:22; 104:14-21).

**RESPONSE:  Disputed.  Testimony reflects that if a voter registration comes in from an agency listed in SDCL 12-4-2 within 5 days following any registration deadline and dated by the deadline the voter registration would be accepted. Pls. Ex. 16 (DeSersa Dep. 103:2-104:1).**

182.   To comply with the NVRA, SOS is obligated to report data to the federal Elections Assistance Commission ("EAC") after every general election, including reporting the number of new voter registrations that came through each state agency covered by Sections 5 and 7 of the NVRA. Ex. 1 (Warne Dep. 122:20-123:18, 124:9-12). SOS is obligated to ensure that the data it reports to EAC is accurate. Ex. 1 (Warne Dep. 123:19-22).

**RESPONSE:  Undisputed.**

183.   A South Dakota administrative rule, ARSD 05:02:03:18, requires county auditors to provide voter registration data to SOS after each general election, including the number of registrations between the last two general elections and the number of duplicate registrations between the last two general elections received from: (a) Driver's license offices; (b) Mail-in; (c) Public assistance agencies such as food stamps, AFDC, and WIC; (d) Department of Human Services; (e) Armed forces recruitment offices; (f) Municipal finance offices; (g) In-person registration at the auditor's office; (h) Voter registration drives which deliver cards; and (i) Individual voters registering through the UOCAVA system. Ex. 1 (Warne Dep. 128:17-130:5); Ex. 2 (Warne Dep. Ex. 17).

**RESPONSE:  Undisputed**

184.   SOS uses the data reported by county auditors to report NVRA compliance data to EAC. County auditors do not produce separate reports to SOS with this data; rather, SOS pulls this data from information entered by county auditors into the TotalVote system. Ex. 1 (Warne Dep. 130:6-132:1). SOS does not independently verify the accuracy of the data entered into the TotalVote system by county auditors before submitting its reports to EAC. Ex. 1 (Warne Dep. 132:2-7).

**RESPONSE:  As to the first sentence, undisputed, but immaterial.**

**Dispute the second sentence.  County auditors have data that they provide to SOS that SOS can't pull from the system.   Pls. Ex. 1 (Warne Dep. 130:6-131-15)**.

**As to the third sentence, undisputed, but immaterial.**

185.   SOS does not review or analyze data reported to EAC for purposes of identifying trends or compliance issues in the state. Ex. 1 (Warne Dep. 135:16-136:9). SOS has never conducted an analysis of voter registration data to identify potential noncompliance with Section 7 by public assistance agencies. Ex. 1 (Warne Dep. 154:15-21).

**RESPONSE:  Disputed.  SOS indicated they will look at the absentee numbers and other similar information to make the information available on their website.  SOS was never asked if they look at trends or compliance issues. Pls. Ex. 1 (Warne Dep. 135:16-136:9).   SOS was asked if they ever conducted an "analysis like this before" which was an analysis done by Plaintiffs.  Pls. Ex. 1 (Warne Dep. 148:4-154:21).  SOS was not asked if they conducted an analysis of voter registration data to identify potential noncompliance with Section 7.  Pls. Ex. 1 (Warne Dep. 148:4-154:21).  The exhibit Plaintiffs created for SOS to review as part of their questioning of SOS was not cited in Plaintiffs' statement.   Pls. Ex. 1 (Warne Dep. 148:4-154:21).**

186.   Although SOS collects information in its TotalVote system on the number of voter registrations corresponding to the relevant agency code, SOS has not shared that information with any voter registration agencies. Ex. 1 (Warne Dep. 73:16-76:13).

**RESPONSE:  Disputed.  The questions posed by Plaintiff to SOS regarded whether SOS shared information with "DSS" not all agencies. Pls. Ex. 1 (Warne Dep. 73:16-76:13).   SOS did not state that voter registration information has not been shared but that SOS did not recall whether the information was shared.  Pls. Ex. 1 (Warne Dep. 73:16-76:13).**

187.   Although SOS expects agencies to collect and review data as part of their NVRA compliance obligations, SOS has not encouraged or required agencies to collect and review relevant data in the last five years. Ex. 1 (Warne Dep. 163:21-164:8).

**RESPONSE:  Undisputed, but immaterial.**

188.   Beyond the data it reports to EAC, SOS does not collect or analyze any other voter registration data from agencies or other sources with respect to compliance with Sections 5 and 7 of the NVRA. Ex. 1 (Warne Dep. 160:16-161:5).

**RESPONSE:  Undisputed, but immaterial.  All data is pulled from TotalVote which is supplied by the agencies to the County auditors.**

189.   SOS admits that data analysis is important for effective oversight of agencies' compliance with the NVRA and that it is not possible to understand

and monitor the current degree of NVRA compliance without data. Ex. 1 (Warne Dep. 162:18-163:2).

**RESPONSE: Undisputed, but immaterial.**

190. Although SOS collects data on the number of voter registration applications generated through state agencies, SOS does not collect or review data on the number of covered transactions that took place at the agencies over the same period. Ex. 1 (Warne Dep. 163:3-10).

**RESPONSE: Undisputed, but immaterial.**

191. SOS admits that, without data on the number of covered transactions (i.e., the number of opportunities clients were supposed to have to register to vote), it is impossible for SOS to understand the voter registration data and its implications for NVRA compliance. Ex. 1 (Warne Dep. 163:11-15).

**RESPONSE: Disputed. SOS collects and analyzes data on the number of voter registration applications generated through DSS and DPS. Pls. Ex. 1 (Warne Dep. 163:3-10).**

**Subject to objection, undisputed but immaterial.**

192. SOS was unaware of problems with its own data reporting and with covered agencies' compliance problems until presented with that data by Plaintiffs during discovery. Ex. 1 (Warne Dep. 150:14-152:16, 157:7-160:9).

**RESPONSE: Disputed. The testimony cited by Plaintiffs discusses discrepancies in data reported by DPS and SOS as compiled by Plaintiffs. Nowhere in the cited testimony do Plaintiffs assert or does SOS acknowledge "problems" with data reporting or compliance.**

**Further, Plaintiffs are referring to exhibits they created showing charts they created, and the exhibits are not part of the record or cited in Plaintiffs' statement. Pls. Ex. 1 (Warne Dep. 148:4-154:21). SOS did not state there were problems with its own data reporting as SOS was viewing exhibits created by Plaintiffs not data that SOS reported in the format SOS reported. Further, the exhibits are not part of the record or cited in Plaintiffs' statement. Ex. 1 (Warne Dep. 148:4-154:16).**

193. For example, SOS was unable to explain the substantial discrepancies between the voter registration data SOS reported to EAC, and the data SOS produced to Plaintiffs from SOS's records during discovery. Ex. 1 (Warne Dep. 141:14-144:1).

**RESPONSE: Disputed. Plaintiffs are referring to exhibits they created showing charts they created, and the exhibits are not part of the**

**record or cited in Plaintiffs' statement.  Pls. Ex. 1 (Warne Dep. 140:1-144:1).  SOS was viewing exhibits created by Plaintiffs not data that SOS reported in the format SOS reported it, and the exhibits are not part of the record or cited in Plaintiffs' statement.  Ex. 1 (Warne Dep. 140:1-144:1).   SOS was asked to explain discrepancies in the data as compiled by Plaintiffs and had no opportunity to verify the accuracy of the data as compiled.**

194.   SOS believes the significant variation among counties in voter registration applications generated by covered transactions can be explained by counties entering applications incorrectly, using incorrect forms, or using incorrect agency codes, as well as differences in the quality of voter registration services provided at different offices. Ex. 1 (Warne Dep. 150:14-152:16).

**RESPONSE:  Disputed.  Plaintiffs are referring to exhibits they created showing charts they created and are not part of the record or cited Plaintiffs' statement. Pls. Ex. 1 (Warne Dep. 140:1-144:1).  SOS was viewing exhibits created by Plaintiffs not data that SOS reported and in the format SOS reported.  Pls. Ex. 1 (Warne Dep. 140:1-144:1).**

195.   SOS has no explanation for discrepancies between voter registration data produced by DPS and agency-specific voter registration data for DPS that was produced by SOS. SOS had not compared data from those two sources prior to the September 2, 2021 Rule 30(b)(6) deposition in this case and was previously unaware of those discrepancies. Ex. 1 (Warne Dep. 157:7-160:8); Ex. 2 (Warne Dep. Ex. 26).

**RESPONSE:  Disputed.  Plaintiffs are referring to exhibits they created showing charts they created and not data that SOS reported and in the format SOS reported.  Pls. Ex. 1 (Warne Dep. 157:7-160:8).   SOS was asked to explain discrepancies in the data as compiled by Plaintiffs and had no opportunity to verify the accuracy of the data as compiled.**

196.   There are also discrepancies in voter registration data for DSS reported by SOS. For example, according to data provided to Plaintiffs by SOS, Ziebach County reported no voter registrations from DSS from January 2018 to December 2020. Ex. 17 (Longbrake Dep. 81:7-11 & Ex. 6); Ex. 1 (Warne Dep. 150:14-154:14). The Ziebach County auditor's office has, in fact, received voter registration applications from DSS from January 2018 to December 2020, and thus considers the data reported to Plaintiffs by SOS to be incorrect. Ex. 17 (Longbrake Dep. 81:12-82:6).

**RESPONSE:  Disputed.  Plaintiffs are referring to exhibits they created showing charts they created, and the exhibits are not part of the record or cited in Plaintiffs' statement.  Pls. Ex. 1 (Warne Dep. 147:18-**

154:14).  **SOS was asked to explain discrepancies in the data as compiled by Plaintiffs and had no opportunity to verify the accuracy of the data as compiled.**

197.   SOS admits offices may not be following proper procedures and may need more training. Ex. 1 (Warne Dep. 144:5-147:11); Ex. 2 (Warne Dep. Ex. 22).

**RESPONSE:  Disputed.  Plaintiffs are referring to exhibits they created showing charts they created, and SOS is testifying to the data on the chart Plaintiffs' created. Pls. Ex. 9 (Warne Dep. 147:18-154:14); Pls. Ex. 2 (Warne Dep. Ex. 22).  SOS was asked to explain discrepancies in the data as compiled by Plaintiffs and had no opportunity to verify the accuracy of the data as compiled.**

198.   SOS admits that compliance with Section 7 of the NVRA is not occurring universally across South Dakota and that more training is needed. Ex. 1 (Warne Dep. 154:22- 155:8).

**RESPONSE:  Disputed.  SOS testimony is in response to Plaintiffs exhibits they created showing charts they created and are not part of the record or cited in Plaintiffs Statement.  Pls. Ex. 1 (Warne Dep. 147:18-155:8).  SOS was asked to explain discrepancies in the data as compiled by Plaintiffs and had no opportunity to verify the accuracy of the data as compiled.**

199.   SOS assigns agency codes for use on voter preference forms and voter registration forms based on the subsection letters in Section 6 of South Dakota Administrative Rule 05:02:03:18(6). Ex. 1 (Warne Dep. 54:7-19; ARSD 05:02:03:18). Code A refers to "[d]river's license offices;" code C refers to "[p]ublic assistance agencies such as food stamps, AFDC, and WIC"); and code D refers to the Department of Human Services (which provides services for individuals with disabilities). Ex. 1 (Warne Dep. 54:20-55:3, 121:6-9, 240:12-241:9); S.D. Admin. R. 05:02:03:18).

**RESPONSE:  Undisputed.**

200.   SOS provides no guidance to agencies on how to use the agency-coded voter registration application forms provided by SOS, and defers to the agencies to do their own trainings on those forms. Ex. 1 (Warne Dep. 42:5-43:4).

**RESPONSE:  Disputed.  The testimony by SOS in Ex. 1 (Warne Dep. 42:5-43:4) only refers to DSS and not to all agencies.  Pls. Ex. 1(Warne Dep. 42:5-43:4).**

201.   Voter preference forms and voter registration forms provided by SOS to the agencies have used inconsistent and incorrect agency codes both prior to and since the revisions to those forms made in July 2020. Ex. 1 (Warne Dep. 48:22-49:21, 50:15-51:7, 54:7-55:6).

**RESPONSE: Disputed. The testimony by SOS indicates that DSS used the wrong form not the other agencies. Pls. Ex. 1 (Warne Dep. 48:22-49:21, 50:15-51:7, 54:7-55:6). The cited testimony does not assert that the incorrect forms were provided by SOS, only that on a specific occasion and incorrect form was used.** *Id.*

202.   There is no agency-specific code for DSS, as Code C refers to any public assistance agency, and multiple state agencies in South Dakota administer public assistance programs. Ex. 1 (Warne Dep. 239:16-19). Accordingly, there is no way for SOS or a public assistance agency to distinguish between applications made through a DSS office or through a DOH office using agency-coded data in TotalVote. Ex. 1 (Warne Dep. 241:14-242:7). It is not possible for SOS to identify which agency was the source of a voter registration problem using agency-coded data alone. Ex. 1 (Warne Dep. 242:2-7).

**RESPONSE: Disputed as the first sentence in that it references there "are multiple state agencies that administer public assistance." There is one other agency that provides public assistance that uses Code C and that is the Department of Health. Pls. Ex. 54 (Warne Dep. 54::20-22); ARSD 05:02:03:18).**

**Further disputed as no allegations were raised in Plaintiffs' Complaint or Amended Complaint regarding the Department of Health.**

**Subject to the objections, undisputed but, immaterial.**

203.   SOS believes there would be value in using separate codes for each agency that administers public assistance programs but has not considered making such a change. Ex. 1 (Warne Dep. 242:8-14).

**RESPONSE: Undisputed but, immaterial.**

204.   DSS's use of forms marked with Code D – which, under state regulation, refers to the Department of Human Services – is in error. Ex. 1 (Warne Dep. 55:1-6).

**RESPONSE: Undisputed, but immaterial.**

205.   SOS does not know if county auditors are using the coding system correctly and has no way to know if county auditors are entering the correct codes into the TotalVote system Ex. 1 (Warne Dep. 121:17-20, 122:2-9).

**RESPONSE:  Undisputed, but immaterial.**

206.   Voter registration forms used by DSS in 2019 contained no agency code. Ex. 1 (Warne Dep. 51:12-53:17); Ex. 2 (Warne Dep. Ex. 5).

**RESPONSE:  Disputed.  There was no testimony that DSS was using, did use, or how often they may have used the voter registration form. Pls. Ex. 1 (Warne Dep. 51:12-53:17).**

**Subject to objection undisputed.**

207. DSS uses voter preference forms and voter registration forms provided by SOS. Ex. 19B (Gill Resp. to Interrog. No. 8); Ex. 10 (Miller Dep. 143:1-11); Ex. 1 (Warne Dep. 42:5- 18, 44:9-45:5).

**RESPONSE:  Undisputed.**

208.   DSS has never received instruction from SOS on the codes used on the voter preference and voter registration forms provided by SOS to DSS. Ex. 10 (Miller Dep. 143:4-16).

**RESPONSE:  Disputed.  The cited testimony does not reflect that SOS never provided instruction on the codes used, only that DSS had never bee told how the codes differ.  Pls. Ex. 10 (Miller Dep. 143:4-16).**

209.   DSS is aware that some forms provided by SOS are coded with the letter "C" and others are coded with the letter "D," but does not know why different codes are used on different forms. Ex. 10 (Miller Dep. 144:2-9).

**RESPONSE:  Undisputed.**

210.   DSS has not requested information or sought guidance from SOS to clarify why different agency codes are used on the voter preference forms and voter registration forms provided by SOS to DSS. Ex. 10 (Miller Dep. 212:16-213:5, 214:2-5).

**RESPONSE:  Undisputed.**

211.   SOS has not provided guidance or other information to DSS on why the voter preference forms and voter registration forms provided by SOS to DSS contain different agency codes. Ex. 10 (Miller Dep. 214:6-8).

**RESPONSE:  Undisputed.**

212.   DPS's Rule 30(b)(6) representative testified that DPS is only "a little familiar" with the NVRA and that the agency "count[s] on the Secretary of State's office for their

expertise." Ex. 12 (Schrank Dep. 24:21-25:5; 25:12-17). The representative did not know what section of the NVRA applies to DPS. Ex. 12 (Schrank Dep. 25:12-17).

**RESPONSE:  Disputed.  The DPS representative knew the NVRA required driver's licenses agencies to provide an opportunity to register to vote when applying for a driver's license or ID and to offer voter registration to everyone applying at a driver exam station.  Pls. Ex. 12 (Schrank Dep. 24:21-25:22).**

213.   To change the address on the applicant's driver's license or non-driver ID, the applicant may apply in person at a driver exam station or county issue office; or they may apply online. In each situation the applicant has the opportunity to change the address on their voter registration by indicating that they wish to do so on the application form. When applications are submitted in person, an examiner reviews the application with the client to ensure they indicate whether they do or do not wish to update their voter registration. Ex. 19C (Price Resp. to Interrog. No. 3).

**RESPONSE:  Undisputed.**

214.   When voters submit a change of address request to DPS with respect to their drivers' license record, DPS does not transmit the change of address request to the county auditor unless the voter specifically checks the box on the change of address form indicating that the voter would like to also update their voter registration. Ex. 1 (Warne Dep. 88:20-89:7, 91:13- 92:16); Ex. 12 (Schrank Dep. 121:6-123:3); Ex. 14 (Bertolotto Dep. 102:6-19); Ex. 15 (Naylor Dep. 61:8-22).

**RESPONSE:  Undisputed.**

215.   SOS has no policy on how county auditors should handle change of address requests transmitted by DPS for voters that do not affirmatively check the box indicating they wish to update their voter registration. Ex. 1 (Warne Dep. 88:20-89:7, 91:13-92:16).

**RESPONSE:  Disputed.  The cited testimony does not reflect whether SOS has a policy regarding the situation described above.  Pls. Ex. 1  (Warne Dep. 88:20-89:7, 91:13-92:16).**

216.   DPS uses a Driver License/ID Card Application form to process change of address requests by applicants that requires applicants to affirmatively check a box saying "yes" if they wish to update their existing voter registration. Ex. 13 (Schrank Dep. Ex 2 (DPS_000342-343)); Ex. 14 (Bertolotto Dep. 102:6-19); Ex. 15 (Naylor Dep. 61:18-22); Ex. 12 (Schrank Dep. 122:6-12).

**RESPONSE:  Dispute that there is an additional affirmative step. DPS trains its driver's licensing examiners to ensure that the application is fully complete prior to accepting it from an applicant.  Pls. Ex. 12 (Schrank Dep. 121:5-18). An examiner will not accept an application without requesting that the applicant make a selection as to voter registration.  *Id.*  The system used for the online applications will not allow an applicant to submit an application unless the applicant has completed the voter registration questions.  Pls. Ex. 12 (Schrank Dep. 48:1-7).   The form of South Dakota's driver's license application is necessary because the application serves dual functions.  Pls. Ex. 12 (Schrank Dep. 74:8-17).  In South Dakota, the same application is used for initial driver's license applications as well as for changes of address.   *Id.***

217.   The Driver License/ID Card Application in effect during the investigation in March 2020 as well as the Driver License/ID Card Application as amended in August 2020 both contain a separate voter registration section that requires individuals to affirmatively elect to change their address for voter registration purposes. Ex. 13 (Schrank Dep. Ex. 2 (DPS_000342- 343)).

**RESPONSE:  Disputed.  Dispute that there is an additional affirmative step.  DPS trains its driver's licensing examiners to ensure that the application is fully complete prior to accepting it from an applicant.  Pls. Ex. 12 (Schrank Dep. 121:5-18). An examiner will not accept an application without requesting that the applicant make a selection as to voter registration.  *Id.*  The system used for the online applications will not allow an applicant to submit an application unless the applicant has completed the voter registration questions.  Pls. Ex. 12 (Schrank Dep. 48:1-7).   The form of South Dakota's driver's license application is necessary because the application serves dual functions.  Pls. Ex. 12 (Schrank Dep. 74:8-17).  In South Dakota, the same application is used for initial driver's license applications as well as for changes of address.  *Id.***

218.   SOS approves revisions of the South Dakota Driver License/ID Card Application only "[i]f anything is changed having to do with voter registration." Ex. 12 (Schrank Dep. 62:11- 14).

**RESPONSE:  Undisputed, but immaterial.**

219.   All changes to the voter registration section on DPS's driver's license application were initiated by SOS, including those made in August 2020, after Plaintiffs' notice letter in July 2020 and before Plaintiff filed their lawsuit in September 2020. Ex. 1 (Warne Dep. 27:10-22, 46:2-10, 247:7-248:5); Ex. 2 (Schrank Dep. Ex. 2 (DPS_000342-343)).

**RESPONSE:  Undisputed.**

220.   Applicants who submit a driver's license application or ID card bearing an address different from the one at which the individual is already registered to vote must take an additional affirmative step on the application to update their voting address. Ex. 12 (Schrank 30:22-31:9). "The customer has to check the box whether they want their registration updated or not." Ex. 12 (Schrank Dep. 121:10-11).

**RESPONSE:  Disputed.  Dispute that there is an additional affirmative step.  DPS trains its driver's licensing examiners to ensure that the application is fully complete prior to accepting it from an applicant.  Pls. Ex. 12 (Schrank Dep. 121:5-18). An examiner will not accept an application without requesting that the applicant make a selection as to voter registration.  *Id.*  The system used for the online applications will not allow an applicant to submit an application unless the applicant has completed the voter registration questions.  Pls. Ex. 12 (Schrank Dep. 48:1-7).   The form of South Dakota's driver's license application is necessary because the application serves dual functions. Pls. Ex. 12 (Schrank Dep. 74:8-17).  In South Dakota, the same application is used for initial driver's license applications as well as for changes of address.  *Id.***

221.   Additionally, the Driver License/I.D. Card Application fails to indicate whether a change of address for driver's license purposes will automatically update the address for voter registration purposes unless the customer opts out. Ex. 13 (Schrank Depo. Ex 2 (DPS_000342- 343)).

**RESPONSE:  Undisputed.**

222.   If an applicant does not have a social security number or driver's license, DPS does not allow the applicant to apply to register to vote at the DPS office, but instead directs them to a county auditor's office. Ex. 12 (Schrank Dep. 112:20-113:2; 156:7-11).

**RESPONSE:  Undisputed.**

223.   When DPS staff were trained by SOS in 2021 on how to provide voter registration services to customers, SOS instructed them that customers without a SD Driver's License or an SSN can only register to vote in the county auditor's office. Ex. 2 (Warne Dep. Ex. 31 (SoS_001787)).

**RESPONSE:  Undisputed.**

224.   Of the 57 DPS offices throughout the State, only eight, or 14%, are on a reservation. Ex. 8C (DPS, List of Driver's Licensing Locations).

**RESPONSE: Undisputed, but immaterial**

225.   DPS offices in Wagner, Armour, Winner, Rosebud, Pine Ridge, Hot Springs, Martin, Sisseton – all towns on or near a reservation – are travel offices. Travel offices provide voter registration services but in a non-permanent room in a building "wherever is available in that community" "once a week, twice a month [or] once a month." Ex. 12 (Schrank Dep. 51:21- 52:18).

**RESPONSE: Undisputed, but immaterial.**

226.   Five of the eight, or 62% of the DPS offices on reservations are travel offices. Ex. 8C (DPS, List of Driver's Licensing Locations).

**RESPONSE: Undisputed, but immaterial.**

227.   The distance Native Americans in Todd County have to travel to register to vote is "definitely further" than it is for others. Ex. 16 (DeSersa Dep. 126:22-127:5). The Todd County building is "miles away from other parts of the [Rosebud] [R]eservation" and this distance "may be one barrier" for Native Americans to register vote. Ex. 16 (DeSersa Dep. 125:3-13).

**RESPONSE: This statement is immaterial. Nevertheless, this statement is disputed. Ms. DeSersa is the Tripp and Todd County auditor. Pls. Ex. 16 (DeSersa Dep. 13:15-17). Ms. DeSersa office does not act as a county issue office for driver's license issuance services. Pls. Ex. 16 (DeSersa Dep. 52:9-13). Todd county is unincorporated and located at least partially on the Rosebud Reservation. Pls. Ex. 16 (DeSersa Dep. 118:10-119:1). Tripp County contracts with Todd county to do their work because Todd county does not have a county seat. Pls. Ex. 16 (DeSersa Dep. 119:2-20). There is no county auditor in Todd County. Pls. Ex. 16 (DeSersa Dep. 120:22-121:2). Rosebud is located on the Rosebud Reservation and has a driver's license office. Pls. Ex. 8C (DPS, List of Driver's Licensing Locations). Mission is located on the Rosebud Reservation and DSS has an office where individuals applying for benefits can complete a voter registration application. Pls. Ex. 10 (Miller Dep. 47:11-49:12, 198:16-199:9)**

228.   DPS has outsourced its motor vehicle services to other entities, such as counties and cities. Ex. 9 (Pls.' June 26, 2020 Letter); Ex. 13 (Schrank Ex. 4); Ex. 8C (DPS, List of Driver's Licensing Locations); Ex. 19C (Price Resp. to Interrog. No. 12). Despite a Joint Powers Agreement requiring DPS "to provide…training and supervision," DPS does not supervise or directly oversee these other entities, known as "issue sites." Ex. 12 (Schrank Dep. 90:16-19; 91:2-5; 152:11-19; 155:3-6); Ex. 13 (Schrank Dep. Ex. 4).

**RESPONSE:  This statement is immaterial.  Nevertheless, the second sentence is disputed.  DPS does not provide in person oversight but does review applications, answer questions from the county, and provide instruction on submission of applications.  Ex. 12 (Schrank Dep. 90:11-91:1).  If completed driver's license applications were not sent in by the county or city issue office to DPS, DPS would be contacted by the applicant to find out what happened with their driver's license or ID card. Pls. Ex. 13 (Schrank Dep. 152:20-153:9).**

**Subject to objection no dispute.**

229.   DPS trains each city or county once when they start providing services and once when they add a new employee. Ex. 12 (Schrank Dep. 149:22-150:1). Most of the issue sites started providing services in 1996. Ex. 6 (Schrank Dep. Ex. 4). Therefore, unless a new employee was added, the last time DPS has trained most of the issue sites was in1996. DPS does not "have information on whether voter registration has been part of that [training] at any point over the years." Ex. 16 (DeSersa Dep.149:22-150:6).

**RESPONSE:  This statement is immaterial.  Nevertheless, the second, third and fourth sentence of the statement are disputed.  The majority of the issues sites started providing services in 2004 and only one started providing services in 1996.  Pls. Ex. 6 (Schrank Dep. Ex. 4). DeSersa deposition ends on page 134. Pls. Ex. 16 (DeSersa Dep.). Additionally, DeSersa is a county auditor and would not have information regarding DPS training.**

230.   When DPS does train a county issue site, there is no set training. Ex. 12 (Schrank Dep. 154:18-21).

**RESPONSE:  This statement is immaterial.  Nevertheless, this statement is disputed.  The witness testified "I don't know if there is a set training." Ex. 5 (Schrank Dep. 154:12-155:2).**

231.   If issue sites are not properly collecting and transmitting voter registration forms, DPS has no formal mechanism of receiving notification. Ex. 12 (Schrank Dep. 153:10-20).

**RESPONSE:  Undisputed, but immaterial.**

232.   Of the eight DPS offices on reservations in the State, three of them, or 40%, are county issue sites. Ex. 8C (DPS, List of Driver Licensing Locations).

**RESPONSE:  Undisputed, but immaterial.**

233.   DPS does not have an office and instead has outsourced its motor vehicle services and voter registration to issue sites in Corson, Dewey, Jackson,

Lyman, Mellette, and Ziebach – all counties on or near a reservation. Ex. 8C (DPS, List of Driver Licensing Locations, https://dps.sd.gov/contact/locations); Ex. 11 (Miller Dep. Ex. 18 (DSS_04014-016)); Ex. 8C (DPS, List of Driver Licensing Locations, https://dps.sd.gov/contact/locations).

**RESPONSE:  Undisputed, but immaterial**

234.   For example, in Corson and Ziebach counties, driver's licensing services are provided by the county treasurer's office. Ex. 14 (Bertolotto Dep. 34:13-21, 36:6-17); Ex. 17 (Longbrake Dep. 26:17-27:16). During Plaintiffs' investigation, the Dupree office clerk said they do not provide any voter registration services and that they direct clients who wish to register to vote to the county auditor's office. Ex. 25 (Cataldo Decl. ¶ 13(b)).

**RESPONSE:  Dispute that Ex. 25 (Cataldo Decl. ¶ 13(b)) supports the second sentence of the statement as there is no ¶ 13(b) in the Cataldo Decl.  Furthermore, the second sentence is based on, or constitutes hearsay and is not admissible for the tr.**

**Subject to objection undisputed, but immaterial.**

235.   Unlike most DPS offices, field offices do not consistently use the state's TotalVote portal to submit voter registration applications to election officials. For example, in Corson County, the auditor's office experienced issues with voter registration applications made at the treasurer's office not being transmitted correctly through the state's TotalVote electronic portal. Ex. 14 (Bertolotto Dep. 36:18-37:10). Because of these problems, the auditor asked the county treasurer to hand-deliver hard-copy voter registration applications for the auditor to enter manually into the system. Ex. 14 (Bertolotto Dep. 34:13-36:5, 38:7-21, 55:5-19, 56:19-57:4). The treasurer's office does not date-stamp completed voter registration applications upon receipt. Ex. 14 (Bertolotto Dep. 57:10-12).

**RESPONSE:  Dispute as vague as to the meaning of "consistently" in the first Sentence.**

**Further dispute the first and fourth sentence.  With regards to the first sentence, there is no cite to the record that field offices do not consistently use the state's TotalVote portal to submit voter registration applications to election officials.  With regards to the fourth sentence the auditor's testimony was that she did not believe so when asked about the treasurer's office date stamping applications.  Pls. Ex. 14 (Bertolotto Dep. 57:10-12).**

**Subject to objection undisputed, but immaterial.**

236.   The Corson County auditor's office does not know whether the county treasurer's office submits voter registration applications to the state in addition to the hard-copy applications it delivers to the auditor's office. Ex. 14 (Bertolotto Dep. 126:2-12).

**RESPONSE:   Undisputed, but immaterial**

237.   DPS frequently sends voter registration applications to the wrong county. Ex. 1 (Warne Dep. 94:12-95:2, 96:9-97:8); Ex. 19A (Barnett Resp. to Interrog. No. 1).

**RESPONSE:   Disputed as vague as to the meaning of "frequently." Further disputed in that Ex. 19A (Barnett Resp. to Interrog. No. 1) does not support that DPS sends voter registration applications to the wrong county.**

**Subject to objection undisputed, but immaterial.**

238.   Sometimes voter registration applications transmitted to the Hughes County auditor's office by DPS through the State's TotalVote system are incomplete. Ex. 15 (Naylor Dep. 24:19-21, 33:22-34:10).

**RESPONSE:   Disputed as vague as to the meaning of "sometimes." Disputed in  that incomplete voter registration applications are because of the applicant or because of DPS.  Pls.  Ex. 15 (Naylor Dep. 24:19-21, 33:22-34:10).**

239.   DPS itself provides no training to staff on voter registration obligations. Ex. 12 (Schrank Dep. 28:14).

**RESPONSE:   Undisputed, but immaterial.**

240.   Any training of DPS staff on voter registration policies and procedures is conducted by the Secretary of State's office. Ex. 12 (Schrank Dep. 28:17-19). The only training SOS provides the DPS examiners "specific to voter registration" is during the Annual Driver Licensing Staff Training. Ex. 12 (Schrank Dep. 139:19-140:2).

**RESPONSE:   Undisputed, but immaterial.**

241.   SOS decides when to provide voter registration training to DPS employees and what length of time to devote to the training.  Ex. 12 (Schrank Dep. 138:6-12; 143:2-20).

**RESPONSE:   Undisputed, but immaterial.**

242.   SOS has conducted a voter registration training of DPS examiners at some, but not all, of that agency's annual trainings since 2015. SOS

conducted no voter registration trainings in 2018 and 2020. Other than those sporadic trainings, SOS does not conduct any trainings for DPS staff. Ex. 1 (Warne Dep. 26:5-27:7, 119:16-19).

**RESPONSE:  Dispute.  There are no supporting cites to the record to support the first or second sentence.  Testimony was presented indicating the Ms. Warne when she came back in 2015, has done the training every year except for 2020 because of COVID.  Ex. 9 (Warne Dep. 26:10-27:7). Disputed as vague as to the meaning of "sporadic."**

243.   From 2015 through the present, SOS has provided a cumulative total of only three hours of voter registration training during the annual Drivers' Licensing Staff Trainings. Ex. 13 (Schrank Dep. Exs. 7 (SoS_000638), 9, 10, 11 (SoS_000153), 12).

**RESPONSE:  Disputed.  The statement cites Ex. 13 (Schrank Dep. Exs. 7 (SoS_000638), 9, 10, 11 (SoS_000153), 12) for the length of training which only covered training through the year 2019.  In 2021 SOS conducted a one-hour training at the Driver Licensing annual meeting. Pls. Ex. 19C (Price Resp. to Interrog. No. 7)**

244.   Between 2015 and 2019, the time allotted to SOS's voter registration training at the annual DPS examiner training was cut by two-thirds—from 90 minutes in 2015, to 60 minutes in 2017, to 30 minutes in 2019, although the more recent sessions may have run longer than the 30 minutes allotted on the agenda. Ex. 1 (Warne Dep. 116:20-117:16); Ex.12 (Schrank Dep. 142:18:143-1). This means that an entire hour's worth of content was eliminated from the training between 2015 to 2019. Ex. 12 (Schrank Dep. 144:8-11).

**RESPONSE:  Disputed.  While the time for the training might have been reduced, the testimony cited by Plaintiffs does not address the content of the training.  Pls. Ex. 12 (Schrank Dep. 144:8-11).**

245.   SOS did not present any training on voter registration duties during the Annual Driver Licensing Staff Training from May 3, 2019 until October 8, 2021. Ex. 13 (Schrank Dep. Exs. 7 (SoS_000638), 9, 10, 11 (SoS_000153), 12); Ex. 1 (Warne Dep. 118:8-12).

**RESPONSE:  Undisputed with clarification.  There was no training in 2020 because of COVID-19.  Ex. 9 (Warne Dep. 118:4-7).**

246. The Director of DPS Driver Licensing Program is the highest-level employee whose job deals with voter registration, and only about 2 or 3 percent of her job deals with voter

registration. Ex. 12 (Schrank Dep. 17:21-18:6). She is responsible for ensuring NVRA compliance "in conjunction with the Secretary of State's office." Ex. 12 (Schrank Dep. 27:3-6).

**RESPONSE:  This statement is immaterial.  Nevertheless, disputed as to the second sentence as testimony revealed that also the deputy director has overall responsibility to ensure compliance with the NVRA, along with Amanda Clark and every examiner at the counter who assists the public.  Pls. Ex. 12 (Shrank Dep. 27:3-28:1).**

**Subject to objection undisputed, but immaterial.**

247.   DPS does not track its own NVRA compliance. Ex. 12 (Schrank Dep. 164:1-6).

**RESPONSE:    Undisputed, but immaterial.**

248.   DPS expects SOS to notify it of errors are made in processing voter registrations from DPS or other NVRA compliance issues. Ex. 12 (Schrank Dep. 164:1-6; 165:9-166:2).

**RESPONSE:  Undisputed, but immaterial.**

249.   DPS reports the number of voter registration applications its office processes to SOS monthly but does not conduct any analysis of that data. Ex. 12 (Schrank Dep. 170:12- 171:2).

**RESPONSE:  Undisputed, but immaterial.**

250.   Other than providing training to DPS employees, SOS does not provide guidance to DPS on NVRA compliance. Ex. 12 (Schrank Dep. 169:20- 170:2).

**RESPONSE:  Undisputed.**

251.   SOS does not track how often county auditors manually assign a voter to a different county after receiving the voter's information from DPS. Ex. 19A (Barnett Resp. to Interrog. No. 1).

**RESPONSE:  Undisputed.**

252.   SOS has no formal recordkeeping process for tracking the number of times a county auditor has requested that SOS pull an original DPS voter registration file, or the results of such searches. Ex. 19A (Barnett Resp. to Interrog. No. 2).

**RESPONSE:  Undisputed**

253.   Although DPS, upon "the advice and recommendations of the Secretary of State's Office" "to ensure compliance with the National Voter Registration Act," revised its Driver's License Application, Ex. 12 (Schrank Dep. Ex. 20 (DPS_001753); Ex. 19C (Price Resp. to Interrog. No. 7), DPS does not know how such a change ensures compliance with the NVRA, Ex. 12 (Schrank Dep. 172:3-5, 232:12-15).

**RESPONSE:  Disputed.  DPS testified that the purpose of the changes was to make the application clearer.  Pls. Ex. 12 (Schrank Dep. 172:3-5).**

254.   Even as amended, the Driver's License Application still fails to indicate that a change of address for driver's license purposes will automatically update the address for voter registration purposes unless the customer opts out. Ex. 13 (Schrank Dep. Ex. 15).

**RESPONSE:  Undisputed.**

255.   Prior to receiving Plaintiffs' May 20, 2020, notice letter, DSS had no policy on what a DSS employee should do if a customer left the voter preference question blank during an application, renewal, or recertification transaction. Ex. 1 (Warne Dep. 37:11-38:17); Ex. 10 (Miller Dep. 37:9-13); Ex. 6 (Nardi Dep. 38:14-19); Ex.7 (Barker Dep. 31:21-32:4). Further, Plaintiffs interviewed DSS clients who answered "yes" to the voter preference question while applying for benefits at DSS offices in Pine Ridge and Rapid City, but who were not offered voter registration forms or assistance. Ex. 25 (Cataldo Dec. ¶¶ 8(j), (k)).

**RESPONSE:  Disputed in that there is no reference in the cited materials as to when the policy took effect and Ms. Warne testified, she was not sure what DSS's policy was before the lawsuit.  Pls  Ex.1 (Warne Dep. 38:9-14).**

**As to the second sentence it cites as support and refers to Pls. Ex. 25 (Cataldo Dec. ¶¶ 8(j), (k)) and both ¶¶ 8(j), (k) which is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.**

**Subject to objections, undisputed.**

256.   Follow DSS's receipt of Plaintiffs' May 20, 2020, notice letter, DSS began to require that benefits specialists ask customers who leave the voter preference question blank if they would like to register to vote at that time and to provide a blank voter registration application to any person who declines to answer. Ex. 10 (Miller Dep. 35:22-37:16); Ex. 11, (Miller Dep. Ex. 18 (DSS_04014-016)).

**RESPONSE:  Disputed in that the cited testimony does not reflect when the policy was implemented.  Pls. Ex. 10 (Miller Dep. 35:22-37:16).  Further, Pls Ex. 18 (DSS_04014-016)) does not support the statement.**

**Subject to objection, Undisputed.**

257.   DSS's current policy of providing a blank voter registration application to clients who leave the voter preference question blank or decline to answer that question was implemented in July 2020 following DSS's receipt of Plaintiffs' May 20, 2020, notice letter. Ex. 10 (Miller Dep. 47:11-49:12, 198:16-199:9); Ex. 11 (Miller Dep. Ex. 18 (DSS_04014-016)).).

**RESPONSE:  Disputed. The testimony cited by Plaintiffs reflects that the procedure was "clarified" to ensure that benefits specialists know how to handle situations when the question is left blank.  Ex. 10 (Miller Dep. 47:20-48:10, 198:16-199:9).  Further, Pls Ex. 18 (DSS_04014-016)) does not support the statement.**

**Subject to objection, Undisputed.**

258.   After adopting the policy of providing a blank voter registration application to any client who leaves the voter preference question blank or declines to answer that question, DSS did not contact or make any other effort to offer voter registration services to clients who had left the voter preference question blank prior to the policy change. Ex. 10 (Miller Dep. 49:16-50:1).

**RESPONSE:  Undisputed, subject to clarification.  Testimony indicated DSS "changed the procedure or clarified the procedure" not that a policy was adopted of providing a blank voter registration application to any client who leaves the voter preference question blank or declines to answer that question.  Pls. Ex. 10 (Miller Dep. 47:20-48:10).**

**Subject to clarification undisputed, but immaterial.**

259.   In September 2020, DSS amended two benefits forms, Form EA-240 (titled "Application for Long Term Care or Related Medical Assistance for Office Use") and Form EA240D (entitled "Application for Medical Assistance for Workers With Disabilities") to update the voter preference question to indicate that the agency would provide a blank voter registration form to any individual who left the voter preference question blank. Ex. 10 (Miller Dep. 135:5-7, 136:6-9; Ex. 11 (Miller Dep. Ex. 11 (DSS_001144-81).

**RESPONSE:  Undisputed, but immaterial.  No allegations were raised in Plaintiffs' Complaint regarding the two referenced applications.**

260.   In September 2020, DSS added the voter preference question for the first time to the following benefits forms: Form EA-240R (DSS's long-term

care review form); Form EA240S (DSS's long-term care review form for simplified cases); Form EA-243 (DSS's Chronic Renal Disease Program application); and Form EA-270 (DSS's Medicare Savings Program application). Ex. 10 (Miller Dep. 135:8-12, 136:10-15).

**RESPONSE:  Undisputed, but immaterial.  No allegations were raised in Plaintiffs' complaint regarding the two referenced applications.**

261.   In September 2020, DSS began including a voter preference form and voter registration application with the Child Care Assistance, Children and Families Medical Assistance, and Low Income Energy Assistance Program ("LIEAP") applications. Ex. 10 (Miller Dep. 135:13-136:1). In June 2021, DSS added the voter preference question to the Child Care Assistance application form rather than attaching it as a separate document. Ex. 10 (Miller Dep. 135:17-136:1-5, 136:16-137:2).

**RESPONSE:  The first sentence is disputed.  Assumes facts not supported by the cited evidence – namely that DSS began including a voter preference form and voter registration application with the Children and Families Medical Assistance in September 2020.  Ex. 10 (Miller Dep. 135:13-136:1).**

**The second sentence is disputed.  Assumes facts not supported by the cited evidence - that in June 2021 that DSS added the voter preference question to the Child Care Assistance application form rather than attaching it as a separate document.  Pls. Ex. Ex. 10 (Miller Dep. 135:17-136:1-5, 136:16-137:2).**

**Disputed.  No allegations were raised in Plaintiffs' complaint regarding the two referenced applications.**

262.   In November 2020, DSS amended Form DSS-EA-301, its public assistance application form, to update the language on the voter preference question to indicate that the agency would provide a blank voter registration form to any individual who left the voter preference question blank. Ex. 10 (Miller Dep. 134:22-135:4).

**RESPONSE:  Disputed. Assumes facts not supported by the cited evidence – namely that DSS amended Form DSS-EA-301 to update the language on the voter preference question "to indicate that the agency would provide a blank voter registration form to any individual who left the voter preference question blank."**

263.   DSS's system for providing voter registration services requires hundreds of benefits specialists to make individual choices to distribute voter

registration applications and then follow through on those choices. Ex. 10 (Miller Dep. 130:22-131:6).

**RESPONSE:  Undisputed.**

264.   For applications, recertifications, and renewals for DSS programs covered by the NVRA, it is up to individual benefits specialists to determine whether to send a voter registration application to a client. Ex. 10 (Miller Dep. 86:18-87:3).

**RESPONSE:  Undisputed.**

265.   DSS benefits specialists do not follow a specific script regarding voter registration when conducting in-person or telephonic interviews with applicants for SNAP or TANF benefits. Ex. 10 (Miller Dep. 56:2-6); Ex. 19B (Gill Resp. to Interrog. No. 9).

**RESPONSE:  Disputed.  This statement contains an incomplete statement as to what actually happens regarding voter registration as DSS benefits specialists go through every question on the application, including the voter registration questions, with an applicant.  Pls. Ex. 10 (Miller Dep. 56:2-57:6); Pls. Ex. 7 (Barker Dep. 50:15-51:6).**

**Disputed.  Plaintiffs Ex. 19B (Gill Resp. to Interrog. No. 9) assumes facts not supported by the evidence – namely that DSS benefits specialist do not follow a specific script regarding voter registration when conducting in-person or telephonic interviews with applicants for SNAP or TANF benefits.**

266.   DSS supervisors have no way to independently verify whether a benefits specialist mailed or caused a voter registration application to be mailed to a client who engaged in a remote transaction. Ex. 10 (Miller Dep. 87:16-88:11).

**RESPONSE:  Undisputed.**

267.   Prior to this lawsuit, some DSS offices, including those in Pine Ridge and Hot Springs, did not use a voter preference form at all. Ex. 7 (Barker Dep. 49:1-18).

**RESPONSE:  Disputed. Assumes facts not supported by the cited evidence – namely that "some" DSS offices did not use a voter preference form at all including those in Pine Ridge and Hot Springs suggesting that there are offices other than Pine Ridge and Hot Spring that did not use the voter preference form.  Pls. Ex. 7 (Barker Dep. 49:1-18).**

**Disputed.  This statement contains an incomplete paraphrase in that it states no voter preference form was used at all as the question posed by Plaintiffs referred only to renewals and recertifications not "all" applications or initial applications.  Pls. Ex. 7 (Barker Dep. 46:18-49:7).**

268.   A DSS customer may report a change of address to DSS in a variety of ways. They may call the office, report the change in writing by postal mail or email, send a text message to their benefits specialist, visit a DSS office in person, report the new address when completing a renewal or six-month report form, or use the change report form available with the DSS online application. Ex. 19B (Gill Resp. to Interrog. No. 3); Ex. 10 (Miller Dep. 78:14-18).

**RESPONSE:  Undisputed.**

269.   If a DSS client calls to report a change of address by telephone, anyone in the DSS office may take that information from the client. Ex. 10 (Miller Dep. 80:20-81:3).

**RESPONSE:  Undisputed.**

270.   SNAP, TANF, and Medical Assistance (children and families) recipients who change their address with DSS are not presented with the voter preference question at any point in the address change process, regardless of whether the request is made in-person or remotely. x. 10 (Miller Dep. 82:1-4). Instead, those recipients are mailed a voter registration application from DSS's central office in Pierre with instructions to complete it and return it either to a county auditor's office or to DSS. The mailing does not indicate whether the individual may seek or obtain help from DSS in completing the voter registration application. Ex. 19B (Gill Resp. to Interrog. No. 3); Ex. 10 (Miller Dep. 81:10-22).

**RESPONSE:  Dispute the first sentence in this statement to the extent Plaintiffs' characterization of the testimony differs from its actual content in that it states no voter preference question is presented at "any point in the address change process", regardless of whether the request is made in person or remotely as the question posed by Plaintiffs referred only to change of address requests made by the "telephone change of address process" and not those made in person.  Pls. Ex. 10 (Miller Dep. 80:20-82:4).**

**Dispute the second sentence in this statement as it misrepresents the information provided in Gill Resp. to Interrog. No. 3.  Plaintiffs' state that the mailing referenced in Gill Resp. to Interrog. No. 3 "does not indicate whether the individual may seek or obtain help from DSS in completing the voter registration application."  The mailing specifically**

directs "[i]f you would like additional information and instruction on how to complete the voter registration process, please call 1-877-999-5612." The phone number provided is the DSS SNAP hotline. https://dss.sd.gov/contactus/.

271.   Similarly, if DSS receives returned mail with a forwarding address from USPS for a SNAP, TANF, or Medical Assistance recipient, DSS will change the recipient's address in the agency's system and automatically send the same form letter from DSS's central office in Pierre with a voter registration application to the recipient. Ex. 10 (Miller Dep. 84:18-85:6).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization of the testimony differs from its actual content, which speaks for itself.  Pls. Ex. 10 (Miller Dep. 84:18-85:6).**

272.   In contrast, when Long Term Care Medical Assistance, LIEAP, and Child Care Assistance beneficiaries report a change of address to DSS by telephone, a DSS benefits specialist is supposed to pose the voter preference question to the beneficiary and mail a voter registration application to any beneficiary who answers "yes" to the voter preference question. In providing these services, DSS policy manuals and DSS trainings instruct benefits specialists to pose the voter preference question. Policy manuals and trainings, however, do not provide any type of script. Ex. 10 (Miller Dep. 82:4-83:14); Ex. 19B (Gill Resp. to Interrog. No. 3).

**RESPONSE:  Undisputed.**

273.   DSS has not instructed DSS staff to ask the voter preference question to clients who call to report a change of address by telephone. Ex. 10 (Miller Dep. 81:7-9).

**RESPONSE:  Disputed.  This statement contains an incomplete paraphrase in that it indicates DSS has not instructed DSS staff to ask the voter preference question to clients who call to report a change of address by telephone, however, that statement only applies to SNAP, TANF, and Medical Assistance and not to LIEAP, and Child Care Assistance clients. Pls. Ex. 10 (Miller Dep. 81:7-9, 82:4-83:14).**

274.   Multiple local DSS offices do not pose the voter preference question to individuals who call the office to report a change of address, including the Hot Springs, Pine Ridge, and Rapid City offices. Ex. 7 (Barker Dep. 56:2-57:5); Ex. 6 (Nardi Dep. 58:12-20).

**RESPONSE:  This statement contains an incomplete paraphrase in that it states "[m]ultiple" local DSS offices do not pose the voter preference question to individuals who call the office to report a change**

of address "including" Hot Springs, Pine Ridge, and Rapid City offices suggesting that there are additional local DSS offices other than       Hot Springs, Pine Ridge, and Rapid City.  Pls. Ex. 7 (Barker Dep. 56:2-57:5); Pls. Ex. 6 (Nardi Dep. 58:12-20).

275.   DSS does not record or track data regarding the number of change of address requests made by the agency's clients. Ex. 19B (Gill Resp. to Request for Production No. 1).

**RESPONSE:  Undisputed.**

276.   For individuals who do not have a USPS address, DSS asserts that the agency's standard operating procedure is for staff to instruct clients to provide a description of their location of residence on forms, including voter registration applications. Ex. 10 (Miller Dep.63:18-65:4). Local DSS offices, however, are unaware of this policy or of any protocol to follow for clients who do not have a USPS address. Ex. 7 (Barker Dep. 46:9-13).

**RESPONSE:  The first sentence is undisputed.**

**The second sentence is disputed to the extent the testimony does not reflect all local DSS offices are unaware of the standard operating procedure for applicants to provide a description for their location of residence on forms only that Ms. Barker is unaware.  Ex. 7 (Barker Dep. 46:9-13).**

277.   For Medical Assistance programs administered by DSS, the agency follows an administrative renewal process when it has sufficient information to determine a client's continued eligibility. In such cases, DSS sends a renewal confirmation without seeking additional information from the client. Ex. 10 (Miller Dep. 72:18-73:16); Ex. 19B (Gill Resp. to Interrog. No. 1).

**RESPONSE:  Undisputed, but immaterial.**

278.   When an administrative renewal is completed, DSS does not require a client to complete a renewal application form. Ex. 10 (Miller Dep. 73:7-16).

**RESPONSE:  Undisputed, but immaterial.**

279.   DSS considers an administrative renewal a renewal of Medical Assistance benefits. Ex. 10 (Miller Dep. 74:2-4).

**RESPONSE:  Undisputed, but immaterial.**

280.   It is DSS policy that renewals of benefits are covered transactions under the NVRA. Ex. 10 (Miller Dep. 74:5-8).

**RESPONSE:  Undisputed, but immaterial.**

281.  DSS does not provide voter registration services in connection with administrative renewals of Medical Assistance. Ex. 10 (Miller Dep. 73:20-74:1).

**RESPONSE:  Undisputed, but immaterial.**

282.   DSS requires some SNAP and TANF recipients to complete a six-month report form to determine whether any changes in the previous six months have affected a recipient's eligibility for benefits. Ex. 10 (Miller Dep. 75:17-76:10).

**RESPONSE:**

283.  For those SNAP and TANF recipients whom DSS requires to complete a six-month report form, completion of that form is required to maintain eligibility for benefits. Ex. 10 (Miller Dep. 76:15-18).

**RESPONSE:  Undisputed.**

284.  Based on information provided by a SNAP or TANF recipient in a six-month report form, the recipient's eligibility could be revoked. Ex. 10 (Miller Dep. 76:11-14).

**RESPONSE:  Undisputed.**

285.  Because the six-month report form is not a full redetermination of benefits, DSS does not consider it a recertification or renewal of benefits. Ex. 10 (Miller Dep. 76:19-78:5).

**RESPONSE:  Undisputed, but immaterial.**

286.  DSS does not provide voter registration services as part of the six-month report process for SNAP and TANF recipients required to complete the six-month report form. Ex. 10 (Miller Dep. 78:6-8).

**RESPONSE:  Undisputed, subject to clarification.  The six-month report is not a recertification or renewal because the household is certified for 12 months, and the six-month report is to make sure the income limits have not been exceeded or other resources have been acquired that may make them ineligible and so the six-month report is not a full redetermination and is just asking the recipient to report if anything has changed.  Pls.  Ex. 10 (Miller Dep. 75:19-78:5).**

287.  Prior to July 2020, DSS considered the following programs that it administers to be subject to the NVRA: SNAP; TANF; Medical Assistance programs (including a variety of Medicaid programs, long-term care programs,

CHIP, the disabled children program, and the Medicare Savings program). Ex. 10 (Miller Dep. 20:4-21:1, 21:416-22).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization of the cited testimony differs from its content, which speaks for itself.**

288.   Prior to July 2020, DSS did not consider LIEAP and Child Care Assistance to be public assistance programs subject to the NVRA and did not offer voter registration services to clients of those programs. Ex. 10 (Miller Dep. 22:18-23:6, 202:18-203:9). DSS began treating LIEAP and Child Care Assistance as public assistance programs covered under the NVRA in July 2020. Ex. 10 (Miller Dep. 206:2-5).

**RESPONSE:  Disputed to the extent that Ms. Miller testified "[a]s far as I know" DSS did not offer voter services to LIEAP and Child Care assistance prior to July 2020.  Ex. 10 (Miller Dep. 202:18-203:9).**

**Dispute that LIEAP is a program that is required to provide voter registration services under the NVRA.  Further Plaintiffs raised nothing in their complaint regarding Child Care Assistance programs.**

289.   After beginning to offer voter registration services with the LIEAP and Child Care Assistance programs in 2020, DSS did not contact or take other action to serve clients of those programs who should have received voter registration services in the past but had not. Ex. 10 (Miller Dep. 27:6-10).

**RESPONSE:   Dispute that LIEAP is program that is required to provide voter registration services under the NVRA.  Further Plaintiffs raised nothing in their complaint regarding Child Care Assistance programs.**

290.   DSS updated the online application for the Child Care Assistance program on October 30, 2020 to include the voter preference questions; before that date, DSS did not provide voter registration services to online applicants for that program. Ex. 10 (Miller Dep. 69:5-70:2).

**RESPONSE:  Undisputed, but immaterial.  Plaintiffs raised nothing in their complaint regarding Child Care Assistance programs.**

291.   In the Rapid City, Pine Ridge, and Hot Springs DSS offices, the Benefits Specialists and supervisors do not affirmatively offer clients assistance in completing voter registration applications, and instead wait for a client to request help before providing assistance. Ex. 6 (Nardi Dep. 27:16-28:12, 29:2-11, 35:15-22); Ex. 7 (Barker Dep. 26:15-27:14).

**RESPONSE:  Disputed.  DSS provides each applicant the same degree of assistance in completing the voter registration applications as is**

**provided in completing their own forms.  Pls.  Ex. 10 (Miller Dep. 34:8-36:16).   DSS affirmatively informs an applicant that DSS will help them fill it out and will review the voter registration application if the applicant needs help.  Pls. Ex. 10 (Miller Dep. 58:19-59:18); Pls. Ex. 7 (Barker Dep. 26:5-14).**

292.   The DSS offices in Pine Ridge and Hot Springs do not routinely assist clients who engage in remote applications via mail ensure their voter registration is complete before mailing it to the county auditor. Ex. 7 (Barker Dep. 24:20-26:21; 28:15-29:6; 44:22-45:9; 45:18-46:3;

62:1-15).

**RESPONSE:  Disputed as vague as to the meaning of "routinely."**

**Disputed.  If a voter registration form is mailed to a DSS office that is incomplete, DSS will reach out to the applicant.  Pls. Ex. 10 (Miller Dep. 59:19-60:19).   Mailed in forms often come in incomplete and DSS will reach out the applicant, but most of the time the applicant is hard to reach.  Pls. Ex. 7 (Barker Dep. 24:16-25:15).**

**When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  If a voter registration form comes back missing a signature, DSS will reach out to the applicant to get them to return to the office or advise the applicant that they can mail it back to the applicant for it to be signed.  Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).  If the customer cannot be reached in a timely manner, the voter registration from will be mailed to the county auditor.   Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).**

**If there was a mistake on a voter registration, Ms. Barker testified that she would try to call an applicant but could not speak for what the workers themselves were doing.   Pls. Ex. 7 (Barker Dep. 24:16-26:4).**

293.   Prior to April 2021, DSS did not provide formal guidance to benefits specialists regarding whether and when to contact customers with unsigned or incomplete voter registration applications. Ex. 10 (Miller Dep. 63:8-11). DSS added the instruction to benefits specialists to reach out to customers with incomplete or unsigned applications in its April 2021 training. Ex. 10 (Miller Dep. 61:5-63:7).

**RESPONSE:  Dispute the first sentence.  Before April 2021, if a voter registration was not completed DSS directed staff to reach out to the applicant to try and get the application completed.  Pls. Ex. 10 (Miller Dep. 62:7-22).  Before April 2021, if a form was not complete benefits**

**specialists would reach out and try to get the form completed.  Pls. Ex. 10 (Miller Dep. 62:19-22).**

294.   Prior to April 2021, whether a DSS staff member reached out to a customer with an unsigned or incomplete voter registration form could have varied by staff person and office. Ex. 10 (Miller Dep. 63:12-17).

**RESPONSE:  Dispute.  "[C]ould have" is speculative.  Further, whether it did in fact vary by office is neither asserted nor supported by this statement.**

295.   Local DSS offices routinely transmit incomplete or incorrectly completed voter registration applications to county auditor offices. Ex. 14 (Bertolotto Dep. 32:9-33:2; Ex. 7 (Barker Dep. 25:3-26:4, 28:22-29:6, 83:22-84:7); Ex. 15 (Naylor Dep. 23:22-24:6; Ex. 16 (DeSersa Dep. 56:7-9; 69:11-14; 69:22-70:5); Ex. 10 (Miller Dep. 60:12-16, 94:10-19); Ex. 6 (Nardi Dep. 47:15-48:13, 48:19-22).

**RESPONSE:  Disputed as vague as to the meaning of "routinely."**

**Disputed.  The local DSS offices that Auditor Bertolotto deals with are better at making sure the forms are filled out correctly.  Pls. Ex. 14 (Bertolotto Dep. 31:17-32:3).  Since 2018 to the date of Bertolloto's deposition was taken on September 29, 2021, she believes there were 32 voter registration applications that were incomplete in some way.  Pls. Ex. 14 (Bertolotto Dep. 13:15-15-12).**

**Mailed in forms often come in incomplete to DSS and DSS will reach out the applicant, but most of the time the applicant is hard to reach. Pls. Ex. 7 (Barker Dep. 24:16-25:15).   When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  If a voter registration form comes back missing a signature, DSS will reach out to the applicant to get them to return to the office or advise the applicant that they can mail it back to the applicant for it to be signed.  Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).  If the customer cannot be reached in a timely manner, the voter registration from will be mailed to the county auditor.   Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).**

**A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

296.  For example, approximately 25 to 50 percent of all voter registration forms transmitted by the Pine Ridge and Hot Springs DSS offices are incomplete or inaccurate when they are mailed to the county auditors' offices. Ex. 7 (Barker Dep. 83:22-84:7).

**RESPONSE:  Disputed as a mischaracterization of the testimony. Defendants respectfully refer the Court to the cited transcript for a correct account of this testimony.  Specifically, the testimony does not reference DSS or whether the applications were mailed to the county auditors' office.  Pls. Ex. 7 (Barker Dep. 83:22-84:7).**

297.   The Corson County auditor's office has also experienced ongoing issues with DSS's local offices transmitting voter registration applications that were not filled out correctly. Ex. 14 (Bertolotto Dep. 31:17-32:5). Within the last decade, the majority of voter registration applications transmitted to the Corson County auditor's office by the local DSS offices were incomplete or filled out incorrectly. Ex. 14 (Bertolotto Dep. 17:13-19:7, 32:9-33:2). Although the number of incomplete or incorrectly completed applications received by the Corson County auditor's office from local DSS offices has declined over time, the auditor's office continues to receive such applications. Ex. 14 (Bertolotto Dep. 32:9-20).

**RESPONSE:  Disputed.  Since 2018 to the date of Bertolloto's deposition was taken on September 29, 2021, she believes there were 32 voter registration applications that were incomplete in some way.  Pls. Ex. 14 (Bertolotto Dep. 13:15-15-12).**

298.   Sometimes voter registration applications transmitted to the Hughes County auditor's office by DSS are incomplete or not date-stamped. Ex. 15 (Naylor Dep. 23:22-24:6).

**RESPONSE:  Undsiputed.**

299.   The voter registration applications from the DSS office in Mission in Todd County "aren't always filled out." Ex. 16 (DeSersa Dep. 22:19-21). Approximately sixty percent of the time, voter registration applications from the Mission DSS office are missing one or more of the essential pieces of information and cannot be processed. Ex. 16 (DeSersa Dep. 23:6-16; 58:2-21).

**RESPONSE:  Undisputed subject to clarification.  Mailed in forms often come in incomplete to DSS and DSS will reach out the applicant, but most of the time the applicant is hard to reach.  Pls. Ex. 7 (Barker Dep. 24:16-25:15).   When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  If a voter registration form comes back missing a signature, DSS will reach out to the applicant to get them to return to the**

office or advise the applicant that they can mail it back to the applicant for it to be signed.  Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).  If the customer cannot be reached in a timely manner, the voter registration from will be mailed to the county auditor.   Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).

A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).

300.   The Todd County Auditor attributes the incomplete voter registration forms to lack of assistance to DSS clients. Ex. 16 (DeSersa Dep. 56:7-9; 69:11-14; 69:22-70:5). The Todd County Auditor has, to no avail, attempted to resolve the problems with the Mission DSS office. Ex. 16 (DeSersa Dep. 60:3-61:5).

RESPONSE:  Dispute the first sentence as it is speculation, not a material fact and the testimony indicated the witness was guessing the incomplete voter registration forms was because of a lack of assistance to DSS clients.  Pls. Ex. 16 (DeSersa Dep. 56:7-9; 69:11-14; 69:22-70:5).

Dispute the second sentence as mischaracterization of DeSersa's statement in that there was no testimony regarding specifically the Mission DSS office.  Pls. Ex. 16 (DeSersa Dep. 60:3-61:5).  Ms. DeSersa is the auditor for Tripp and Todd County.

301.   When voter registration forms cannot be processed, the Todd County Auditor attempts to reach the voter by mail and phone to obtain a full and accurate application. Ex. 16 (DeSersa Dep. 24:9-25:6). These subsequent attempts are successful only about twenty-five to forty percent of the time. Ex. 16 (DeSersa Dep. 25:7-10; 85:16-21). "If it's incomplete, unfortunately, the voter is unable to vote." Ex. 16 (DeSersa Dep. 78:16-17).

RESPONSE:  The first sentence is undisputed.

Dispute the second sentence as it is speculation, not a material fact. Pls. Ex. 16 (DeSersa Dep. 25:7-10; 85:16-21).

Dispute the third sentence as a mischaracterization of testimony. Ms. DeSersa  was asked if a voter's registration is sent to the wrong county and if in Todd and Tripp County do voters show up to vote and find out they are not registered.  Pls. Ex. 16 (DeSersa Dep. 77:12-78-19). There is no reference in the questioning or testimony if the voter

**registration was incomplete due to the voter, DSS, some other agency. Pls. Ex. 16 (DeSersa Dep. 77:12-78-19).**

302.   In Todd County, Native American residents typically register to vote through DSS. Ex. 16 (DeSersa Dep. 128:3-6).

**RESPONSE:  Disputed.  Voters do not disclose their ethnicity on the voter registration, so it is speculation on whether the voter is Native American or some other ethnicity.**

303.   Most incomplete applications received by the Todd County Auditor from DSS are from Native Americans. Ex. 16 (DeSersa Dep. 67:1-16).

**RESPONSE:  Disputed. Voters do not disclose their ethnicity on the voter registration, so it is speculation on whether the voter is Native American or some other ethnicity.**

**Furthermore, the majority of incomplete voter registration applications received by the Todd County Auditor are incomplete because of mistakes made by the applicant registering to vote in completing the application such as putting the wrong social security number down and it is being kicked back because it does not match the applicants name.  Ex. 16 (DeSersa Dep. 65:22-67:10).**

304.   One reason why so many voter registration applications transmitted by DSS offices to county auditor offices are incomplete or incorrectly completed is the DSS offices' practice of submitting mailed-in voter registration applications immediately and in the form received from the applicant, with or without an effort to contact the voter to correct any mistakes. Ex. 7 (Barker Dep. 24:20-26:4, 28:15-29:6, 44:22-45:9, 45:18-46:3, 62:3-63:9, 83:22-84:7); Ex. 6 (Nardi Dep. 47:15-48:13, 48:16-22).

**RESPONSE:  Disputed.  Mailed in forms often come in incomplete to DSS and DSS will reach out the applicant, but most of the time the applicant is hard to reach.  Pls. Ex. 7 (Barker Dep. 24:16-25:15).   When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  If a voter registration form comes back missing a signature, DSS will reach out to the applicant to get them to return to the office or advise the applicant that they can mail it back to the applicant for it to be signed. Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).  If the customer cannot be reached in a timely manner, the voter registration from will be mailed to the county auditor.   Pls. Ex. 10 (Miller Dep. 59:19-61:19, 94:4-19).**

**A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later**

**than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

**Disputed as a mischaracterization of the testimony cited in Pls. Ex. 7 (Barker Dep.  83:22-84:7).  Defendants respectfully refer the Court to the cited transcript for a correct account of this testimony.  Specifically, the testimony does not reference whether the voter registration applications were transmitted by DSS or why the voter registrations applications were filled out incorrectly or not completely. Pls. Ex. 7 (Barker Dep. 83:22-84:7).  Attempts are made to reach the applicant but often it's hard to reach them.  Pls. Ex. 7 (Barker Dep. 25:9-15); Pls Ex. 6 (Nardi Dep. 47:15-48:13).**

305.   The Hot Springs and Pine Ridge DSS offices submit mailed-in voter registration applications to the county auditor immediately in the form they were received. Ex. 7 (Barker Dep. 24:20-25:21, 44:22-45:9, 45:18-46:3).

**RESPONSE:  Disputed.  Mailed in forms often come in incomplete to DSS and DSS will reach out the applicant, but most of the time the applicant is hard to reach.  Pls. Ex. 7 (Barker Dep. 24:16-25:15).   When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  A completed voter registration application accepted at a voter registration agency shall be transmitted to DSS not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

**A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).  Attempts are made to reach the applicant but often it's hard to reach them.  Pls. Ex. 7 (Barker Dep. 25:9-15); Pls Ex. 6 (Nardi Dep. 47:15-48:13).**

306.   For mailed-in voter registration applications, Hot Springs and Pine Ridge DSS employees sometimes, but do not always, contact individuals whose voter registration applications were incomplete. Ex. 7 (Barker Dep. 25:3-26:4).

**RESPONSE:  Disputed as a mischaracterization of Barker's statements.  Defendants respectfully refer the Court to the transcript of the cited statements in Plaintiffs' Exhibit 7 (Barker Dep. 25:3-26:4).  When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  Ms. Barker testified that if it was her, she would attempt to call the applicant, but she could not speak for other employees.  Pls. Ex. 7 (Barker Dep. 25:9-26:4).   Attempts are made to reach the applicant but often it's hard to reach them.  Pls. Ex. 7 (Barker Dep. 25:9-15); Pls Ex. 6 (Nardi Dep. 47:15-48:13).**

307.   A large share of voter registration applications mailed to the Hot Springs and Pine Ridge DSS offices are incomplete or not completed correctly. Ex. 7 (Barker Dep. 28:15-21). A representative of those offices estimates that 25 to 50 percent of voter registration applications are not filled out completely, or are filled out incorrectly. Ex. 7 (Barker Dep. 83:22-84:7).

**RESPONSE: The first sentence is disputed to the extent the characterization conflicts with the cited document, which speaks for itself.  The testimony was that a large share of voter registration applications are not completed correctly not that a large share are incomplete.  Pls. Ex. 7 (Barker Dep. 28:15-21).  Further, it is unknown whether the incorrect voter registrations were because of the voter entering the required information, such as their social security number, incorrectly.**

**The second sentence is disputed as a mischaracterization of the testimony cited in Pls. Ex. 7 (Barker Dep.  83:22-84:7).  Defendants respectfully refer the Court to the cited transcript for a correct account of this testimony.  Specifically, the testimony does not reference that the voter registration applications were transmitted by DSS or why the voter registrations applications were filled out incorrectly or not completely.  Pls. Ex. 7 (Barker Dep. 83:22-84:7).**

308.   The Hot Springs and Pine Ridge DSS offices do not typically call individuals with incomplete voter registration applications prior to transmitting those applications to the county auditor. Ex. 7 (Barker Dep. 28:22-29:6).

**RESPONSE:  Disputed.  When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).  Ms. Barker testified that if it was her, she would attempt to call the applicant, but she could not speak for other employees.  Pls. Ex. 7 (Barker Dep. 25:9-26:4).**

**Furthermore, a completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

309.   The Hot Springs and Pine Ridge DSS offices have received complaints from the county auditor's office that voter registration applications transmitted by DSS are not complete. Ex. 7 (Barker Dep. 62:3-16).

**RESPONSE:  Undisputed subject to clarification. A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

310.   Although the Hot Springs and Pine Ridge DSS offices have been asked by the county auditor's office to ensure that voter registration applications are thoroughly completed, the DSS offices have not changed their practice of transmitting completed voter registration applications immediately regardless of completeness. Ex. 7 (Barker Dep. 62:12-63:9).

**RESPONSE:  Disputed.  Mailed in forms often come in incomplete to DSS and DSS will reach out to the applicant, but most of the time the applicant is hard to reach.  Pls. Ex. 7 (Barker Dep. 24:9-15).  DSS reviews the applications and attempts to correct any incomplete or incorrect applications but balances this requirement with submitting the applications in a timely manner to the county auditor. Pls. Ex. 7 (Barker Dep. 24:16-25:15, 62:19-22).   When DSS cannot reach the applicant to get the form corrected, they will submit the voter registration to the auditor.  Pls. Ex. 7 (Barker Dep. 25:9-15).**

**A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

311.   As another example, the Rapid City DSS currently office sends incomplete voter registration applications to the county auditor and then notifies the client by telephone, email, or mail that the application was complete. Ex. 6 (Nardi Dep. 47:15-48:13, 48:19-22). The Rapid City DSS office

does not track how often its employees reach out to clients about incomplete voter registration applications. Ex. 6 (Nardi Dep. 48:16-18).

**RESPONSE:  The first sentence is disputed as a mischaracterization of the testimony regarding notification by email.  Pls. Ex. 6 (Nardi Dep. 47:15-48:13, 48:19-22).**

**The second sentence is undisputed.**

312.   Prior to Plaintiffs' notice letter, DSS only required local offices to transmit voter registration applications to county auditors once weekly. Ex. 10 (Miller Dep. 50:2-21); Ex. 11 (Miller Dep. Ex. 11, Defendants' June 5, 2020 letter, DSS_40114-16).

**RESPONSE:  Undisputed, but immaterial.**

**A completed voter registration application accepted at a voter registration agency shall be transmitted to the county auditor not later than 10 days after acceptance unless it is accepted within 5 days before the last day for registration to vote in an election then it shall be sent to DSS not later than 5 days after the date of acceptance.  52 U.S.C. § 20506(7)(d)(1) and (2).**

313.   DSS does not track data on the voter registration services provided by its offices. DSS has never requested voter registration data collected by SOS through the TotalVote system from SOS, nor has SOS ever shared that information with DSS. Accordingly, DSS has no data about its own voter registration performance with which it could evaluate its own performance and NVRA compliance. Ex. 1 (Warne Dep. 73:16-76:15); Ex. 19B (Gill Resp. to Req. for Prod. No. 2).

**RESPONSE: The first two sentences are undisputed, but immaterial.**

**The third sentence is disputed as it contains characterizations and conclusions, not material assertions, and is not a proper assertion of fact.**

314.   DSS does not record or track whether covered transactions are conducted in person or by telephone. Ex. 19B (Gill Resps. to Req. for Prod. Nos. 1, 12).

**RESPONSE:  Undisputed, but immaterial.**

315.   DSS supervisors are responsible for reviewing cases to ensure that a benefits specialist followed the correct voter registration procedures during covered transactions. Ex. 10 (Miller Dep. 41:4-21).

**RESPONSE:  Undisputed, but immaterial.**

316.   DSS's requirement that supervisors train their existing staff on voter registration requirements was not an express agency policy until DSS's July 29, 2020, supervisor training on voter registration issues and NVRA compliance. Ex. 10 (Miller Dep. 42:11-43:4).

**RESPONSE:  Disputed as vague as to the meaning of "express." DSS requirement that supervisors train their staff on voter registration has always been a part of their responsibility as voter registration has been part of the DSS program for 25 years and the voter registration has always been a part of the application and the supervisors would train a new person on how to complete their duties.  Pls. Ex. 10 (Miller Dep. 41:22-43:4).   On the job training did occur prior to 2020 on the NVRA requirements and began when an employee starts in the position.  Pls. Ex. 6 (Nardi Dep. 21:12-18, 67:9-17); Pls. Ex. 7 (Barker Dep. 74:1-16).**

317.   DSS's requirement that supervisors' case reviews include reviewing benefits specialists' compliance with voter registration requirements was not an express agency policy until the July 29, 2020, supervisor training on voter registration issues and NVRA compliance. Ex. 10 (Miller Dep. 42:11-43:2).

**RESPONSE:  Disputed as vague as to the meaning of "express." DSS requirement that supervisors train their staff on voter registration has always been a part of their responsibility as voter registration has been part of the DSS program for 25 years and the voter registration has always been a part of the application and the supervisors would train a new person on how to complete their duties.  Pls. Ex. 10 (Miller Dep. 41:22-43:4).**

318.   DSS supervisors' responsibilities to ensure compliance with voter registration procedures is not and has not been explicitly stated in supervisors' job descriptions. Ex. 10 (Miller Dep. 43:3-11).

**RESPONSE:  Undisputed, but immaterial.**

319.   DSS's system for transmitting voter registration applications to county auditors depends on hundreds of benefits specialists or clerical workers collecting and delivering those applications in a timely manner. Ex. 10 (Miller Dep. 132:3-9).

**RESPONSE:  Undisputed, but immaterial.**

320.   Data regarding the number of voter registration applications received by DSS and transmitted to SOS or county election officials is not available in any format as DSS does not track this information. Ex. 19B (Gill Resp. to Req. for Prod. No. 2).

**RESPONSE: Disputed. SOS collects information regarding the number of voter registration applications received from DSS and this information is available from SOS. Pls. Ex. 1 (Warne Dep. 75:4-175).**

321. DSS does not track, record, or log forms or records related to the transmittal or delivery of voter registration applications to SOS, DSS, or county auditors. Ex. 19B (Gill Resp. to Req. for Prod. No. 14 & Gill Resp. to Interrog. No. 6).

**RESPONSE: Undisputed, but immaterial.**

322. DSS offices do not use cover sheets when mailing completed voter registration applications to county auditors. Ex. 19B (Gill Resp. to Interrog. No. 6).

**RESPONSE: Undisputed, but immaterial.**

323. The case narrative, adopted in 2021, that a benefits specialist puts into a client's file does not indicate whether the benefits specialist transmitted the client's voter registration application to a county auditor. Ex. 10 (Miller Dep. 93:8-13, 109:1-6).

**RESPONSE: Disputed, assumes facts not supported by the cited evidence – namely the case narrative was adopted in 2021 and that when asked at Ex. 10 (Miller Dep. 109:1-6). The testimony was that the bullet in slide 9 did not instruct the benefits specialists to include anything about transmitting the client's voter registration application to a county auditor. Pls. Ex. 10 (Miller Dep. 107:11-109:5).**

**Furthermore, other deposition testimony indicated that the benefits specialist narrative is supposed to always state if a voter registration application was transmitted and the narrative would state mailed off or sent through the mail however, the verbiage might be a little different from worker to worker, but the last part of the narrative would indicate the benefits specialist mailed the voter registration application to the auditor. Pls. Ex. 6 (Nardi Dep. 62:5-63-13); Pls. Ex. 7 (Barker Dep. 61:6-62-2).**

324. DSS local office supervisors have no way to verify whether a benefits specialist or clerical worker transmitted a completed voter registration application to a county auditor. Ex10 (Miller Dep. 131:20-132:2; 132:10-14); Ex. 6 (Nardi Dep. 62:5-12); Ex. 7 (Barker Dep. 59:9- 12, 61:6-10).

**RESPONSE: Disputed, assumes facts not supported by the cited evidence – namely the testimony indicated that the benefits specialist narrative is supposed to always state if a voter registration application**

**was transmitted and the narrative would state mailed off or sent through the mail however, the verbiage might be a little different from worker to worker but the last part of the narrative would indicate the benefits specialist mailed the voter registration application.  Pls. Ex. 6 (Nardi Dep. 62:5-63-13); Pls. Ex. 7 (Barker Dep. 61:6-62-2).**

325.   DSS staff do not know whether county auditors have received voter registration applications transmitted by a DSS office. Ex. 10 (Miller Dep. 93:14-20).

**RESPONSE:  Undisputed, but immaterial.**

326.   DSS leadership cannot verify whether local DSS offices are following the agency's standard procedure of transmitting voter registration applications to county auditors in a timely manner unless they personally observe the procedures being followed. (Miller Dep. 91:18-92:9).

**RESPONSE:  Undisputed, but immaterial.**

327.   DSS's central office has never conducted on-site observations of voter registration procedures at DSS local offices. Ex. 10 (Miller Dep. 92:14-17).

**RESPONSE:  Undisputed, but immaterial.**

328.   Other than DSS's July 29, 2020, changes to its policies regarding blank voter preference questions and frequency of transmission of voter registration applications to county auditors, DSS is unaware of any other changes to the agency's voter registration procedures since the NVRA went into effect in 1995. Ex. 10 (Miller Dep. 52:19-54:22; 71:9-72:3); Ex. 19B (Gill Resp. to Interrog. No. 1).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization conflicts with the actual content of the cited documents, which speaks for itself.  Namely – the testimony was that Julie Miller could not "recall right now" any other changes.  Pls. Ex. 10 (Miller Dep. 52:19-54:22).**

**Subject to disputed portion, undisputed but immaterial.**

329.   DSS reviews local offices' compliance with DSS policies and procedures through several mechanisms, including quality control reviews by DSS's quality control unit and management evaluations of local offices conducted on a three-year cycle, with each local office undergoing an evaluation once every three years. Ex. 10 (Miller Dep. 120:20-122:13, 122:14-125:17, 218:11-219:5, 225:13-226:22, 227:1-9).

**RESPONSE:  Undisputed, but immaterial.**

330.   Before January 2021, the quality control reviews and management evaluations of local offices did not contain any specific questions related to voter registration. Ex. 10 (Miller Dep. 122:14-125:17, 218:11-219:5, 225:13-226:22).

**RESPONSE:  Undisputed, but immaterial**

331.   Since adding voter registration questions to the local office management evaluations, DSS has not tabulate or summarize the results of the voter registration questions. Ex. 10 (Miller Dep. 232:15-18).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization conflicts with the actual content of the cited documents, which speaks for itself.  Namely – the testimony does not indicate that DSS has not tabulated or summarized any reports only that the witness has not seen them.   Pls. Ex. 10 (Miller Dep. 232:15-18).**

332.   DSS does not specifically factor NVRA compliance into DSS staff performance evaluations. Ex. 10 (Miller Dep. 133:20-22).

**RESPONSE:  Undisputed, but immaterial.**

333.   DSS has never requested or received data on voter registration applications generated at DSS from SOS. Ex. 10 (Miller Dep. 129:8-12).

**RESPONSE:  Undisputed, but immaterial.**

334.   DSS did not analyze or evaluate its compliance with the NVRA in the five years preceding the agency's receipt of Plaintiffs' May 20, 2020 notice letter. Ex. 10 (Miller Dep. 129:21-130:6).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization conflicts with the actual content of the cited documents, which speaks for itself.  Namely – the testimony was that DSS did not "do any analysis to evaluate" its compliance with the NVRA in the five years preceding the Plaintiffs notice letter.**

335.   DSS does not consider data on the agency's provision of voter registration services helpful in assessing its compliance with the NVRA. Ex. 10 (Miller Dep. 132:15-133:3).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization conflicts with the actual content of the cited documents, which speaks for itself.  Namely – the testimony was that Julie Miller was not sure that data would be helpful in assessing NVRA compliance.**

**Subject to disputed portion, undisputed but immaterial.**

336.   DSS bases its assessment that its voter registration services improved between 2020 and 2021 on the fact that it has provided better training and undertaken case reviews to ensure that the training has taken effect. Ex. 10 (Miller Dep. 133:4-16).

**RESPONSE:  Undisputed, but immaterial.**

337.   The number of voter registration applications generated at DSS has declined over the last 20 years. Ex. 10 (Miller Dep. 146:12-16); Ex. 11 (Miller Dep. Ex. 10).

**RESPONSE:  Disputed.  Plaintiffs are referring to chart that they created wherein the witness was asked to assume it was accurate and it is speculative and is not admissible without proper foundation and is not a material fact.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).  Further the testimony was that the chart Plaintiffs created showed a decline.  Pls. Ex. 10 (Miller Dep. 145:14-146:16); Pls. Ex. 11 (Miller Dep. Ex. 10).**

**Furthermore, the chart Plaintiffs created lumps all public assistance agencies into one category and does not separate DSS from all other public assistance agencies.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).**

338.   DSS was not aware of the decline in voter registration applications generated at DSS over the last 20 years before Plaintiffs' May 20, 2020, notice letter. Ex. 10 (Miller Dep. 146:22-6).

**RESPONSE:  Disputed.  Plaintiffs are referring to chart that they created wherein the witness was asked to assume it was accurate and it is speculative and is not admissible without proper foundation and is not a material fact.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).  Further the testimony was that the chart Plaintiffs created showed a decline.  Pls. Ex. 10 (Miller Dep. 145:14-146:16); Pls. Ex. 11 (Miller Dep. Ex. 10).**

**Furthermore, the chart Plaintiffs created lumps all public assistance agencies into one category and does not separate DSS from all other public assistance agencies.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).**

339.   The number of DSS clients has not declined over the last 20 years at a rate similar to the decline in voter registration applications generated at DSS. Ex. 10 (Miller Dep. 147:7-13)

**RESPONSE:  Disputed.  Plaintiffs are referring to chart that they created wherein the witness was asked to assume it was accurate and it is speculative and is not admissible without proper foundation and is not a material fact.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).  Further the testimony was that the chart Plaintiffs created showed a decline.  Pls. Ex. 10 (Miller Dep. 145:14-146:16); Pls. Ex. 11 (Miller Dep. Ex. 10).**

**Furthermore, the chart Plaintiffs created lumps all public assistance agencies into one category and does not separate DSS from all other public assistance agencies.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).**

340.   DSS does not know why the number of voter registration applications from DSS have declined over the last 20 years. Ex. 10 (Miller Dep. 147:13-18).

**RESPONSE:  Disputed.  Plaintiffs are referring to chart that they created wherein the witness was asked to assume it was accurate and it is speculative and is not admissible without proper foundation and is not a material fact.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).  Further the testimony was that the chart Plaintiffs created showed a decline.  Pls. Ex. 10 (Miller Dep. 145:14-146:16); Pls. Ex. 11 (Miller Dep. Ex. 10).**

**Furthermore, the chart Plaintiffs created includes all public assistance agencies into one category and does not separate DSS from all other public assistance agencies.  Pls. Ex. 10 (Miller Dep. 145:14-146:10); Pls. Ex. 11 (Miller Dep. Ex. 10).**

**Neither did Plaintiff refer to any exhibit of the document or attach an exhibit as supporting their statement.**

341.   DSS does not know why voter registration rates by covered transaction vary widely between counties in South Dakota. Ex. 10 (Miller Dep. 154:21-155:7).

**RESPONSE:  Disputed.  Plaintiffs are referring to document that they created wherein the witness was asked to assume it was accurate and it is speculative and is not admissible without proper foundation and is not a material fact.  Pls. Ex. 10 (Miller Dep. 151:6-155:23).  Further the testimony was that the chart Plaintiffs created showed a decline.  Pls. Ex. 10 (Miller Dep. 145:14-146:16); Pls. Ex. 11 (Miller Dep. Ex. 10).**

**Neither did Plaintiff refer to any exhibit of the document or attach an exhibit as supporting their statement.**

342.   DSS has never analyzed geographical or temporal variations in voter registrations. Ex. 10 (Miller Dep. 157:10-15).

**RESPONSE: Disputed.  Plaintiffs are referring to document that they created wherein the witness was asked to assume it was accurate and it is speculative and is not admissible without proper foundation and is not a material fact.  Pls. Ex. 10 (Miller Dep. 151:6-155:22).**

**Neither did Plaintiff refer to any exhibit of the document or attach an exhibit as supporting their statement.  Further Julie Miller testified "not to my knowledge" was an analysis conducted like this before.  Pls. Ex. 10 (Miller Dep. 157:10-15).**

343.   DSS considers SOS's role in DSS's provision of voter registration services and NVRA compliance to be limited to providing the agency forms to use and providing ad hoc guidance when specific problems arise regarding specific offices or forms. Ex. 10 (Miller Dep. 157:16-19).

**RESPONSE:  Undisputed, but immaterial.**

344.   Prior to July 2020, DSS never provided training on voter registration procedures and NVRA compliance to any of the agency's employees. Ex. 10 (Miller Dep. 99:7-15, 103:9- 15); Ex. 19B (Gill Resp. to Interrog. No. 5); Ex. 6 (Nardi Dep. 21:22-11). Nor had DSS ever provided written guidance or instruction to local office supervisors on how to train their employees on voter registration and the NVRA. Ex. 10 (Miller Dep. 104:9-105:4).

**RESPONSE:  The first sentence is disputed.  Prior to July 2020, on the job training was provided on the NVRA.  Pls. Ex. 10 (Miller Dep. 104:9-20). On the job training did occur prior to 2020 on the NVRA requirements and began when an employee starts in the position.  Pls. Ex. 6 (Nardi Dep. 21:12-18, 67:9-17); Pls. Ex. 7 (Barker Dep. 74:1-16).**

**The second sentence is undisputed.**

345.   On July 29, 2020, for the first time since the NVRA took effect in 1995, DSS conducted an initial training on voter registration services and NVRA compliance with the agency's Economic Assistance Regional Managers and Supervisors. Ex. 19B (Gill Resp. to Interrog. No. 5).

**RESPONSE:  Disputed to the extent Plaintiffs' characterization conflicts with actual content of the cited document, which speaks for itself.  Namely Interrogatory No. 5 asked to list all dates since "January 1, 2018", when training was provided.  Pls. Ex. 19B (Gill Resp. to Interrog. No. 5).   On the job training did occur prior to 2020 on the NVRA**

**requirements and began when an employee starts in the position.  Pls. Ex. 6 (Nardi Dep. 21:12-18, 67:9-17); Pls. Ex. 7 (Barker Dep. 74:1-16).**

**Pls. Ex. 10 (Miller Dep. 104:9-20); Pls. Ex. 6 (Nardi Dep. 21:12-18, 67:9-17); Pls. Ex. 7 (Barker Dep. 74:1-16).**

346.   The benefits specialist supervisor for DSS's Hot Springs and Pine Ridge offices, a 26-year employee of DSS, first learned about what the NVRA requires in July 2020. Ex. 7 (Barker Dep. 51:7-21).

**RESPONSE:  Disputed.  The statement is vague and ambiguous.  The NVRA has many requirements that DSS is not subject to.  The benefits specialist supervisor for DSS's Hot Springs and Pine Ridge offices describe the programs that were subject to the NVRA prior to July 2020 and the programs that were added to the voter registration requirement after July 2020.   Pls. Ex. 7 (Barker Dep. 18:21-22:3). The benefits specialist trains her subordinates on their voter registration duties.  Pls. Ex. 7 (Barker Dep. 29:10-30:5).  The benefits specialist indicated that they have always had the voter registration question on the SNAP and TANF applications for as far as she could remember.  Pls. Ex. 7 (Barker Dep. 36:7-11).  On the job training did occur prior to 2020 on the NVRA requirements and began when an employee starts in the position.  Pls. Ex. 6 (Nardi Dep. 21:12-18, 67:9-17); Pls. Ex. 7 (Barker Dep. 74:1-16).**

347.   DSS is following a "train the trainer" model in which local DSS office supervisors who receive training on voter registration and NVRA compliance are then responsible for training their own staffs at least once annually. Ex. 10 (Miller Dep. 99:16- 100:18). DSS instructed the supervisors who received the initial training on voter registration services and NVRA compliance on July 29, 2020, to present that same training to their staffs, including Economic Assistant Benefits Specialists, Child Care Assistance Caseworkers, LIEAP workers, and all clerical staff who assist with these programs. Ex. 19B (Gill Resp. to Interrog. No. 5). Local DSS offices did not offer such training to existing staff until after the July 29, 2020, training. Ex. 19B (Gill Resp. to Interrog. No. 5).

**RESPONSE:  The first and second sentence are undisputed.**

**The Third sentence is disputed.   Prior to July 2020, on the job training was provided on the NVRA.  Pls. Ex. 10 (Miller Dep. 104:9-20).**

348.   DSS does not require employment specialists to receive voter registration training. Ex. 10 (Miller Dep. 234:7-17).

**RESPONSE:  Undisputed, but immaterial.  The benefits specialists assist TANF applicants and does the voter registration and the employment**

**specialists just determines what work activities the TANF recipient would be required to do.  Pls. Ex. 10 (Miller Dep. 234:7-17).**

349.   Following Plaintiffs May 20, 2021 Notice Letter, DSS leadership created a PowerPoint presentation on the NVRA for the first time in July 29, 2020, and subsequently revised that presentation on April 15, 2021. Ex. 10 (Miller Dep. 239:13-240:6); Ex. 11 (Miller Dep. Ex. 17).

**RESPONSE:  Disputed to the extent there is nothing in the cited pages that indicate following Plaintiffs May 20, 2021 Notice Letter, DSS leadership created a PowerPoint presentation for the first time on July 29, 2020.**

350.   DSS's voter registration training presentation does not differentiate between in person and telephonic interactions with respect to employees' obligation to provide customers with voter registration applications. Ex. 10 (Miller Dep. 107:2-10, 239:13-240:6); Ex. 11 (Miller Dep. Ex. 17).

**RESPONSE:  Disputed to the extent that cited document is referring to training PowerPoint slides and the statement does not delineate between information contained on the slides and verbal training presented concurrently with the slide presentation.**

351.   DSS's voter registration training does not explain to staff how to send a voter registration form to clients following telephonic transactions. Ex. 10 (Miller Dep. 108:5-9).

**RESPONSE:  Disputed to the extent that cited documents is referring to training PowerPoint slides and the statement does not delineate between information contained on the slides and verbal training presented concurrently with the slide presentation.**

352.   The July 29, 2020, training contains a slide stating, "If requested, you may help an individual complete the voter registration application." The April 15, 2021, training similarly states, "If requested, DSS may help an individual complete the voter registration application." Ex. 10 (Miller Dep. 109:7-110:4); Ex. 11 (Miller Dep. Exs. 2, 17).

**RESPONSE:  Undisputed.**

353.   DSS admits that a DSS employee could reasonably interpret the training language that, "[i]f requested, [you or DSS] may help an individual complete the voter registration application" to mean that the employee must wait for a client to ask for assistance before offering help in completing an application. Ex. 10 (Miller Dep. 111:2-8).

**RESPONSE: Disputed. DSS indicated the statement is incorrect and benefits specialists do not wait for somebody to ask for assistance and in practice it is a conversation that is happening between the customer and the benefit specialists, and they are not trained to say wait until somebody asks for help; they are going to offer help. Pls. Ex. 10 (Miller Dep. 110:1-111-1).**

354.   Although DSS benefits specialists, supervisors, regional managers, clerical staff, and other employees involved in determining benefits eligibility have used a computerized data entry system called Access for many years, DSS's training guide for the Access system did not include any information on voter registration before September 2020. Ex. 10 (Miller Dep. 113:2- 17, 116:12-16); Ex. 11 (Miller Dep. Ex. 5).

**RESPONSE: Undisputed, but immaterial.**

355.   Prior to July 2020, employees in at least some local DSS offices, including those in Hot Springs, Pine Ridge, and Rapid City, were not regularly trained on voter registration issues. Ex. 7 (Barker Dep. 71:4-7, 73:8-22); Ex. 6 (Nardi Dep. 21:12-15; 67:9-17; 71:5-7; 73-7- 12).

**RESPONSE: Disputed. The meaning of "regularly" is vague.**

**Further disputed that statement insinuates that other offices were not trained on voter registration when all cited references refer only to the Hot Spring, Pine Ridge, and Rapid City offices.**

**Further disputed prior to July 2020 DSS employee Barker trained employees on voter registration and employee Nardi received training when she started in her position and new employees would have received training on voter registration issues. Pls. Ex. 7 (Barker Dep. 74:3-13); Pls. Ex. 6 (Nardi Dep. 21:12-2; 67:9-17).**

356.   In the Hot Springs and Pine Ridge DSS offices, employee trainings on voter registration conducted since July 2020 typically last only 10-15 minutes. Ex. 7 (Barker Dep. 70:6-7, 71:8-14, 73:2-11).

**RESPONSE: Undisputed, but immaterial.**

357.   Although DSS admits that employment specialists and DSS local office employees from other divisions may be the first person to interact with an individual seeking to apply for, renew, or recertify benefits, DSS does not train those individuals on the NVRA or voter registration. Ex. 10 (Miller Dep. 237:13-238:6); Ex. 7 (Barker Dep. 39:7-17, 40:17-41:7, 53:5-8).

**RESPONSE: Disputed, but immaterial. It could happen but would be pretty rare that an employment specialists would be the first person**

**seen.  Pls. Ex. 10 (Miller Dep. 237:13-238:6).  DSS trains their receptionists.  Pls. Ex. 7 (Barker Dep. 29:7-15, 69:13-16); Pls. Ex. 6 (Nardi Dep. 70:15-71:1).**

358.   For example, in October 2019, an individual staffing the front desk of the DSS office in Hot Springs told an applicant to visit the county auditor's office for voter registration. Ex. 7 (Barker Dep. 29:7-17); Ex. 25 (Cataldo Dec. ¶ 8(a)). After learning of this incident, DSS did not provide any training regarding voter registration responsibilities to ensure that it did not happen again. Ex. 7 (Barker Dep. 40:17-41:7; 53:5-8). No effort was made to identify the client who should have received voter registration services but did not. Ex. 7 (Barker Dep. 83:1-5).

**RESPONSE:  Disputed on the ground that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.  Further disputed that Ex. 7 (Barker Dep. 29:7-17) does not support the statement.**

**The second sentence is disputed.  There is no cited reference that indicates DSS ever learned of the incident Plaintiffs are referring to.  Further it is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted in the first sentence.**

**The third sentence is disputed.  There is no cited reference that indicates DSS ever identied the client Plaintiffs are referring to.  Further it is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted in the first sentence.**

359.   At least some local DSS offices are unaware of any protocol to follow for clients who do not have a driver's license, nondriver identification card, or social security number, or that ARSD 5:02:03:21 provides that such individuals to complete an affidavit of eligibility to register to vote. Ex. 7 (Barker Dep. 46:14-17; 53:9-16); Ex. 6 (Nardi Dep. 51:19-22).

**RESPONSE:  Disputed to the extent that the statement provide for by ARSD 5:02:03:21 cannot be completed at DSS offices and must be completed at the county auditor's office.  SDCL 12-4-5.4**

360.   DLR receives applications for, determines eligibility for, and provides a widep range of services under the federally funded Workforce Innovation and Opportunity Act, many of which are similar to TANF or SNAP benefits. These services include by way of illustration and not limitation, cash benefits and benefits for tuition, childcare, housing, work attire, and cost of veteran training. Ex. 3 (McEntaffer Dep. 62:1-3, 82:3-83:7, 87:3-21, 97:2-98:12, 106:1-19, 108:1-20, 109:5-20, 110:1-3, 143:6-14, 172:13-173:20, 177:1-9); Ex. 4 (McEntaffer Dep. vol. 2 Ex. 3).

**RESPONSE:  Disputed.  No allegations were raised in the complaint that DLR was not providing voter registration services under the WIOA.**

**Further, the first sentence stating that the range of services provided under the WIOA are similar to TANF or SNAP is disputed.**

**Further, the second sentence is disputed.   The services provided under WIOA are not similar to TANF or SNAP.**

361.   No voter registration assistance is given in connection with the application (including renewals) for, or changes of address made in connection with, DLR's assistance and services under the WIOA. Ex. 3 (McEntaffer Dep. 62:1-7, 82:3-83:11, 87:22-88:5, 104:4-105:5, 170:13-172: 2, 178:1-179:22, 180:3-14).

**RESPONSE:  Disputed.  No allegations were raised in the complaint that DLR was not providing voter registration services under the WIOA.**

362.   Before and since the filing of this lawsuit, including at the time DLR's 30(b)(6) representative was deposed by Plaintiffs, DLR published on its website and admitted that it administered the TANF program with DSS. Ex. 4 (McEntaffer Dep. Ex. 11); Answer to Compl. ¶ 24, ECF No. 25 (admitting to Compl. ¶ 27); Ex. 3 (McEntaffer Dep. 42:9-43:7; 49:5-16). Specifically, until at least September 27, 2021, DLR stated the following on its website:

> The South Dakota Temporary Assistance for Needy Families (TANF) program is a public assistance program for families with serious financial needs. The Department of Labor and Regulation administers this program together with the Department of Social Services. . . .

> If you would like to know more about TANF, you have two easy options. If you live in a non-reservation community, contact your local job service office and ask to visit with a TANF employment specialist. If you live in a community within one of South Dakota's reservations, contact your local Department of Social Services office and ask to talk to a TANF benefits specialist.

(Ex. 8A (DLR, S.D. Website, https://dlr.sd.gov/localoffices/job_search_tools/default.aspx)).

**RESPONSE:  Disputed.  The first sentence cites to the Answer to Plaintiffs' initial Complaint which was subsequently amended and Defendants provided an answer to the amended complaint denying that DLR administered the TANF program with DSS.  ECF 47 ¶¶ 151.**

**Further disputed is that DLR administers the TANF program because while DLR is a drop off location for TANF 201 applications, DLR does not**

**assist in completing TANF 201 applications.  Pls. Ex. 3 (McEntaffer Dep. 44:7-46:13; 47:7-11).  TANF is administered by the South Dakota Department of Social Services ("DSS") and not DLR.  SDCL Chapter 28-7A; Pls. Ex. 10 (Miller Dep. 161:6-12).  Rules are adopted by DSS to implement eligibility qualifications, application procedure, and assistance level for TANF benefits.  SDCL 27-7A-3(1) and SDCL 28-7A-4.  There is nothing in South Dakota Codified Laws that allows DLR to administer the TANF program, and therefore, DLR is not required to provide voter registration services irrespective of what DLR's website says.**

363.   Since the Rule 30(b)(6) deposition of a DLR representative, DSS has dropped the language quoted in paragraph one from that page on its website and denied in its Amended Answer that it "co-administers" TANF with DSS. (Ex. 8A (DLR, S.D. Website, https://dlr.sd.gov/localoffices/job_search_tools/default.aspx).; Answer to Am. Compl. ¶ 71, ECF No. 47). Nevertheless, DLR still states that it partners with DSS to provide TANF benefits and that individuals may inquire about TANF benefits at DLR offices, writing:

> The South Dakota Temporary Assistance for Needy Families (TANF) program is a public assistance program for families with serious financial needs. The Department of Social Services administers this economic assistance program and partners with the Department of Labor and Regulation to provide support to families on their journey to self-sufficiency. . . .If you would like to know more about TANF, contact your Job Service [DLR] office or local DSS office[Exhibit 8A (DLR, S.D. Website, https://dlr.sd.gov/localoffices/job_search_tools/default.aspx]

**RESPONSE:  Disputed.  DLR did not provide an Amended Answer, however, DLR did provide an Answer to Amended Complaint.  Answer to Am. Compl. ECF No. 47.**

**Further disputed that DSS has dropped the language quoted in paragraph one from that page on its website and that it "co-administers" TANF with DSS.  Pls. Ex. 8A (DLR, S.D. Website, https://dlr.sd.gov/localoffices/job_search_tools/default.aspx).**

364.   DLR is, in fact, involved in the administration of TANF benefits in South Dakota. Individuals may complete form DSS-EA-201, titled "Application For Temporary Assistance for Needy Families (TANF)," to initiate the process for receiving TANF benefits, and regularly do so. Ex. 3 (McEntaffer Dep. 16:9-22, 17:1-12, 60:1-14); Ex. 4 (McEntaffer Dep. Ex. 9). Filling out Form DSS-EA-201 initiates the TANF application process. Ex. 4 (McEntaffer Dep. 59:13- 20, 60:1-13). The date an individual completes this form at a DLR office is considered the individual's application date, even though they must complete their

application at DSS. Ex. 10 (Miller Dep. 162:3-22). DLR does not present individuals who complete DSS-EA-201 the voter preference question and does not offer or provide any assistance with voter registration to those individuals. Ex. 3 (McEntaffer Dep. 17:13-20; 58:3-4).

**RESPONSE:  Disputed.  The reference to Pls. Ex 3 (McEntaffer Dep. 16:9-22) is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted**.   Further disputed that DSS has dropped the language quoted in paragraph one from that page on its website and that it "co-administers" TANF with DSS.  Pls. Ex. 8A

**The DSS-EA-201 is very brief and just asks for basic information. Pls. Ex 3 (McEntaffer Dep. 16:21-17-3).  The application for TANF is DSS-EA-301 and is many more pages than the DSS-EA-201.   Pls. Ex 3 (McEntaffer Dep. 59:7-60-10).  If anything, the DSS EA 201 should be called a pre-application because it has no eligibility questions.  Id.**

**You cannot determine whether someone is eligible for TANF just by filling out DSS-EA-201.  Id.  The DSS-EA-201 is a DSS form not a DLR form.  Id.; Pls. Ex 3 (McEntaffer Dep. 59:7-60-10).  Pls. Ex. 4 (McEntaffer Dep. Ex. 9).**

**No one can apply for SNAP or TANF at DLR.  Pls. Ex. 10 (Miller Dep. 160:20-161:16).  The TANF program is administered by DSS and DSS contracts with DLR to provide services to DSS TANF applicants.  Pls. Ex. 10 (Miller Dep. 161:6-12).  In order to receive TANF an applicant must complete DSS-EA-301 and meet with a DSS benefits specialist.  Pls. Ex. 10 (Miller Dep. 162:9-163:22).  DLR provides services regardless of TANF eligibility.  Pls. Ex. 10 (Miller Dep. 163:6-14).**

**The second sentence is disputed.  Filling out Form DSS-EA-201 should be referred to as a pre-application and no eligibility can be determined by completing the DSS-EA-201 form.  Pls. Ex. 4 (McEntaffer Dep. 59:7-60:10).**

**The third sentence is undisputed.**

**The fourth sentence is undisputed.**

365.   Although DLR administers or participates in the administration of various public assistance programs, DLR staff has never received training on the NVRA. Ex. 3 (McEntaffer Dep. 110:4-9, 114:4-21).

**RESPONSE:  Disputed.  This statement contains legal conclusions. DLR does not administer or participate in the administration of various public assistance programs.  Public assistance programs are not defined in**

**the NVRA and DLR does not provide any services with regards to entitlement programs.**

366.   DLR has never considered itself subject to the NVRA or attempted to comply with the NVRA's requirements. Ex. 3 (McEntaffer Dep. 30:9-15, 58:10-59:1).

**RESPONSE:  Undisputed.**

367.   Although SOS created a DLR-specific voter preference form and voter registration form following Plaintiffs' May 20, 2020 notice letter, DLR is not aware of those forms and have not used them. Ex. 3 (McEntaffer Dep. 56:10-22, 57:1-22; 58:1-4); Ex. 4 (McEntaffer Dep. Ex. 8).

**RESPONSE:  Disputed.  DLR was not aware of the DLR-specific voter preference form and voter registration form until after the lawsuit was commenced. Pls. Ex. 3 (McEntaffer Dep. 56:10-22, 57:1-22; 58:1-4).**

368.   DLR has never considered itself subject to the NVRA or attempted to comply with the NVRA's requirements. Ex. 3 (McEntaffer Dep. 30:9-15, 58:10-59:1).

**RESPONSE:  Undisputed**

369.   SOS updated voter preference forms, driver's license voter registration forms, TotalVote manual, and Driver License Examiners Training PowerPoint following Plaintiffs' May 20, 2020 notice letter to Defendants. Ex. 19A (Barnett Resp. to Interrog. No. 8).

**RESPONSE: Undisputed.**

370.   Defendants have made no effort to identify clients who were improperly denied the opportunity to register to vote, or those whose voter registration applications were not correctly processed, after making voluntary changes beginning in July 2020. Ex. 12 (Schrank Dep. 172:14-173:1); Ex. 7 (Barker Dep. 83:1-10).

**RESPONSE:  Disputed.  Assumes facts not supported by the cited evidence.  Further, DPS is not aware of any client who did not receive voter registration services.  Pls. Ex. 12 (Schrank Dep. 172:14-173:1).**

371.   Applicants with conviction histories are eligible to vote in South Dakota upon completion of their sentences, including probation, parole, and restitution. S.D. Codified Laws § 12-4-18.

**RESPONSE:  Undisputed.**

372.   Plaintiffs' investigation revealed a DSS client in Rapid City who incorrectly believed he could not vote due to a felony conviction. He was under the impression he could not register to vote despite having completed his sentence. No one at the office informed him that this was the case and he remained unregistered. In addition, at the Martin DSS office, the investigators interviewed a DSS client who had completed her sentence and was eligible to vote when she applied for SNAP, TANF, and Medicaid. The DSS case worker who assisted this client with her application skipped the voter preference question when reviewing the benefits application form because this client had once been convicted of a felony, even though she was now eligible to vote under South Dakota law. Ex. 25 (Cataldo Decl. ¶ 8(e)-(f)).

**RESPONSE:  Disputed on the ground that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.**

373.   Investigation revealed a DSS client who incorrectly believed he could not vote due to a felony conviction. He was under the impression he could not register to vote despite having completed his sentence. No one at the office informed him that this was the case and he remained unregistered. In addition, at the Martin DSS office, a DSS client who had completed her sentence and was eligible to vote when she applied for SNAP, TANF, and Medicaid. The DSS case worker who assisted this client with her application skipped the voter preference question when reviewing the benefits application form because this client had once been convicted of a felony, even though she was now eligible to vote under South Dakota law. Ex. 25 (Cataldo Decl. ¶ 8(e)-(f).

**RESPONSE:  Disputed on the ground that this statement is based on, or constitutes, hearsay inadmissible for the truth of the matter asserted.**

Dated this 16th day of March 2022.

Respectfully submitted,

_/s/ Clifton E. Katz_
Clifton E. Katz
Assistant Attorney General
Office of the Attorney General
1302 East Highway 14, Suite 1
Pierre, South Dakota 57501-8501
Telephone: (605) 773-3215
Email: Clifton.Katz@state.sd.us

/s/ Grant Flynn_____
Grant Flynn
Special Assistant Attorney General
Bachand & Hruska, P.C.
206 W. Missouri Ave.
PO Box 1174
Pierre, SD 57501
Telephone:  (605) 224-0461
E-mail: gflynn@pirlaw.com

*Attorneys for Defendants*


CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of March, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western Division by using the CM/ECF system. Participants in this case who are registered CM/ECF users will be served by the CM/ECF system.


/s/ Clifton E. Katz_____
Clifton E. Katz
Assistant Attorney General